UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2004 FEB 23  P 12: 41

ANN M. CODY,
  PLAINTIFF,

vs.

THE CITY OF HARTFORD, ET AL.,
  DEFENDANTS.

CIVIL ACTION NO.
3:02CV1789

February 20, 2004

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S
## MOTION TO COMPEL DEFENDANT'S DEPOSITION AND FOR SANCTIONS

  Pursuant to Federal Rules of Civil Procedure 37(a)(2) and (4) and Local Civil Rules 16(g) and 37(a)(4) of the United States District Court for the District of Connecticut, the plaintiff Ann M. Cody hereby respectfully moves this court to compel the continued deposition of defendant Mark Rudewicz and/or his counsel for unilaterally ending Mr. Rudewicz's January 23, 2004, deposition without substantial justification.

  As discussed more fully in the accompanying memorandum of law, Mr. Rudewicz's counsel improperly and unilaterally ended Mr. Rudewicz deposition by repeatedly interfering with the questioning by Plaintiff's counsel and repeatedly coaching the deponent on how to respond. The Plaintiff has submitted affidavits, attached Exhibits A and B to the accompanying memorandum, declaring that she first tried in good faith to resolve this dispute.

### I. PROCEDURAL AND FACTUAL BACKGROUND

During a deposition conducted on January 23, 2004, defendant, Mark Rudewicz and defendant's counsel, Jill Hartley., effectively obstructed the gathering of evidence by plaintiff's counsel, Jim Brewer. During the deposition, Attorney Brewer questioned the defendant as to facts relevant to the instant case, specifically, Attorney Brewer asked Rudewicz about any other pending litigation. During the deposition, Attorney Hartley improperly and repeatedly instructed defendant not to answer questions relevant regarding any other litigation he is involved in, specifically, litigation involving violations of other Hartford Police officers civil rights. Such questioning is imperative to the discovery process, in that the plaintiff is entitled to evidence regarding any prior complaints, lawsuits or misconduct on the part of a defendant. This is especially important to the claims against the City of Hartford who is the employer of Mark Rudewicz.

Attorney Hartley further improperly and repeatedly instructed defendant not to reveal whether his attorneys in his other pending lawsuits had knowledge of the deposition. Since defendant was represented by counsel at the deposition, and the information sought is relevant and not subject to privilege, defendant's counsel effectively obstructed plaintiff's fact gathering.

### II. LEGAL STANDARD

#### A. Motion to Compel

Federal Rule of Civil Procedure 37(a)(2)(B) provides that "[I]f a deponent fails to answer a question propounded . . . under Rule 30 [concerning oral depositions] . . . the discovering party may move for an order compelling an answer." Fed. R. Civ. P. 37(a)(2)(B). In addition to ordering a deponent to answer questions, a court may impose sanctions on the deponent when they were not substantially justified in resisting discovery. Fed. R. Civ. P. 37(a)(4)(A). A party acts with substantial justification when reasonable people could genuinely disagree about whether he or she is required to do so. See Pierce v. Underwood, 487 U.S. 552, 565 (1988). While the Rule explictly provides for "reasonable expenses incurred in making the motion, including attorney's fees," Fed. R. Civ. P. 37(a)(4)(A), these sanctions are not exclusive. 8A Wright, Miller & Marcus, Federal Practice & Procedure: Civil 2d § 2284 at 612 (1994 & Supp. 2002); see also

Local Civil Rule 37(a)(4) (stating that sanctions are appropriate for party's unwarranted opposition to discovery). Both the decision to compel discovery and the decision regarding what sanctions to impose are within the court's discretion. See, e.g., Diapulse Corp. of Am. V. Curtis Pub. Co., 374 F.2d 442, 447 (2d. Cir. 1967).

### B. Sanctions Against Counsel

Local Civil Rule 16(g) of the Unites States District Court for the District of Connecticut provides that it is counsel's duty "to promote the just, speedy and inexpensive determination of every action. The Court may impose sanctions directly against counsel who disobey an order of the Court or intentionally obstruct the effective and efficient administration of justice." D. Conn. L. Civ. R. 16(g). A finding of bad faith, however, is not necessary. In re: Sanctions for Failure to Comply with a Court Order, 58 B. R. 560, 568 (D. Conn. 1985) (Cabranes, J.) (discussing Local Rule 16(g)'s predecessor, Local Rule 31).

As stated by the United States Supreme Court, "the deposition and discovery rules are to be accorded a broad and liberal treatment . . . [because] mutual knowledge of all relevant facts is essential to proper litigation. To that end, either party may compel the other to disgorge *whatever facts* he has in his possession." Hickman v. Taylor, 329 U.S. 495, 507 (1942) (emphasis added).

The purpose of the deposition is to serve as a "question-and-answer conversation" between the witness and deposing attorney to garner facts in relation to that witness' actions and experiences." Hall v. Clifton Precision, 150 F.R.D. 525, 528 (E.D.Pa. 1993). Thus, counsel for the deponent has a very limited role during the taking of a deposition and conversing with the witness is limited to discussions about whether the objection of privilege should be asserted. Id. at 528.; see also In re Amezaga, 195 B.R. 22, 227 (Bankr. D.P.R. 1996) (holding that counsel may not instruct deponent not to answer questions by opposing counsel unless specifically protected by privilege). Because of the limited role of deponent's counsel during a deposition, defendant's legal interests were adequately represented by Atty. Hartley during the deposition attempted on January 23, 2004 and the presence of other attorneys was unnecessary.

Contrary to defendant's claim, the information sought by plaintiff is not protected by attorney-client privilege. "The attorney-client privilege protects only communications made in

confidence by a client to his attorney for the purpose of obtaining a legal opinion or the performance of a legal service rendered in confidence by the attorney." In re Kaplan, 110 F.R.D. 161 (S.D.N.Y. 1986). It is well-established in the Second Circuit that since "the privilege stands . . . as an obstacle to investigation of the truth, the privilege out to be strictly confined within the narrowest possible limits. . . ." In re Horowitz, 482 F.2d 72, 81 (2d Cir. 1973) (internal quotations omitted); see also U.S. v. Silverman, 430 F.2d 106, 122 (2d Cir. 1920) ("The purpose of the privilege, the encouragement of full disclosure to the attorney in procuring legal advice, implies that a communication from an attorney is not privileged unless it has the effect of revealing a confidential communication."). Since plaintiff's questions pertained to relevant facts, and not confidential communications made between defendant and his attorneys, defendant's counsel improperly evoked the attorney-client privilege.

Secondly, deposition questions regarding knowledge of deponent's counsel as to the occurrence of a deposition being conducted does not appear to be protected by attorney-client privilege. Although few decisions address the issue, case law in other jurisdictions seems to suggest that the attorney-client privilege does not apply. See Thurmond v. Compaq Computer Corp., 198 F.R.D. 475, 483 (E.D. Tex. 2000) (holding that the attorney-client privilege is not applicable to deposition questions that asked deponent to reveal knowledge regarding the case at issue so long as deponent was not asked to reveal legal strategy).

The plaintiff now moves the court to compel the deposition of defendant Mark Rudewicz, and instruct Mr. Rudewicz to answer the questions that were posed to him.

THE PLAINTIFF,

BY: _____
Erin I. O'Neil
Brewer & O'Neil, LLC
818 Farmington Ave.
West Hartford, CT 06119
(860) 523-4055
Federal Bar # CT 23073
His Attorney

## **CERTIFICATION**

       This is to certify that the foregoing has been sent, postage pre-paid, on February 19, 2004 to all counsel and pro se parties of record:

Jill Hartley
Lori Rittman Clark
Sabia & Hartley, LLC
190 Trumbull Street, Suite 202
Hartford, CT 06103

                                                              Erin I. O'Neil

**EXHIBIT A**

**BREWER & O'NEIL, LLC**
ATTORNEYS AT LAW
818 Farmington Avenue
West Hartford, CT 06119
(860) 523-4055
Facsimile (860) 233-4215

JAMES S. BREWER
ERIN I. O'NEIL

February 5, 2004

Jill Hartley
Sabia & Hartley, LLC
190 Trumball Street, Suite 202
Hartford, CT 06103

RE: <u>Cody v City of Hartford, et. al. 3:02CV1789(SRU)</u>

Dear Jill:

As you are aware, we need to continue the deposition of Mark Rudewicz that began on January 23, 2004. Please provide my secretary with dates that you and your client are available for its continuation.

Additionally, please inform me of your position on whether your client intends on refusing to answer questions regarding other litigation he is involved in so that I may file the appropriate Motions to Compel and for Sanctions if necessary.

Sincerely,

Erin I. O'Neil

# SABIA & HARTLEY, LLC

ATTORNEYS AT LAW
190 TRUMBULL STREET
SUITE 202
HARTFORD, CONNECTICUT 06103-2205

RANDALL J. SABIA
JILL HARTLEY*
EDWARD C. TAIMAN, JR.

EILEEN C. MOSKEY
MICHAEL G. ALBANO**
JOHN P. SHEA, JR.
LORI RITTMAN CLARK

OF COUNSEL:
EILEEN G. FERRIS

* ALSO ADMITTED IN MA
** ALSO ADMITTED IN NY & NJ

TELEPHONE
(860) 541-2077

FACSIMILE
(860) 713-8944

WWW.SABIAHART.COM

February 5, 2004

**VIA FACSIMILE (233-4215) AND REGULAR MAIL**
James S. Brewer, Esq.
Brewer & O'Neil, LLC
818 Farmington Avenue
West Hartford, CT 06119

Re:   Ann Cody v. City of Hartford, et al.; Civil Action No. 3:02CV1789 (SRU)

Dear Jim:

I understand that you have requested an available date for the continuation of Mark Rudewicz's ("Mr. Rudewicz" or "Defendant") deposition. Please be advised that we will not agree to voluntarily produce Mr. Rudewicz a second time for his deposition. As you know, we produced Mr. Rudewicz on January 23rd for his deposition. You began to engage in improper "cross-discovery," by asking Mr. Rudewicz questions pertaining to another pending case in which I do not represent him (the Fago case). I objected and asked for a short break in order to call Mr. Rudewicz's counsel in Fago and invite him to attend the deposition.

You would not agree to take a break from the deposition and allow me the opportunity to call Defendant's counsel in Fago. Instead, you threatened me with sanctions and adjourned the deposition prior to the lunch break. I informed you more than once that we were prepared to go forward with the deposition and were not trying to prevent you from asking questions related to the Fago case. We were merely asking for the opportunity to have Defendant's counsel in the Fago case attend the deposition given the fact that you were asking Defendant questions related to that litigation. After you adjourned the deposition and stormed out of the conference room, I left a message with your office indicating that Mr. Rudewicz and I were going to lunch and that we would return to continue the deposition if you changed your mind and decided to resume same. We never heard from you again that day.

RECEIVED

James S. Brewer, Esq.
February 5, 2004
Page 2

    In light of the above, we have satisfied our obligation under the Federal Rules by producing Mr. Rudewicz for his deposition once already. Your decision to adjourn the deposition prematurely – when we were willing to continue with questions relating to this case and questions relating to Fago as long as Defendant's counsel in that case was present – does not obligate Mr. Rudewicz to appear a second time for his deposition.

    For all the foregoing reasons, we will not agree to voluntarily produce Mr. Rudewicz for his deposition a second time.

    Thank you for your attention.

                                       Sincerely,

                                       Jill Hartley

JH:dr
cc:    Helen Apostolidis, Esq. (via facsimile)
E:\WPDOCS\City of Hartford\Cody\corr\brewer.2.5.04.wpd

## EXHIBIT B

### DEPOSITION OF MARK RUDEWICZ   JANUARY 23, 2004

I. TESTIMONY ATTACHED AS FOLLOWS ;

PAGE  7
PAGE  8
PAGE 23
PAGE 24
PAGE 25
PAGE 26
PAGE 28
PAGE 29
PAGE 61
PAGE 62
PAGE 63
PAGE 64
PAGE 65
PAGE 66
PAGE 67
PAGE 80
PAGE 81
PAGE 82
PAGE 83
PAGE 84

5

1  by Jill Hartley here today, right?
2      A    (Witness nodding.)
3      Q    If you have any legal questions, you can ask
4  her. But anything like Hey, where's the bathroom or can
5  we take a break or whatever, you simply do it. You don't
6  have to get permission, okay?
7      A    Okay.
8      Q    It may seem sometimes like an interrogation but
9  it is not. So if you need a break, you can have one. You
10 should also remember you can't really take a break to get
11 help with answering a question though. That's the only
12 exception. If there's a question so to speak on the
13 table, try to answer it first unless it's a real
14 catastrophic emergency, then just go.
15     A    Okay.
16     Q    Is there anything that would inhibit your
17 ability to answer questions today, medication or lack of
18 sleep or illness?
19     A    No.
20     Q    You're okay?
21     A    Yes. Fine to answer.
22     Q    If I ask you a question today, sometimes your
23 attorney may object because of the form of the question or
24 for many other reasons but sometimes they might not and

A+ REPORTING SERVICES

6

1  you might not even understand the question. So if that
2  happens, don't wait for somebody else to intercede. You
3  tell me that you don't understand what I'm asking or can
4  you rephrase it and I'll do that. If you forgot what I
5  asked, I generally try to have the same question read back
6  to you. I'll ask Lisa and her fancy computer to read the
7  same question back. There is a little difference.
8      A    All right.
9      Q    It's not a time to be proud if there's a word
10 that I use that you didn't understand. A lot of times
11 maybe I didn't either. Just say I didn't know what the
12 heck that means, okay?
13     A    All right.
14     Q    I don't anticipate it taking that long. Things
15 come up and I have to explore them or whatever, but I
16 anticipate trying to get out of here at lunchtime.
17 Lawyers tend to go to lunch at one. Other people that
18 might not work. We'll caucus on that, that was my word
19 for the day, if it comes up, okay?
20     A    Okay.
21     Q    Did we spell your name right, Rudewicz?
22     A    R-u-d-e-w-i-c-z. That's on the notice.
23     Q    Exhibit 1 is a renotice of the deposition which
24 you may or may not have seen. It shows we noticed it for

A+ REPORTING SERVICES

7

1  today, okay?
2      A    Okay.
3      Q    Obviously it's not an issue because you're here.
4  And have you read any of the pleadings in the case, the
5  complaint?
6      A    Yes.
7      Q    They call it the amended complaint.
8      A    Yes.
9      Q    Did you read anything prior or in anticipation
10 of being deposed here in preparation for it?
11     A    Right. I have met with the attorney.
12     Q    I don't want to know about your discussions.
13 We're allowed to ask what documents or audio that you
14 might have listened to.
15     A    I read documents that were part of the
16 investigation, you know, interdepartmental memorandums and
17 so forth.
18     Q    You refreshed your recollection on a few things?
19     A    Yes.
20     Q    Did you read what I call pleadings, like the
21 amended complaint, the allegations in the complaint?
22         MS. HARTLEY:  If I can jump in here. He
23     read the amended complaint. He read the brief
24     of the City of Hartford in connection with the

A+ REPORTING SERVICES

8

1       grievance, that's dated March 21, 2002.
2           MR. BREWER:  On what form, Jill? Is this
3       the Labor Board?
4           MS. HARTLEY:  Yeah. The State Board of
5       Mediation and Arbitration, dated 3-21-02. And
6       he did read some internal investigation
7       memoranda.
8      Q    We may or may not go through some of these
9  documents if it's necessary.
10          MS. HARTLEY:  Just to be complete, report
11      of disciplinary infractions.
12          MR. BREWER:  Against him or who?
13          MS. HARTLEY:  Ann Cody.
14          MR. BREWER:  Is there a date on that?
15          MS. HARTLEY:  Why don't I just give you
16      the copies of them.
17          MR. BREWER:  We'll make copies of them if
18      you put them over there. I'll keep moving and
19      during a break -- I think we have the same
20      stuff probably. What about those?
21          MS. HARTLEY:  It's notes about where your
22      office is.
23          MR. BREWER:  It does say Starbuck's. We
24      got a Starbuck's customer here.

A+ REPORTING SERVICES

21

```
1    guess.
2       Q    You don't have to guess. If you don't remember,
3    that's all right.
4       A    I would say towards the end.
5       Q    Of 2002?
6       A    Yeah. I was promoted August, so maybe
7    September. Once again, it was a redeployment in manpower
8    with a lot of folks retiring. And, of course, the
9    position I was in really required more of a sergeant than
10   a lieutenant.
11      Q    You were overranked for the position, sort of?
12      A    I guess, yeah.
13      Q    Where in Patrol -- you were a lieutenant
14   supervisor --
15      A    Patrol lieutenant.
16      Q    Patrol lieutenant. Thank you. What shift or
17   squad?
18      A    I worked in the afternoons B Squad.
19      Q    B Squad. Was it still broken down in 2002 into
20   like PSAs or anything?
21      A    North, South. Sometimes you would cover -- I
22   was a relief. Sometimes I covered North. Sometimes I
23   covered South. Sometimes the whole city.
24      Q    Your position was the relief lieutenant? Is
```

22

```
1    that what you're saying?
2       A    Yes.
3       Q    You were the junior?
4       A    Junior. At the time, maybe three or four
5    lieutenants assigned to B Squad. You picked up pays for
6    the days off. You were the fill in. I worked North. I
7    worked South. Like I said, sometimes I covered the whole
8    city.
9       Q    Did you ever work for -- I guess maybe for. It
10   gets confusing with demotions. Did you ever work for Mike
11   Fago when he was a lieutenant?
12      A    Yeah.
13      Q    Could you describe -- I don't know what you did.
14   Did you work as his subordinate for any time period?
15      A    I didn't directly work with him. I only
16   recall -- when you say work under him, do you mean in a
17   continuous situation or like a one day event type of
18   thing?
19      Q    I leave it wide open, Mark. You tell me what it
20   was.
21      A    Mr. Brewer, I worked with Mike Fago, not on a
22   continuous basis but I've worked -- you know, you work an
23   event or you work -- I worked a line car one time. And he
24   happened to be the Patrol lieutenant that day.
```

23

```
1       Q    You were a sergeant still?
2       A    Sergeant, yes, sir.
3       Q    Whatever makes you feel more comfortable. You
4    don't have to call me Mr. Brewer, if you don't want to.
5    Some lawyers tell their clients even if I say that.
6            MS. HARTLEY: I told him to call you
7       Jimmy.
8       Q    Don't call my Jimmy. That's an old joke with
9    Jill. It's not required for me. Some people feel more
10   comfortable.
11      A    It's a polite thing.
12           MS. HARTLEY: Before you continue, if you
13      have more questions about Fago, I'm going to
14      call Shipman & Goodwin to see if they want to
15      attend this.
16           MR. BREWER: You can call whoever you
17      want.
18           MS. HARTLEY: Are you going to ask any
19      more questions about Fago?
20           MR. BREWER: I have questions about Mark
21      Rudewicz. It doesn't work that way. We can
22      get the judge on the line. I can ask any
23      witness about anything they know that might be
24      relevant.
```

24

```
1            MS. HARTLEY: If you're going to ask
2       questions that relate to Fago in this case in
3       this matter, Chuck Howard has a right to be
4       here.
5            MR. BREWER: If he wants to come here
6       because I'm asking this witness what he knows
7       about the Hartford Police Department. We don't
8       go by that. It's interfering with the
9       deposition. I will bring it up with Judge
10      Underhill.
11           MS. HARTLEY: I'll give you fair warning.
12           MR. BREWER: It's not a warning. The
13      federal rules do not require me to give a
14      notice to every defendant in every case in the
15      City of Hartford if they happen to be
16      defendants in multiple cases.
17           MS. HARTLEY: Let me respond to this.
18           MR. BREWER: You're interfering with the
19      deposition.
20           MS. HARTLEY: No, I'm not. I'm telling
21      you what I'm going to do if you have a lot of
22      questions about the Fago case so it's clear on
23      the record.
24           MR. BREWER: File a motion. This time you
```

25

1  have to go through with it and I'll move for
2  sanctions.
3       MS. HARTLEY: I'm not arguing with you.
4  Go ahead and ask your questions.
5       MR. BREWER: Judge Underhill --
6       MS. HARTLEY: Go ahead and ask your
7  questions.
8       MR. BREWER: You're coaching him.
9       MS. HARTLEY: I haven't coached him.
10  Q    Describe for me your relationship, your contact
11 with Mike Fago when he was a lieutenant.
12  A    My contact with Mike Fago. I've tried to be
13 honest. I've tried to have very limited contact with Mike
14 Fago.
15  Q    You didn't get along with him?
16  A    I'd have to say that he didn't get along with
17 me.
18  Q    Okay. There's my Fago questions. But you don't
19 have anything specific that you would say that was
20 derogatory about Mike Fago that you can recall? I'm
21 talking about --
22  A    Yeah.
23  Q    What was it?
24  A    Derogatory in terms of -- I mean --

26

1   Q    Whatever.
2        MS. HARTLEY: Are you saying you don't
3  understand the question?
4   Q    Do you want me to rephrase the question? You
5  know what "derogatory" means, negative?
6   A    I do. But I mean I --
7   Q    Let me ask -- I'll withdraw the question. I'll
8  say it another way. I'll ask another way.
9   A    Yes, sir.
10  Q    Let me make it an easier question. Do you have
11 any personal knowledge of anything that Mike Fago did to
12 you that you thought was unbecoming a lieutenant?
13  A    Yes, sir.
14  Q    What was it?
15  A    Mike Fago, as a lieutenant, would do things,
16 subtle things to try to vex or harass people or
17 intimidate.
18  Q    You were intimidated by him?
19  A    Sure. Sure.
20  Q    What did he do?
21  A    In relation to being a lieutenant?
22  Q    Yes. What did he do though?
23  A    Well, he would --
24  Q    I need a specific example, certain day or

27

1  whatever he did this.
2   A    I don't recall the dates because I don't have my
3  stuff on that case here. He would pick a place or a time
4  when it would be just -- when it was opportune for him.
5  I'll give you case in point. I'm in this room. I'm using
6  this as an example. This is not a specific --
7   Q    I need a specific thing that you know that he
8  did. If you don't have that, I'm not interested in
9  speculation.
10  A    Let me see. Specific, sure. I can give you
11 something specific. As a lieutenant -- he was a
12 lieutenant. I don't remember the exact date. He was
13 walking through the back door.
14  Q    Where?
15  A    Hartford police headquarters, rear entrance door
16 of Hartford police headquarters. He was a lieutenant. I
17 was coming out the hallway out of the property room and he
18 would walk up the hallway and he would stop and he would
19 just turn and, like, kind of, I use the word leer like a
20 stare or glance, but even -- if that's proper --
21  Q    Whatever way you want to describe it.
22  A    He would stop and turn and he would just stare
23 at you like glare at you. He would make some kind of
24 motion with his arms like he's flexing and then there

28

1  would be noise. He would make a humming noise. That was
2  one example of intimidation, his way of trying to
3  intimidate.
4        MS. HARTLEY: Are you finished answering
5  the question?
6   A    Yes.
7        MS. HARTLEY: I'm going to take a break.
8  I'm going to call Shipman & Goodwin and see if
9  they want to come.
10       MR. BREWER: I don't have time for this.
11 We'll go for sanctions with the judge. You're
12 not going for a break.
13       MS. HARTLEY: I'm taking a two-minute
14 break to call from --
15       MR. BREWER: No. They don't have an
16 appearance in the case. I'm not playing games.
17 I'm going to move for sanctions.
18       MS. HARTLEY: You can ask whatever you
19 want to.
20       MR. BREWER: It doesn't work that way. If
21 you want to call your friend Chuck and tell him
22 we're deposing Mark Rudewicz today and maybe he
23 wants to file an appearance --
24       MS. HARTLEY: I'm calling them.

A+ REPORTING SERVICES

Page 29

```
 1            MR. BREWER:  You're dismissed.  Get out of
 2   the office.  We're done.  I'm going to move for
 3   sanctions for interfering with the witness.
 4            We're not going to have a break because I asked
 5   questions about Mike Fago so you can get Chuck
 6   in here, like somehow that's going to make a
 7   difference.  If Chuck wants to talk to you
 8   about it beforehand --
 9            MS. HARTLEY:  Call the judge right now and
10   resolve this to see if it's appropriate to do a
11   deposition about Fago.  He's a defendant in
12   Fago.
13            MR. BREWER:  You set the pattern as to how
14   you're going to do it.  Goodbye.  I don't have
15   time for this nonsense.
16            (Whereupon, a short break was taken.)
17            (Whereupon, back on the record.)
18      Q     The last question on that issue is directly
19   related to you.
20            MS. HARTLEY:  I thought you told Barbara
21   you're done talking about Fago.
22      Q     After Lieutenant Fago was demoted, you
23   subsequently were promoted to lieutenant, is that
24   accurate?
```

Page 30

```
 1      A     Yes, sir.
 2      Q     So there was a vacancy as of May or so of 2002
 3   in the lieutenant slots when Fago was demoted, right, as
 4   far as you know?
 5      A     Yeah.  There were lieutenant vacancies.
 6      Q     In your recollection of the Hartford Police
 7   Department, do you know of any other -- you've been there
 8   since '83?
 9      A     21 years.
10      Q     In your 21 years, other than lieutenants Fago
11   and Albert, do you know of any other lieutenant that was
12   demoted from lieutenant back to sergeant, any name or
13   time?
14      A     No.  No.  Off the top of my head, I can't recall
15   a name.
16      Q     Did you have a probationary period as a
17   lieutenant?
18      A     Yes, sir.
19      Q     I forget when you said you started.  September
20   or so of 2002?
21      A     August.
22      Q     August.  As a lieutenant?
23      A     Yes.  As a lieutenant.  That's when the
24   promotion took effect.
```

Page 31

```
 1      Q     Were you on a one-year probationary status?
 2      A     Yes.  One year.
 3      Q     I'm not holding you to a specific date.  Is it
 4   fair to say around August of 2003, you were off probation
 5   at some point?
 6      A     Yes, that's correct.
 7      Q     Did you get a notice saying congratulations,
 8   you've succeeded your probationary period or passed it?
 9      A     I don't believe I did.
10      Q     Was it a significant event in your life that you
11   got through that year?
12      A     No.  You know, I didn't -- you just went about
13   doing my daily job.
14      Q     Did you get interim and final probationary
15   evaluations?
16      A     I can't say specifically how often.  I know -- I
17   want to say I recall -- I believe you have to sign when
18   they would do an evaluation like your captain.
19      Q     You're supposed to sign it?
20      A     Right.  I remember that occurring I want to say
21   a couple times.
22      Q     Did you keep your -- it was a carbon sheet form?
23      A     I understand it was a three-page document in
24   triplicate.
```

Page 32

```
 1      Q     Not to be bureaucratic, but you get to sign the
 2   original and it presses through and makes hard copies?
 3      A     Yes.
 4      Q     You recall that?
 5      A     I believe -- I recall.
 6      Q     I understand.
 7      A     To the best of my recollection.  I don't want to
 8   say with unequivocal certainty that happened.
 9      Q     Right.  I understand you don't have it in front
10   of you.
11      A     Yes, sir.
12      Q     From your recollection, you recall getting it
13   and signing it?
14      A     Right.
15      Q     Whether it was interim or whatever it was
16   called, you know you got one and then a final one, is that
17   fair, of these evaluations?
18      A     Yeah.  At the end, there is a final evaluation.
19      Q     How did you do?
20      A     Well, I passed.
21      Q     There's a box that says satisfactory,
22   unsatisfactory.
23      A     Right.  There's a couple of different
24   categories.  It must have been satisfactory.
```

61

```
1        A    As you know, I'm named in another suit.
2        Q    I've had this come up where people don't
3   remember that they're sued.
4        A    I had the other Michael Fago case I'm named in
5   so yes, I guess I am.
6        Q    Who is your lawyer in Michael Fago?
7        A    Chuck Howard.
8        Q    Did you tell him you were being deposed today?
9             MS. HARTLEY: Objection to the form of the
10  question. You're asking what he told his
11  lawyer?
12            MR. BREWER: You made an issue before that
13  Chuck doesn't know somehow? You opened the
14  door.
15            MS. HARTLEY: I'm objecting to the
16  question, not just the form. I'm objecting to
17  the question, sir.
18            MR. BREWER: You're calling me sir.
19            MS. HARTLEY: All right, Jimmy. I'm
20  objecting to the question and I'm instructing
21  the witness not to answer on the grounds it
22  calls for attorney/client privilege.
23       Q    I'll still call you Mark if you want because
24  I
```

A+ REPORTING SERVICES

62

```
1        A    That's fine.
2             MR. BREWER: We don't need the hostility.
3   But, Jill, you shouldn't, in front of witnesses
4   and on the record call me Jimmy, because you
5   know I don't like to be called that. Were you
6   doing it because you're angry?
7             MS. HARTLEY: I'm not angry.
8             MR. BREWER: You were a little hyper about
9   the whole thing. You brought up the issue.
10            MS. HARTLEY: I'm not going to argue with
11  you.
12            MR. BREWER: Don't call me Jimmy. Call me
13  Jim on the record.
14            MS. HARTLEY: Don't try to get my witness
15  to blurt out --
16            MR. BREWER: It's on the record.
17       Q    Without telling me about anything you discussed
18  with your attorney because -- I'm assuming you're going to
19  follow your lawyer's advice and not answer that last
20  question, correct?
21       A    Yes.
22       Q    Nothing wrong with that. It's her, not you.
23            MR. BREWER: I think it's a bogus
24  objection. Let the judge decide.
```

A+ REPORTING SERVICES

63

```
1        Q    Other than what you said to your lawyers at
2   Shipman & Goodwin, do they know that you're being deposed
3   today?
4             MS. HARTLEY: Objection to the question.
5   I instruct the witness not to answer. It calls
6   for disclosure of attorney/client
7   communications.
8             MR. BREWER: It doesn't call for that. It
9   calls for knowledge of whether or not they know
10  the deposition is going on.
11            MS. HARTLEY: The only reason --
12            MR. BREWER: I understand why you wouldn't
13  want him to answer that, Jill, because now it
14  calls into question your veracity in telling
15  the witness and telling me and maybe the court,
16  Well, I got to call Chuck Howard and let him
17  know about this deposition when he probably
18  already knows.
19            MS. HARTLEY: I stand on my objection.
20            MR. BREWER: You can object, but I think
21  it's improper for you to tell him whether or
22  not he knows that they've been informed. Are
23  you telling him he can't answer that question,
24  about his knowledge?
```

A+ REPORTING SERVICES

64

```
1             MS. HARTLEY: Yes. I'm instructing him
2   not to answer that question.
3             MR. BREWER: Let the judge decide. We'll
4   make an issue.
5        Q    You're a defendant in the Fago case, right?
6        A    Yes, sir.
7        Q    Did you prepare with anyone from Shipman &
8   Goodwin about your deposition today? You don't have to
9   look at her.
10            MR. BREWER: That shows what's going on
11  here. The witness, after I asked that
12  question, is now because of the interference of
13  Attorney Hartley is looking --
14            MS. HARTLEY: You can ask --
15            MR. BREWER: Don't interrupt me. -- at
16  his lawyer to see if she's going to interfere
17  with the deposition and raise an objection.
18            MS. HARTLEY: I'm instructing him not to
19  answer. He doesn't know what the privilege is.
20            MR. BREWER: I'm sure you told him the
21  privilege before he refused to answer the
22  question. He should know what the privilege
23  is.
24            MS. HARTLEY: You're wasting time.
```

A+ REPORTING SERVICES

65

```
1         MR. BREWER: You're wasting my time.
2         MS. HARTLEY: If you want to ask him if he
3    met with Shipman & Goodwin before this
4    deposition, you can ask him that. I'm not
5    going to allow him to answer anything --
6         MR. BREWER: Let the judge decide. The
7    record's clear.
8    Q    You're refusing to answer that question, whether
9    or not Shipman & Goodwin knows you're here today?
10        MS. HARTLEY: Yes. That question I
11   instruct him not to answer.
12        MR. BREWER: That's what I want him to
13   say. You're not the witness, Jill, even though
14   you want to take his place.
15   Q    You're not a marionette. Are you refusing to
16   answer that question? It's your choice. It's your
17   privilege, not Jill Hartley's. When you refuse to answer
18   the question, since she doesn't want to let you know about
19   the privilege, it's your privilege. You can say I don't
20   really care about this because I don't want to protect
21   Shipman & Goodwin or other people. I did tell them. Or
22   you can say no. I have a privilege of what my discussions
23   were with my counsel. I don't want to discuss that.
24   That's fine. It's your privilege.
```

A+ REPORTING SERVICES

66

```
1    A    Okay.
2    Q    My question is not what you said to Chuck Howard
3    or anybody over there, it's whether or not you notified
4    them, which has nothing to do with any substance in these
5    cases, that you were being deposed here today. If you
6    don't want to answer that --
7         MS. HARTLEY: That's a different question.
8         MR. BREWER: It's not a different
9    question.
10        MS. HARTLEY: I'm objecting to that
11   question on the grounds of attorney/client
12   privilege and instructing the witness not to
13   answer.
14   Q    I still need you to answer. I hope you
15   understand what the privilege is a little bit more. Your
16   lawyer is not allowed to tell you not to answer something.
17   She can instruct you.
18   A    Right.
19   Q    Which means it's on you. I'm not saying it to
20   try to threaten you.
21   A    I understand.
22   Q    You need to be aware of that. If we have to
23   come back, it's an inconvenience upon you. That's the
24   reason I say that. It's not that big a deal.
```

A+ REPORTING SERVICES

67

```
1         MS. HARTLEY: The answer to him is are you
2    yes, going to follow my instructions or not?
3    A    Yes. No disrespect to you.
4    Q    None taken. I've been around a long time, Mark.
5    I don't take it personally.
6    A    On the advice of counsel.
7    Q    In any event, with regard to the Fago --
8    A    Yes, sir.
9    Q    -- complaint against you, do you think that
10   would make you a little biased about your testimony that
11   you gave earlier, the fact the guy's suing you might make
12   you a little biased about your testimony about him?
13   A    No.
14   Q    It didn't bother you that he sued you?
15   A    You're asking me --
16   Q    This is a new question.
17   A    -- does that change my opinion?
18   Q    No. New question. Does it bother you that he
19   sued you?
20   A    No.
21   Q    Does it bother you that Ann Cody sued you?
22   A    No.
23   Q    Doesn't bother you at all?
24   A    No.
```

A+ REPORTING SERVICES

68

```
1    Q    Has anyone told you, other than your lawyer,
2    that you don't have to worry about personal liabilities in
3    these lawsuits?
4    A    No.
5    Q    You know that you're a defendant in these suits?
6    A    Yes, sir. I realize that.
7    Q    It doesn't bother you that somebody's trying to
8    say that you acted illegally, that you sexually harassed
9    somebody in this case and in Fago's case, there's
10   constitutional claims?
11   A    It's definitely -- it's not a fun process to go
12   through. But it -- how do I word this? I mean it
13   sometimes goes with the territory, with the job. Going
14   back to supervision. Not everybody's going to be happy.
15   People perceive things in certain ways. That's why they
16   have the right to exercise and utilize attorneys.
17   Q    Have you ever sued anybody in your life?
18   A    You know what, I don't believe I have.
19   Q    I hate to hear that. Never? Not even an auto
20   accident or anything? Never? Small claims?
21   A    You know what, once again, let me say for the
22   record, I don't recall.
23   Q    Everything's on the record.
24   A    I don't recall. 45 years. I don't think I
```

A+ REPORTING SERVICES

77

1  time on the job. To say I'm friends with him, no. He's
2  an acquaintance, somebody you work with.
3      Q    You were friendly with him though?
4      A    Yeah. You know, Hello and goodbye. Very
5  cordial, I guess.
6      Q    Did you ever complain about Joe Buyak to
7  anybody, the new ombudsman for the department, Captain Joe
8  Buyak?
9      A    No.
10     Q    Did you get along with Joe?
11     A    Yes.
12     Q    Did Joe ever use profanity in your presence?
13     A    You know, I have to say that Joe -- no, no. I
14 can't say ever because, once again, we go back 20 years.
15 And I can't recall every word that was spoken by another
16 individual. But I'll say that Joe Buyak is a well-spoken
17 individual. And he's a polite individual. He's a
18 gentleman.
19     Q    Do you know of any relationship or do you know
20 what the relationship is between Joe Buyak and Laura
21 Buyak, Officer Laura Buyak?
22     A    Yes.
23     Q    What are they?
24     A    Brother and sister.

A+ REPORTING SERVICES

78

1      Q    Do you know if they got along when they worked
2  at the HPD?
3      A    This is just -- I would imagine they did.
4      Q    If you don't know, you don't know.
5      A    I don't know. I don't know if they worked
6  together or --
7      Q    Were you friendly with Laura Buyak?
8      A    Yes.
9      Q    Did you ever go out with her?
10     A    Yes, I did.
11     Q    I don't know if that's the right term. Dated
12 her?
13     A    Yes, I did.
14     Q    So you had a relationship with her?
15     A    Yeah. I dated her, yes.
16     Q    When was that?
17     A    Several years back. The exact dates I will say
18 don't hold me to the dates.
19     Q    I'm not going to tell her, so don't worry.
20     A    Maybe in the '90s, early '90s.
21     Q    Did the relationship end amicably or was there
22 any kind of falling out?
23     A    No.
24     Q    Was her brother ever angry about you going out

A+ REPORTING SERVICES

79

1  with her?
2      A    No.
3      Q    Joe?
4      A    No. I wouldn't believe so.
5      Q    But I mean you don't have a current relationship
6  with Laura Buyak, like you're not still friends with her
7  or anything?
8      A    Well, I wouldn't say -- well, whatever. I
9  haven't seen her since I've retired, but I have to say
10 that when I did see her in the hallway --
11     Q    When did you retire?
12     A    October 25.
13     Q    Of 2003?
14     A    2003, yes, sir.
15     Q    I think I forgot to ask you that.
16     A    I will say I had a friendly relationship with
17 her. If I saw her in the hallway, I'd say Hello. I'd ask
18 How's your mom? How's your dad? We were friendly to
19 talk.
20     Q    It wasn't like it was cold?
21     A    No. No reason to be.
22     Q    Do you recall anyone making any offensive
23 remarks, at least you might construe as offensive about
24 your relationship with Laura Buyak?

A+ REPORTING SERVICES

80

1      A    Well, the only person that would have a problem
2  with it or I would say did would be Michael Fago.
3      Q    He made offensive remarks about your
4  relationship with her?
5      A    Yeah. Yes, sir.
6      Q    What did he say?
7      A    I can't recall, like I said, once again every
8  word spoken by Mr. Fago, but the dates and times, sure
9  there have been words. He has said things and he has done
10 things.
11          MS. HARTLEY: Hold on a second. Are you
12     finished with your response?
13     A    Yes.
14          MS. HARTLEY: You represented, Jim, to the
15     court that you were done asking questions about
16     the Fago case.
17          MR. BREWER: I represented nothing. I
18     said we were going to do a motion.
19          MS. HARTLEY: You told Barbara we had an
20     agreement. The agreement was you were done
21     with the questions --
22          MR. BREWER: We don't have an agreement.
23     I said I was done with that questioning. This
24     is ridiculous. You know you're going to lose

A+ REPORTING SERVICES

81

1  this like the other thing you did.
2      MS. HARTLEY: If you have more questions
3  about Fago --
4      MR. BREWER: I have questions about
5  whatever I want. It's about Mr. Rudewicz, not
6  Fago.
7      MS. HARTLEY: If you're going to ask
8  questions about the Fago case, I'm going to
9  call Chuck Howard.
10     MR. BREWER: Call him. Tell him to come
11 down. What is Chuck Howard going to do? Is he
12 going to come in here and cast a spell on all
13 this, take Mark out and hit him with the
14 whipping stick and make sure he says the right
15 thing? Is that what it's about? Or is it
16 about getting the truth out of the witness or
17 making sure Chuck comes in here and tells this
18 witness what to say? Is that what you need?
19     MS. HARTLEY: You don't have to raise your
20 voice.
21     MR. BREWER: You raised your voice a long
22 time ago. I'm not raising my voice. You had
23 your hand in my face and called me Jimmy.
24     MS. HARTLEY: It's 12:15.

A+ REPORTING SERVICES

82

1      MR. BREWER: You interfered too many
2  times.
3      MS. HARTLEY: Let's take a break for
4  lunch. You said we could break.
5      MR. BREWER: We're done for the day. I'm
6  not going to have my deposition interfered
7  with.
8      MS. HARTLEY: I'm going to call the court
9  then.
10     MR. BREWER: He's not there, Jill.
11     MS. HARTLEY: Then I'm going to call
12 Chuck.
13     MR. BREWER: Call Chuck.
14     MS. HARTLEY: Ask other things.
15     MR. BREWER: No, I'm not. I do it in my
16 sequence, not yours. You don't get to
17 interfere with the deposition.
18     MS. HARTLEY: I'm not. Ask whatever you
19 want.
20     MR. BREWER: Excuse me.
21     MS. HARTLEY: The other lawyer should be
22 here.
23     MR. BREWER: No, he shouldn't be here.
24 We've done that in the past. Mr. Rudewicz --

A+ REPORTING SERVICES

83

1  it's obvious by his refusal to answer the
2  question that Chuck knows he's here. We'll get
3  an affidavit together because we already know
4  that Chuck knows he's here.
5      MS. HARTLEY: I'm calling Chuck to come
6  over here. Let's break for lunch.
7      MR. BREWER: You need Chuck's help. I'm
8  not going through this. You've interfered with
9  the deposition on too many occasions for my
10 liking.
11          With all due respect to Mark Rudewicz, I'm
12 not trying to make it hard. We're going to do
13 one thing, stop right now. And when Judge
14 Underhill is able to make a ruling, we'll get a
15 ruling and stop this pattern of you interfering
16 with depositions. We're not going to have
17 Judge Garfinkle or Judge Fitzsimmons or anybody
18 else. Judge Underhill likes to handle these
19 himself. He's said that on other occasions,
20 other cases. He wants to deal with these and
21 nip them in the bud. I'm not going to be
22 wasting my time.
23     MS. HARTLEY: That's great. We can duke
24 it out with Judge Underhill. That's fine.

A+ REPORTING SERVICES

84

1      MR. BREWER: The issue about not finishing
2  the deposition is you interfered. You caused
3  me to lose my concentration. You made it
4  difficult for me to have a flow of questions.
5  You're coaching the witness.
6      MS. HARTLEY: I'm not coaching him at all.
7      MR. BREWER: You're telling him that he
8  doesn't have to answer questions about Mike
9  Fago when that is not what the question is.
10 It's about Laura Buyak.
11     MS. HARTLEY: No, no.
12     MR. BREWER: He offered Fago. And you
13 hear the buzz word Fago and you have this
14 Pavlovian response that you got to get Chuck in
15 here because somehow they're going to get hurt
16 by it. The truth may hurt them. If
17 Mr. Rudewicz wants to tell the truth, I
18 understand that. You can't handle the truth.
19 I have nothing more to say.
20     MS. HARTLEY: My position --
21     MR. BREWER: You can put your position on
22 the record. You can send the transcript.
23 Thank you for you time.
24     MS. HARTLEY: My position is that I do not

A+ REPORTING SERVICES