**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| ANN CODY,<br>**Plaintiff,** | : | **CIVIL ACTION NO.**<br>**3:02CV1789 (SRU)** |
| | : | |
| **v.** | | |
| | : | |
| **CITY OF HARTFORD, et al.**<br>**Defendants.** | : | **FEBRUARY 26, 2004** |

## MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S DEPOSITION AND FOR SANCTIONS

### I. INTRODUCTION

Defendants, City of Hartford, Robert Rudewicz, Mark Rudewicz and Michael Manzi (collectively "Defendants"), submit this opposition to Plaintiff's Motion to Compel and For Sanctions (the "Motion") in which Plaintiff seeks the following relief: (1) to generally re-depose Mark Rudewicz ("Rudewicz"); (2) to compel Rudewicz to answer questions to which the undersigned objected on the grounds of the attorney-client privilege; and (3) sanctions.

The Motion should be denied for several reasons. First, it was Plaintiff's counsel, Attorney James Brewer ("Attorney Brewer"), not the undersigned, who abruptly terminated the deposition of Rudewicz (the "Deposition") for no valid reason. A complete copy of the Deposition is appended hereto for the Court's ease of reference as Exhibit A. Having done so, Plaintiff is precluded from requiring Rudewicz to appear and bear the burden associated with a

second deposition. Second, the undersigned did not, as Plaintiff alleges, instruct Rudewicz not

to answer questions "regarding any other litigation" in which Rudewicz is involved. Rather, the

undersigned merely asked for the opportunity to call Rudewicz's counsel in such other

litigation so that they could attend the Deposition. Third, the five questions that the

undersigned instructed Rudewicz not to answer would potentially have required Rudewicz to

reveal communications with counsel in the <u>Fago v. City of Hartford, et al.</u> case (the "<u>Fago</u>

case") which would be protected by the attorney-client privilege and which, in any event, have

no relevance to any issue in this case. Fourth, Plaintiff has no basis for seeking to impose

sanctions because the undersigned raised appropriate and limited objections and because the

only attorney in this case who "obstructed the effective administration of justice"[1] is Attorney

Brewer when he deliberately questioned Rudewicz regarding issues in the <u>Fago</u> case without

permitting Rudewicz's counsel in that case to be present.[2]

---

[1]  <u>See</u> Memorandum In Support of Plaintiff's Motion to Compel Defendant's Deposition and for Sanctions ("Memorandum") at 3.

[2]  Attorney Brewer's questions to Rudewicz regarding the <u>Fago</u> case, without the presence of his counsel in that matter, constituted a violation of Rule 4.2 of the Connecticut Code of Professional Conduct ("Rule 4.2"). <u>See</u> Defendants' Memorandum of Law in Support of Motion for Protective Order dated February 26, 2004. This conduct will be the subject of a cross-motion for sanctions by Defendants. In a failed effort to legitimize Attorney Brewer's line of questions in contravention of Rule 4.2, Plaintiff maintains that Rudewicz was somehow "adequately represented" at the Deposition and that "the presence of other attorneys was unnecessary." Memorandum at 3.

- 2 -

## II. FACTS

At the Deposition, Plaintiff's counsel persisted in asking Rudewicz questions pertaining to the Fago case, another lawsuit unconnected to the instant action, in which Rudewicz is a defendant and is represented by different counsel than in this case.[3] The undersigned counsel objected to this practice on the record, and repeatedly asked for a break from the deposition in order to contact Rudewicz's counsel in the Fago case and provide him with the opportunity to be present for any questions regarding that case. Plaintiff's counsel would not accommodate this request:

MS. HARTLEY:    I'm going to take a break . I'm going to call Shipman & Goodwin and see if they want to come.

MR. BREWER:    I don't have time for this. We'll go for sanctions with the judge. You're not going for a break.

MS. HARTLEY:    I'm taking a two-minute break to call from - -

MR . BREWER:    No. They don't have an appearance in the case. I'm not playing games. I'm going to move for sanctions.

MS. HARTLEY:    You can ask whatever you want to.

MR. BREWER:    It doesn't work that way. If you want to call your friend Chuck and tell him we're deposing Mark Rudewicz today and maybe he wants to file an appearance - -

---

[3]    For example, Plaintiff's counsel asked Rudewicz about his experiences in working with the Plaintiff in the Fago case. Mr. Fago has no connection whatsoever with this litigation. Exhibit A, pp. 22, lines 9-14; p. 25, lines 10-11.

- 3 -

| | |
|---|---|
| MS. HARTLEY: | I'm calling them. |
| MR. BREWER: | You're dismissed. Get out of the office. We're done. I'm going to move for sanctions for interfering with the witness. We're not going to have a break because I asked questions about Mike Fago so you can get Chuck in here, like somehow that's going to make a difference. If Chuck wants to talk to you about it beforehand - - |
| MS. HARTLEY: | Call the judge right now and resolve this to see if it's appropriate to do a deposition about Fago. He's a defendant in Fago. |
| MR. BREWER: | You set the pattern as to how you're going to do it. Goodbye. I don't have time for this nonsense. |

Exhibit A, p. 28, lines 7-24 through p. 29, lines 1-15.

After the foregoing exchange, the undersigned contacted the Court's chambers in an effort to obtain guidance from the Court. The undersigned and Attorney Brewer explained the nature of the dispute to Barbara Sbalbi. Upon learning that Judge Underhill was not available, Attorney Brewer indicated that he was finished with that portion of his questioning of the witness that related to other pending cases and that the parties would therefore complete the deposition and later brief the nature of their dispute for the Court.

Attorney Brewer then resumed the deposition but continued to pose questions to Rudewicz that related solely to the Fago case.[4] Also, apparently in response to the

---

[4]     For example, Attorney Brewer asked Rudewicz if there was a vacancy in the Lieutenant slots at the Hartford Police Department when Fago was demoted (Exhibit A, p. 30, lines 2-4,) and whether Rudewicz was aware of any Lieutenants other than Fago and Albert who were demoted from Lieutenant back to Sergeant. Exhibit A at p. 30, lines 10-13.

- 4 -

undersigned's request that Rudewicz's counsel in the <u>Fago</u> case be given the opportunity to attend the Deposition, Attorney Brewer pursued a line of questioning designed to establish that Rudewicz's <u>Fago</u> counsel were somehow aware of the Deposition and/or prepared Rudewicz for same. To that end, Attorney Brewer posed five separate questions to Rudewicz, all of which potentially invaded the attorney-client privilege including whether or not Rudewicz told his <u>Fago</u> counsel he was being deposed in the <u>Cody</u> case and whether or not he "notified" his counsel in the <u>Fago</u> case of the Deposition.[5]

When the undersigned again requested a break in order to call Rudewicz's counsel in Fago, Attorney Brewer refused and terminated the deposition for the second and last time. Exhibit A, p. 83, lines 5-22 (stating "we're going to do one thing, stop right now"); Exhibit A, p. 82, lines 1-7 (announcing "[w]e're done for the day"); and p. 84, lines 12-19 (noting "I have nothing more to say.").

Contrary to Plaintiff's assertions, the deposition transcript is devoid of any effort by the undersigned to "interfere" with the questioning of Rudewicz other than to halt Rudewicz's responses to five questions that potentially invaded the attorney-client privilege. Indeed, the undersigned confirmed that Rudewicz had finished responding to such questions before

---

[5]     <u>See</u>, <u>infra</u>, Section III. B. of this brief setting forth each question posed to Rudewicz which he was instructed not to answer. Although it has absolutely no bearing upon any issue in this case, the undersigned contacted Rudewicz's lead counsel of record in the <u>Fago</u> case, Attorney Charles Howard, after the Deposition and learned that he had not been aware, or on notice, of the Deposition.

- 5 -

requesting a break to contact Rudewicz's counsel in the <u>Fago</u> case. Exhibit A, p. 28, lines 4-9; p. 80, lines 11-16. The undersigned's efforts to protect Rudewicz, when appropriate, without obstructing the orderly completion of the Deposition are fully described at p. 85 of the Deposition. (This last page of the transcript was omitted from Plaintiff's submission.)

## III.  ARGUMENT AND AUTHORITIES

A.  **Plaintiff's Unilateral, Unjustified Decision To Stop The Deposition Precludes Plaintiff From Seeking A Second Deposition.**

"Like most discovery disputes, the availability of a second deposition is left to the discretion of the trial court." <u>Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.</u>, 945 F. Supp. 693, 732 (S.D.N.Y. 1996).  <u>See also</u> <u>Innomed Labs, LLC v. Alza Corp.</u>, 211 F.R.D. 237, 239 (S.D.N.Y. 2002) (same).  Pursuant to Fed. R. Civ. P. 30(a)(2)(B), a party "must obtain leave of court, which shall be granted to the extent consistent with the principles stated in Rule 26(b)(2)" before that party is permitted to take a second deposition of a person.  Rule 26(b)(2) provides, in pertinent part, that a district court may limit discovery if it determines that "the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought," or, if "the burden or expense of the proposed discovery outweighs the likely benefit."  Consequently, "[s]cheduling a second deposition of the same person without a showing of good cause will generally support a finding of annoyance and undue burden or expense." <u>Cuthbertson v. Excel Industries, Inc.</u>, 179 F.R.D. 599, 605 (D. Kan. 1998).

- 6 -

Here, Plaintiff has failed to show good reason for compelling Rudewicz to appear for a second deposition after having already had ample opportunity to obtain needed discovery during the Deposition. The transcript of the Deposition plainly reveals that the Deposition ended after two hours solely upon the decision of Attorney Brewer. Exhibit A, p. 83, lines 5-22, p. 82, lines 1-7 and p. 84, lines 12-19.

The facts underlying the instant Motion are strikingly similar to those before the Cuthbertson Court, which denied a defendant employer's motion to compel a second deposition of a third-party witness. In Cuthbertson, the plaintiff brought a number of employment discrimination claims against its former employer. Cuthbertson, 179 F.R.D. at 601. During the deposition of the plaintiff's son, who was also a former employee of the defendant but not a party to the litigation, defendant's counsel asked a series of questions over the objections of the plaintiff's attorney regarding the son's purported use of alcohol and drugs. Id. at 605. After the son, who was not represented by counsel, eventually declined to answer any more of the defendant's counsel's continued inquiries into his purported drug and alcohol use, "[the deposition was unilaterally terminated by defendant's counsel without inquiry into other matters." Id. at 601. The plaintiff's counsel, prior to the termination of the deposition, had "twice suggested that defendant continue the deposition, 'getting relevant information or discoverable information from [the son],' then, if the court so determined, bring the deponent back for the limited purpose of responding to the disputed inquiry." Id. at 605. Despite this

- 7 -

reasoned offer from the plaintiff's counsel, "[t]he defendant declined." Id. On the basis of these facts, the Cuthbertson Court held that there was no grounds for a second deposition of the son. Id.

Similar to the facts before the Cuthbertson Court, Attorney Brewer pressed forward on his impermissible line of questioning and refused to complete other areas of inquiry beyond the Fago case.[6] In light of these facts, Plaintiff has not, and cannot, justify compelling Rudewicz to appear for a second deposition. Plaintiff's motion should be denied, accordingly.

**B.      Answers To The Five Questions Posed By Attorney Brewer To Rudewicz Regarding His Fago Counsel's Purported Knowledge Of The Deposition Should Not Be Compelled Because They Would Potentially Reveal The Nature Of Attorney-Client Communications.**

Attorney Brewer posed the following questions which the undersigned instructed Rudewicz not to answer on the grounds of attorney-client privilege:

Question 1:

Q.      Who is your lawyer in Michael Fago?

A.      Chuck Howard.

Q.      Did you tell him you were being deposed today?

---

[6]      To expedite the completion of the Deposition the undersigned suggested that Brewer ask questions unrelated to the Fago case while the parties awaited Attorney Howard's notification and possible attendance at the Deposition. Exhibit A, p. 85, lines 10-14.

- 8 -

| | |
|---|---|
| MS. HARTLEY: | Objection to the form of the question. You're asking what he told his lawyer? |
| MR. BREWER: | You made an issue before that Chuck doesn't know somehow? You opened the door. |
| MS. HARTLEY: | I'm objecting to the question, not just the form. I'm objecting to the question, sir. |
| MR. BREWER: | You're calling me sir. |
| MS. HARTLEY: | All right, Jimmy. I'm objecting to the question and I'm instructing the witness not to answer on the grounds it calls for attorney/client privilege. |

Exhibit A at p. 61, lines 6-22.

Question 2:

> Q.   Other than what you said to your lawyers at Shipman & Goodwin, do they know that you're being deposed today?

> MS. HARTLEY:   Objection to the question. I instruct the witness not to answer. It calls for disclosure of attorney/client communications.

Exhibit A at p. 63, lines 1-7.

Question 3:

> Q.   Did you prepare with anyone from Shipman & Goodwin about your deposition today? You don't have to look at her. . . .

> MS. HARTLEY:   I'm instructing him not to answer. He doesn't know what the privilege is. . . .

- 9 -

MS. HARTLEY:    If you want to ask him if he met with Shipman & Goodwin before this deposition, you can ask him that. I'm not going to allow him to answer anything - -

MR. BREWER:    Let the judge decide. The record's clear.

Exhibit A at p. 64, lines 7-9 and lines 18-19.

Question 4:

 Q. You're refusing to answer that question, whether or not Shipman & Goodwin knows you're here today?

MS. HARTLEY:    Yes. That question I instruct him not to answer.

Exhibit A at p. 64, lines 2-11.

Question 5:

 Q. My question is not what you said to Chuck Howard or anybody over there, it is whether or not you notified them, which has nothing to do with any substance in these cases, that you were being deposed here today. If you don't want to answer that - -

MS. HARTLEY:    That's a different question.

MR. BREWER:    It's not a different question.

MS. HARTLEY:    I'm objecting to that question on the grounds of attorney/client privilege and instructing the witness not to answer.

Exhibit A at p. 66, lines 2-13.

- 10 -

Questions 1 and 5 potentially call for Rudewicz's disclosure of communications made by him to his <u>Fago</u> counsel. Question 3 is similarly improper as it potentially calls for Rudewicz's disclosure of the nature of communications with <u>Fago</u> counsel. Question 4 potentially calls for Rudewicz's disclosure of information that could only be known to him though his communications with his counsel in the <u>Fago</u> case. Because Questions 1 through 5 potentially call for the direct or indirect disclosure and communications between Rudewicz and his counsel in the <u>Fago</u> case, such communications are absolutely protected from disclosure by the attorney-client privilege. <u>See</u> generally, <u>In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983</u>, 731 F.2d 1032, 1036 (2d Cir. 1984).

### C.    Plaintiff Has Failed To Point To Any Conduct By The Undersigned That Warrants The Imposition Of Sanctions.

Although the undersigned is accused in the Motion of several different types of egregious behavior ranging from "unilaterally ending" the Deposition,[7] "coaching" the witness on how to respond to questions[8], and "obstructing Plaintiff's fact gathering,"[9] such accusations are directly refuted by Exhibit A. Neither the undersigned's numerous requests for a momentary break in the Deposition to remedy Attorney Brewer's violation of Rule 4.2 in his

---

[7]    Memorandum at 1.

[8]    Memorandum at 1.

[9]    Memorandum at 2.

- 11 -

SABIA & HARTLEY, LLC • ATTORNEYS AT LAW
190 TRUMBULL STREET • SUITE 202 • HARTFORD, CT 06103-2205 • (860) 541-2077 • FAX (860) 713-8944

questioning of Rudewicz,[10] nor her good faith efforts to prevent a waiver of the attorney-client

privilege constitute the kind of "unwarranted opposition to discovery"[11] necessary for the

imposition of sanctions.

        DEFENDANTS, CITY OF HARTFORD,
        ROBERT RUDEWICZ, MARK RUDEWICZ
        AND MICHAEL MANZI


        By_____
           Jill Hartley
           Federal Bar CT 10570
           Lori Rittman Clark
           Federal Bar CT 19908
           Sabia & Hartley, LLC
           190 Trumbull Street, Suite 202
           Hartford, CT 06103
           Telephone: (860) 541-2077
           Facsimile: (860) 713-8944

---

[10]   For a further discussion of the impropriety of this questioning and the undersigned's
       corresponding basis for insisting that Rudewicz's counsel in the Fago case be
       contacted, see Defendants' Memorandum of Law In Support of Protective Order, which
       briefing is incorporated herein by reference.

[11]   Memorandum at 2.

- 12 -

## **CERTIFICATION**

I hereby certify that a copy of the foregoing was faxed and mailed, first class, postage prepaid, this 26th day of February, 2004 to James S. Brewer, Esq., and Erin I. O'Neil, Esq., 818 Farmington Avenue, West Hartford, CT 06119.

_____
Jill Hartley

E:\WPDOCS\City of Hartford\Cody\mem.opp.Compel.Sanctions.Rudewicz.deposition.wpd

- 13 -

1              UNITED STATES DISTRICT COURT

2                 DISTRICT OF CONNECTICUT

3    ------------------------------x
                                  :
4    ANN M. CODY,                 :
              Plaintiff           :
5    VS.                          :CIVIL ACTION NO:
                                  :3:02CV1789(SRU)
6    THE CITY OF HARTFORD, ET AL, :
              Defendants          :
7    ------------------------------x

8

9                    JANUARY 23, 2004

10

11         Deposition of MARK RUDEWICZ, taken

12   pursuant to the Federal Rules of Civil Procedure, held at

13   the Law Offices of Brewer & O'Neil, 818 Farmington Avenue,

14   West Hartford, CT, before Elisa Ferraro, LSR, a Notary

15   Public in and for the State of Connecticut, License No.

16   233, on Friday, January 23, 2004 at 10:15 a.m.

17

18

19

20                 A+ REPORTING SERVICES
                      P.O. BOX 831
21                 Wallingford, CT 06492
                     (203)269-9976
22

23

24

EXHIBIT A



```
 1            UNITED STATES DISTRICT COURT
 2               DISTRICT OF CONNECTICUT
 3   ------------------------------X
 4   ANN M. CODY,                  :
                Plaintiff          :
 5   VS.                           :CIVIL ACTION NO:
                                   :3:02CV1789(SRU)
 6   THE CITY OF HARTFORD, ET AL,  :
                Defendants         :
 7   ------------------------------X
 8
 9               JANUARY 23, 2004
10
11        Deposition of MARK RUDEWICZ, taken
12   pursuant to the Federal Rules of Civil Procedure, held at
13   the Law Offices of Brewer & O'Neil, 818 Farmington Avenue,
14   West Hartford, CT, before Elisa Ferraro, LSR, a Notary
15   Public in and for the State of Connecticut, License No.
16   233, on Friday, January 23, 2004 at 10:15 a.m.
17
18
19
20            A+ REPORTING SERVICES
21                 P.O. BOX 831
                Wallingford, CT 06492
22               (203)269-9976
23
24
```

```
 1           A P P E A R A N C E S:
 2
 3   FOR THE PLAINTIFF:
 4   THE LAW OFFICES OF BREWER & O'NEIL
     818 Farmington Avenue
 5   West Hartford, CT 06119
     BY:  JAMES S. BREWER, ESQUIRE
 6
 7
 8   FOR THE DEFENDANT:
 9   THE LAW OFFICES OF SABIA & HARTLEY
     190 Trumbull Street
10   Hartford, CT 06103
     BY:  JILL HARTLEY, ESQUIRE
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

3

```
 1            S T I P U L A T I O N S
 2        IT IS HEREBY STIPULATED AND AGREED BY and among
 3   representing the parties that all formalities in
 4   connection with the taking of this deposition, including
 5   time, place, sufficiency of notice, and the authority of
 6   the officer before whom it is being taken may be hereby
 7   waived.
 8        IT IS FURTHER STIPULATED AND AGREED BY and among
 9   counsel representing the parties that the objections other
10   than as to form are reserved to the time of trial.
11        IT IS FURTHER STIPULATED AND AGREED BY and among
12   counsel representing the parties that the reading and
13   signing of the transcript SHALL NOT BE WAIVED.
14        IT IS FURTHER STIPULATED AND AGREED BY and among
15   counsel representing the parties that proof of the
16   qualification of the Notary Public before whom the
17   deposition is being taken is hereby waived.
18
19
20
21
22
23
24
```

4

```
 1        (Whereupon, MARK RUDEWICZ, having first
 2   been duly sworn, was examined and testified as follows:)
 3   Whereupon,
 4        THE COURT REPORTER:  Would you state your
 5   name and address for the record please.
 6        THE DEPONENT:  Mark Rudewicz, 6 Timber
 7   Trail, Wethersfield, Connecticut.
 8        (Whereupon, Notice of Deposition was pre marked
 9   as Plaintiff's Exhibit 1 for identification.)
10                DIRECT EXAMINATION
11   BY MR. BREWER:
12   Q    Good morning.
13   A    Good morning.  How are you, sir?
14   Q    How are you doing?
15   A    Not bad.
16   Q    Let me start by introducing myself.  I think you
17   know I represent Ann Cody in a case against the City of
18   Hartford and Robert Rudewicz, you and Michael Manzi.  Are
19   you familiar with the case a little bit?
20   A    Yes.
21   Q    I wanted to go through -- I'll show you this in
22   a second.  It's no big deal.  I wanted to go through a few
23   ground rules on the deposition so all of us have an
24   understanding as to what's going on.  You're represented
```

1    by Jill Hartley here today, right?
2        A    (Witness nodding.)
3        Q    If you have any legal questions, you can ask
4    her.  But anything like Hey, where's the bathroom or can
5    we take a break or whatever, you simply do it.  You don't
6    have to get permission, okay?
7        A    Okay.
8        Q    It may seem sometimes like an interrogation but
9    it is not.  So if you need a break, you can have one.  You
10   should also remember you can't really take a break to get
11   help with answering a question though.  That's the only
12   exception.  If there's a question so to speak on the
13   table, try to answer it first unless it's a real
14   catastrophic emergency, then just go.
15       A    Okay.
16       Q    Is there anything that would inhibit your
17   ability to answer questions today, medication or lack of
18   sleep or illness?
19       A    No.
20       Q    You're okay?
21       A    Yes.  Fine to answer.
22       Q    If I ask you a question today, sometimes your
23   attorney may object because of the form of the question or
24   for many other reasons but sometimes they might not and

1    you might not even understand the question.  So if that
2    happens, don't wait for somebody else to intercede.  You
3    tell me that you don't understand what I'm asking or can
4    you rephrase it and I'll do that.  If you forgot what I
5    asked, I generally try to have the same question read back
6    to you.  I'll ask Lisa and her fancy computer to read the
7    same question back.  There is a little difference.
8        A    All right.
9        Q    It's not a time to be proud if there's a word
10   that I use that you didn't understand.  A lot of times
11   maybe I didn't either.  Just say I didn't know what the
12   heck that means, okay?
13       A    All right.
14       Q    I don't anticipate it taking that long.  Things
15   come up and I have to explore them or whatever, but I
16   anticipate trying to get out of here at lunchtime.
17   Lawyers tend to go to lunch at one.  Other people that
18   might not work.  We'll caucus on that, that was my word
19   for the day, if it comes up, okay?
20       A    Okay.
21       Q    Did we spell your name right, Rudewicz?
22       A    R-u-d-e-w-i-c-z.  That's on the notice.
23       Q    Exhibit 1 is a renotice of the deposition which
24   you may or may not have seen.  It shows we noticed it for

1    today, okay?
2        A    Okay.
3        Q    Obviously it's not an issue because you're here.
4    And have you read any of the pleadings in the case, the
5    complaint?
6        A    Yes.
7        Q    They call it the amended complaint.
8        A    Yes.
9        Q    Did you read anything prior or in anticipation
10   of being deposed here in preparation for it?
11       A    Right.  I have met with the attorney.
12       Q    I don't want to know about your discussions.
13   We're allowed to ask what documents or audio that you
14   might have listened to.
15       A    I read documents that were part of the
16   investigation, you know, interdepartmental memorandums and
17   so forth.
18       Q    You refreshed your recollection on a few things?
19       A    Yes.
20       Q    Did you read what I call pleadings, like the
21   amended complaint, the allegations in the complaint?
22       MS. HARTLEY:  If I can jump in here.  He
23   read the amended complaint.  He read the brief
24   of the City of Hartford in connection with the

1    grievance, that's dated March 21, 2002.
2        MR. BREWER:  On what form, Jill?  Is this
3    the Labor Board?
4        MS. HARTLEY:  Yeah.  The State Board of
5    Mediation and Arbitration, dated 3-21-02.  And
6    he did read some internal investigation
7    memoranda.
8        Q    We may or may not go through some of these
9    documents if it's necessary.
10       MS. HARTLEY:  Just to be complete, report
11   of disciplinary infractions.
12       MR. BREWER:  Against him or who?
13       MS. HARTLEY:  Ann Cody.
14       MR. BREWER:  Is there a date on that?
15       MS. HARTLEY:  Why don't I just give you
16   the copies of them.
17       MR. BREWER:  We'll make copies of them if
18   you put them over there.  I'll keep moving and
19   during a break -- I think we have the same
20   stuff probably.  What about those?
21       MS. HARTLEY:  It's notes about where your
22   office is.
23       MR. BREWER:  It does say Starbuck's.  We
24   got a Starbuck's customer here.

1    MS. HARTLEY: Smoking gun.
2    Q    Are you still working at the Hartford Police
3    Department?
4    A    No, sir.
5    Q    The easiest way is if you could give me sort of
6    a work history either from when you started up to now or
7    now back, whatever way is easier in your mind to recall.
8    I call it a Reader's Digest of what assignments you had.
9    A    Sure. I entered into the Hartford police in
10   January of 1983.
11   Q    As you go along, if you can, what assignment you
12   had. You probably started as Patrol?
13   A    Right.
14   Q    So 1-83 Patrol?
15   A    Right.
16   Q    And as you went along, did you have any other
17   different assignments other than Patrol?
18   A    Yes, sir. I worked in what's called a Crime
19   Suppression Unit.
20   Q    What dates, if you recall, the best you recall?
21   A    I would have to say mid '80s to the late '80s.
22   Q    That's fine.
23   A    It's just a guess. To be honest, the exact
24   dates --

1    Q    It gives me sort of a sense where you worked.
2    If we need to focus more on it, it's a matter of record
3    probably, right?
4    A    Absolutely.
5    Q    So mid '80s you were in the Crime Suppression
6    Unit?
7    A    Right.
8    Q    You were still an officer though, right?
9    A    Yes, sir.
10   Q    You weren't a detective?
11   A    No, sir.
12   Q    Who was your supervisor there?
13   A    There was a couple. There was Gerry Pleasent
14   was a sergeant.
15   Q    He was a chief for a while, right?
16   A    Yes, sir. He was a deputy chief. And a
17   sergeant named Frank Daly.
18   Q    I always get this confused. Is this the Frank
19   Daly whose son was Frank Daly that went to Northwest
20   Catholic?
21   A    No.
22   Q    Was it a different Daly?
23   A    No, this was different.
24   Q    There was a Frank Daly like that?

1    A    There was two Frank Dalys. You're right.
2    Q    I thought I was losing it.
3    A    No, you're not. Frank Daly was my supervisor
4    there.
5    Q    He was a sergeant, right?
6    A    He was a sergeant. He retired at the rank of
7    sergeant and unfortunately passed away last -- I want to
8    say either last year or early this year, if I recall.
9    Q    From what? Do you know?
10   A    I want to say cancer. Young man in his 50s. He
11   had no children.
12   Q    Then after that what assignment do you recall
13   having?
14   A    From there I took a supervisor test.
15   Q    For sergeant?
16   A    For sergeant, yes. I was promoted to the rank
17   of sergeant.
18   Q    What year, date?
19   A    I want to say 1992, so I want to say maybe 1990
20   to maybe where I took the test I was back in the Patrol
21   Division.
22   Q    After you were promoted, you went back to
23   Patrol?
24   A    Yes. To give you -- you do these assignments.

1    You come on as an officer. I worked a couple little
2    details and was assigned to what is called Street Crime
3    Unit. From there if I recall correctly, it was -- I think
4    they, not disbanded it but for redeployment of manpower so
5    we went back to Patrol. From there, I was back in Patrol Division and
6    I took the sergeant's test, was promoted to the rank of
7    sergeant and then was assigned to midnight shift for a
8    little -- not too long. From there, I was assigned to
9    what's called the Auxiliary Services Division or basically
10   the private job office.
11   Q    That's sort of like a desk job?
12   A    Administrative job. You're responsible for
13   distribution of road jobs, private jobs.
14   Q    You're like a coordinator for that?
15   A    Somewhat, yes.
16   Q    When did you start doing that?
17   A    I would have to say '92, '93. I was only on
18   midnights for a short while, a matter of months if that.
19   They were looking for somebody -- that position is not a
20   revered position.
21   Q    I can imagine. You can either make friends or
22   enemies there.
23   A    A little of both, I imagine. When they offered
24   me, I grabbed that because of the day shift and the hours.

1  Q    The day shift?

2  A    I had a son I raised. He'll be 22 next week.

3  Q    You did raise him.

4  A    Yes, I did, sir.

5  Q    Are you married?

6  A    No, I'm not married.

7  Q    You adopted this --

8  A    No. He was my biological son.

9  Q    And what's your son's name?

10  A    Michael.

11  Q    But he goes by Rudewicz?

12  A    Rudewicz, absolutely.

13  Q    In '92, '93, he would have been like a teenager

14  or adolescent?

15  A    Yeah. Young. I'm not sure exactly how old he

16  would have been. 11, 12 years old maybe.

17  Q    Getting the job in the Auxiliary Services helped

18  with your child care responsibilities, right?

19  A    Well, it freed you up. It was a day position.

20  Q    And your son's in school during the day?

21  A    Right. He's in school during the day. And, of

22  course, you're home in the evening for the most part. You

23  work like -- a lot of police officers sometimes they work

24  extra duty jobs. But that was the reason I opted for that

A+ REPORTING SERVICES

---

1  position.

2  Q    Obviously your son is important to you?

3  A    Of course.

4  Q    So you wanted to make sure you could get a

5  schedule that helped him with that? I don't want to put words

6  in your mouth. That's helpful to you?

7  A    Right. The position became available because

8  the sergeant that was assigned there, he wanted out. It's

9  not a very revered position, but I opted to take that.

10  Q    Not to belabor the point, but you went from

11  probably a more preferable job, not the time period but

12  Patrol might be more interesting or whatever to Auxiliary

13  Services because it's hard for you to be gone from

14  midnight to seven when nobody's home with your son, right?

15  A    There was supervision and grandparents that

16  watched him, yes.

17  Q    Helped?

18  A    Absolutely it's an easier schedule.

19  Q    The reason why I'm asking that is you know Mike

20  Fago. Too many Mikes. Mike Perodeau sued the city for an

21  issue he was raising kids too. Did you know that?

22  A    No.

23  Q    You're not aware of that lawsuit?

24  A    No. To be honest with you, I am not.

A+ REPORTING SERVICES

---

15

1  Q    You know who Mike Perodeau is?

2  A    Of course.

3  Q    What did you think of Mike Perodeau?

4  A    I got a long with Mike.

5  Q    Was he a slouch? Did he not work hard ever?

6  A    You know, I never worked directly with him. The

7  times that I had -- let me say I believe one of his

8  assignments was Evidentiary.

9  Q    Yeah. ESD.

10  A    The times I had called for assistance and he

11  happened to be on, sure, there was no problem.

12  Q    He would show up?

13  A    Yeah. Come, show up, do what he had to do, what

14  his position called for, taking photos.

15  Q    Hartford CSI?

16  A    Basically. I had no negative interaction with

17  him.

18  Q    I was curious what your view of his work was.

19  A    Yes.

20  Q    And who was the chief when you were in Auxiliary

21  Services, chief of police? Was it Bernie Sullivan then

22  still?

23  A    No. It was -- might have been a couple.

24  Q    Jessie Campbell?

A+ REPORTING SERVICES

---

16

1  A    Jessie Campbell. He was transitional. He.

2  Was -- maybe six, seven months. Maybe Loranger? I want

3  to say Chief Loranger.

4  Q    What time frame did you work Auxiliary Services?

5  You said '92, '93 till what?

6  A    Maybe '96.

7  Q    What did you do after that? You were a sergeant

8  in Auxiliary Services.

9  A    Yes, sir.

10  Q    I shouldn't be asking that. You told me that.

11  After Auxiliary Services, where did you work?

12  A    I went to the Mounted Unit, the Hartford police

13  horses.

14  Q    No longer in existence, right?

15  A    Right.

16  Q    We get raises for the mayor's staff -- I'm just

17  kidding. There is no Mounted Unit as of what year?

18  A    It was disbanded.

19  Q    Few years ago, right?

20  A    '99, 2000 maybe.

21  Q    Were you there when it was disbanded? Were you

22  assigned to it?

23  A    No. I had just transferred actually months

24  prior to that.

A+ REPORTING SERVICES

1     Q   When did you stop working at the Mounted? '98
2 sometime?
3     A   Don't hold me to this exact date. Maybe '99.
4     Q   What division was that? Was that Patrol or
5 Community Service?
6     A   Yes. It would come under a Community Service.
7     Q   More of a community job?
8     A   For the most part it was.
9     Q   You know what I'm saying. They have like the
10 breakdown?
11     A   Right. It was more of a community based
12 division. The function, we would obviously patrol,
13 provide high visibility downtown in area parks. We did a
14 lot of events and a lot of things with the community. It
15 was a working unit too because we were also used evenings
16 for when Hartford had larger concerts. I worked at the
17 Dave Matthews band at the Meadows.
18     Q   With the horses?
19     A   Yes.
20     Q   They need them back there.
21     A   I remember Dave Matthews. I'm speaking. It was
22 fun. It was a nice assignment.
23     Q   You know how to ride a horse?
24     A   Yes, sir.

A+ REPORTING SERVICES

1     Q   Did you learn when you got the job or did you
2 know beforehand?
3     A   No. I learned on the job.
4     Q   Who teaches it? I don't know how relevant. Did
5 somebody teach you that?
6     A   They had officers there that were assigned,
7 folks that -- stabled hands I guess. There was personnel
8 assigned there that had experience. And we would meet
9 with other police units, other farms, other -- I did a lot
10 of stuff on my own. I had taken riding lessons. I wanted
11 to insure I knew what I was doing on a 100 pound animal
12 with a mind of its own. If you're having a bad day, you
13 need to be able to control that as safely as you can.
14 You've got yourself and other folks around.
15     Q   After the Mounted Unit, where did you go? We're
16 getting close to 2004.
17     A   To the South PSA they called them back then.
18 Police Service Area.
19     Q   As a patrol officer?
20     A   No. Sergeant.
21     Q   You were on Patrol? Was it a Patrol assignment?
22     A   Well, you covered -- once again, it was a
23 community based division.
24     Q   What division were you in?

A+ REPORTING SERVICES

19

1     A   You do -- I dealt with the Community Service
2 officers. There were officers that were operation
3 officers. They would walk a beat, some narcotics, some
4 undercover. As a supervisor when the area -- say the
5 supervisor for the Patrol supervisor was not available, I
6 would pick up, have to step up to the plate and cover
7 Patrol too.
8     Q   But your assignment on the books, what division
9 were you assigned to?
10     A   Community Response Division. It was the South
11 PSA. The city at the time I believe was broken down into
12 two or three, it was the South Central and the North
13 Police Service Area.
14     Q   How long did you stay there?
15     A   Maybe the end of 2001.
16     Q   Then where did you go?
17     A   To the property room.
18     Q   As a supervisor?
19     A   Supervisor. Yes, sir.
20     Q   Do you know when in 2001 you started in the
21 property room?
22     A   I want to say the end, towards maybe October.
23     Q   Was it after 9-11, the terrorist attacks? Does
24 that refresh your recollection?

A+ REPORTING SERVICES

20

1     A   Yes, it was.
2     Q   We use that as a benchmark.
3     A   Yes.
4     Q   Maybe October of 2001?
5     A   Yes.
6     Q   Did you go anywhere else?
7     A   From there I was promoted to lieutenant and I
8 remained there for probably a few weeks or a month as a
9 lieutenant.
10     Q   What was your promotion date, if you recall, to
11 lieutenant?
12     A   Sure. I want to say August of 2002, August 1,
13 2002.
14     Q   And you stayed in the property room after you
15 were promoted?
16     A   Shortly. And then went back to Patrol and
17 worked Patrol.
18     Q   When did you go back to Patrol for the property
19 room? Do you recall?
20     A   I'd say towards the end of 2000 --
21     Q   Two?
22     A   I'm trying to remember the dates but not trying
23 to mess it up.
24     MS. HARTLEY: No one's asking you to

A+ REPORTING SERVICES

22

1    guess.
2        Q    You don't have to guess. If you don't remember,
3    that's all right.
4        A    I would say towards the end.
5        Q    Of 2002?
6        A    Yeah. I was promoted August, so maybe
7    September. Once again, it was a redeployment in manpower
8    with a lot of folks retiring. And, of course, the
9    position I was in really required more of a sergeant than
10   a lieutenant.
11       Q    You were overranked for the position, sort of?
12       A    I guess, yeah.
13       Q    Where in Patrol -- you were a lieutenant
14   supervisor?
15       A    Patrol lieutenant.
16       Q    Patrol lieutenant. Thank you. What shift or
17   squad?
18       A    I worked in the afternoons B Squad.
19       Q    B Squad. Was it still broken down in 2002 into
20   like PSAs or anything?
21       A    North, South. Sometimes you would cover -- I
22   was a relief. Sometimes I covered North. Sometimes I
23   covered South. Sometimes the whole city.
24       Q    Your position was the relief lieutenant? Is

A+ REPORTING SERVICES

1    that what you're saying?
2        A    Yes.
3        Q    You were the junior?
4        A    Junior. At the time, maybe three or four
5    lieutenants assigned to B Squad. You picked up pays for
6    the days off. You were the fill in. I worked North. I
7    worked South. Like I said, sometimes I covered the whole
8    city.
9        Q    Did you ever work for -- I guess maybe for. It
10   gets confusing with demotions. Did you ever work for Mike
11   Fago when he was a lieutenant?
12       A    Yeah.
13       Q    Could you describe -- I don't know what you did.
14   Did you work as his subordinate for any time period?
15       A    I didn't directly work with him. I only
16   recall -- when you say work under him, do you mean in a
17   continuous situation or like a one day event type of
18   thing?
19       Q    I leave it wide open, Mark. You tell me what it
20   was.
21       A    Mr. Brewer, I worked with Mike Fago, not on a
22   continuous basis but I've worked -- you know, you work an
23   event or you work -- I worked a line car one time. And he
24   happened to be the Patrol lieutenant that day.

A+ REPORTING SERVICES

23

1        Q    You were a sergeant still?
2        A    Sergeant, yes, sir.
3        Q    Whatever makes you feel more comfortable. You
4    don't have to call me Mr. Brewer, if you don't want to.
5    Some lawyers tell their clients even if I say that.
6        MS. HARTLEY: I told him to call you
7    Jimmy.
8        Q    Don't call my Jimmy. That's an old joke with
9    Jill. It's not required for me. Some people feel more
10   comfortable.
11       A    It's a polite thing.
12       MS. HARTLEY: Before you continue, if you
13   have more questions about Fago, I'm going to
14   call Shipman & Goodwin to see if they want to
15   attend this.
16       MR. BREWER: You can call whoever you
17   want.
18       MS. HARTLEY: Are you going to ask any
19   more questions about Fago?
20       MR. BREWER: I have questions about Mark
21   Rudewicz. It doesn't work that way. We can
22   get the judge on the line. I can ask any
23   witness about anything they know that might be
24   relevant.

A+ REPORTING SERVICES

24

1        MS. HARTLEY: If you're going to ask
2    questions that relate to Fago in this case in
3    this matter, Chuck Howard has a right to be
4    here.
5        MR. BREWER: If he wants to come here
6    because I'm asking this witness what he knows
7    about the Hartford Police Department. We don't
8    go by that. It's interfering with the
9    deposition. I will bring it up with Judge
10   Underhill.
11       MS. HARTLEY: I'll give you fair warning.
12       MR. BREWER: It's not a warning. The
13   federal rules do not require me to give a
14   notice to every defendant in every case in the
15   City of Hartford if they happen to be
16   defendants in multiple cases.
17       MS. HARTLEY: Let me respond to this.
18       MR. BREWER: You're interfering with the
19   deposition.
20       MS. HARTLEY: No, I'm not. I'm telling
21   you what I'm going to do if you have a lot of
22   questions about the Fago case so it's clear on
23   the record.
24       MR. BREWER: File a motion. This time you

A+ REPORTING SERVICES

25

```
 1    have to go through with it and I'll move for
 2    sanctions.
 3           MS. HARTLEY: I'm not arguing with you.
 4    Go ahead and ask your questions.
 5           MR. BREWER: Judge Underhill --
 6           MS. HARTLEY: Go ahead and ask your
 7    questions.
 8           MR. BREWER: You're coaching him.
 9           MS. HARTLEY: I haven't coached him.
10    Q    Describe for me your relationship, your contact
11    with Mike Fago when he was a lieutenant.
12    A    My contact with Mike Fago. I've tried to be
13    honest. I've tried to have very limited contact with Mike
14    Fago.
15    Q    You didn't get along with him?
16    A    I'd have to say that he didn't get along with
17    me.
18    Q    Okay. There's my Fago questions. But you don't
19    have anything specific that you would say that was
20    derogatory about Mike Fago that you can recall? I'm
21    talking about --
22    A    Yeah.
23    Q    What was it?
24    A    Derogatory in terms of -- I mean --
```

A+ REPORTING SERVICES

26

```
 1    Q    Whatever.
 2           MS. HARTLEY: Are you saying you don't
 3    understand the question?
 4    Q    Do you want me to rephrase the question? You
 5    know what "derogatory" means, negative?
 6    A    I do. But I mean I --
 7    Q    Let me ask -- I'll withdraw the question. I'll
 8    say it another way. I'll ask another way.
 9    A    Yes, sir.
10    Q    Let me make it an easier question. Do you have
11    any personal knowledge of anything that Mike Fago did to
12    you that you thought was unbecoming a lieutenant?
13    A    Yes, sir.
14    Q    What was it?
15    A    Mike Fago, as a lieutenant, would do things,
16    subtle things to try to vex or harass people or
17    intimidate.
18    Q    You were intimidated by him?
19    A    Sure. Sure.
20    Q    What did he do?
21    A    In relation to being a lieutenant?
22    Q    Yes. What did he do though?
23    A    Well, he would --
24    Q    I need a specific example, certain day or
```

A+ REPORTING SERVICES

27

```
 1    whatever he did this.
 2    A    I don't recall the dates because I don't have my
 3    stuff on that case here. He would pick a place or a time
 4    when it would be just -- when it was opportune for him.
 5    I'll give you case in point. I'm in this room. I'm using
 6    this as an example. This is not a specific --
 7    Q    I need a specific thing that you know that he
 8    did. If you don't have that, I'm not interested in
 9    speculation.
10    A    Let me see. Specific, sure. I can give you
11    something specific. As a lieutenant -- he was a
12    lieutenant. I don't remember the exact date. He was
13    walking through the back door.
14    Q    Where?
15    A    Hartford police headquarters, rear entrance door
16    of Hartford police headquarters. He was a lieutenant. I
17    was coming out the hallway out of the property room and he
18    would walk up the hallway and he would stop and he would
19    just turn and, like, kind of, I use the word leer like a
20    stare or glance, but even -- if that's proper --
21    Q    Whatever way you want to describe it.
22    A    He would stop and turn and he would just stare
23    at you like glare at you. He would make some kind of
24    motion with his arms like he's flexing and then there
```

A+ REPORTING SERVICES

28

```
 1    would be noise. He would make a humming noise. That was
 2    one example of intimidation, his way of trying to
 3    intimidate.
 4           MS. HARTLEY: Are you finished answering
 5    the question?
 6    A    Yes.
 7           MS. HARTLEY: I'm going to take a break.
 8    I'm going to call Shipman & Goodwin and see if
 9    they want to come.
10           MR. BREWER: I don't have time for this.
11    We'll go for sanctions with the judge. You're
12    not going for a break.
13           MS. HARTLEY: I'm taking a two-minute
14    break to call from --
15           MR. BREWER: No. They don't have an
16    appearance in the case. I'm not playing games.
17    I'm going to move for sanctions.
18           MS. HARTLEY: You can ask whatever you
19    want to.
20           MR. BREWER: It doesn't work that way. If
21    you want to call your friend Chuck and tell him
22    we're deposing Mark Rudewicz today and maybe he
23    wants to file an appearance --
24           MS. HARTLEY: I'm calling them.
```

A+ REPORTING SERVICES

30

1    MR. BREWER: You're dismissed. Get out of
2  the office. We're done. I'm going to move for
3  sanctions for interfering with the witness.
4  We're not going to have a break because I asked
5  questions about Mike Fago so you can get Chuck
6  in here, like somehow that's going to make a
7  difference. If Chuck wants to talk to you
8  about it beforehand --
9    MS. HARTLEY: Call the judge right now and
10  resolve this to see if it's appropriate to do a
11  deposition about Fago. He's a defendant in
12  Fago.
13    MR. BREWER: You set the pattern as to how
14  you're going to do it. Goodbye. I don't have
15  time for this nonsense.
16    (Whereupon, a short break was taken.)
17    (Whereupon, back on the record.)
18  Q    The last question on that issue is directly
19  related to you.
20    MS. HARTLEY: I thought you told Barbara
21  you're done talking about Fago.
22  Q    After Lieutenant Fago was demoted, you
23  subsequently were promoted to lieutenant, is that
24  accurate?

---

1  A    Yes, sir.
2  Q    So there was a vacancy as of May or so of 2002
3  in the lieutenant slots when Fago was demoted, right, as
4  far as you know?
5  A    Yeah. There were lieutenant vacancies.
6  Q    In your recollection of the Hartford Police
7  Department, do you know of any other -- you've been there
8  since '83?
9  A    21 years.
10  Q    In your 21 years, other than lieutenants Fago
11  and Albert, do you know of any other lieutenant that was
12  demoted from lieutenant back to sergeant, any name or
13  time?
14  A    No. No. Off the top of my head, I can't recall
15  a name.
16  Q    Did you have a probationary period as a
17  lieutenant?
18  A    Yes, sir.
19  Q    I forget when you said you started. September
20  or so of 2002?
21  A    August.
22  Q    August. As a lieutenant?
23  A    Yes. As a lieutenant. That's when the
24  promotion took effect.

---

31

1  Q    Were you on a one-year probationary status?
2  A    Yes. One year.
3  Q    I'm not holding you to a specific date. Is it
4  fair to say around August of 2003, you were off probation
5  at some point?
6  A    Yes, that's correct.
7  Q    Did you get a notice saying congratulations,
8  you've succeeded your probationary period or passed it?
9  A    I don't believe I did.
10  Q    Was it a significant event in your life that you
11  got through that year?
12  A    No. You know, I didn't -- you just went about
13  doing my daily job.
14  Q    Did you get interim and final probationary
15  evaluations?
16  A    I can't say specifically how often. I know -- I
17  want to say I recall -- I believe you have to sign when
18  they would do an evaluation like your captain.
19  Q    You're supposed to sign it?
20  A    Right. I remember that occurring I want to say
21  a couple times.
22  Q    Did you keep your -- it was a carbon sheet form?
23  A    I understand it was a three-page document in
24  triplicate.

---

32

1  Q    Not to be bureaucratic, but you get to sign the
2  original and it presses through and makes hard copies?
3  A    Yes.
4  Q    You recall that?
5  A    I believe -- I recall.
6  Q    I understand.
7  A    To the best of my recollection. I don't want to
8  say with unequivocal certainty that happened.
9  Q    Right. I understand you don't have it in front
10  of you.
11  A    Yes, sir.
12  Q    From your recollection, you recall getting it
13  and signing it?
14  A    Right.
15  Q    Whether it was interim or whatever it was
16  called, you know you got one and then a final one, is that
17  fair, of these evaluations?
18  A    Yeah. At the end, there is a final evaluation.
19  Q    How did you do?
20  A    Well, I passed.
21  Q    There's a box that says satisfactory,
22  unsatisfactory.
23  A    Right. There's a couple of different
24  categories. It must have been satisfactory.

33

1    Q    Do you recall seeing that?
2    A    I believe so. I can say I didn't have any
3 unsatisfactories.
4    Q    Who was your rater for that?
5    A    I want to say -- well, Captain Pawlina or maybe
6 Chief Reilly.
7    Q    There could be more than one on this document?
8    A    Absolutely.
9    Q    The initial supervisor was who, Pawlina?
10    A    Right. At one point, he was my supervisor,
11 Captain Pawlina.
12    Q    Shouldn't that be the person rating you?
13    A    Yes.
14    Q    I'm seeing if it refreshes your recollection.
15    A    Yes.
16    Q    Was it Pawlina who did that?
17    A    I'm not sure. I want to say at one point I
18 might have met with Chief Reilly, assistant chief, for
19 whatever reason. Maybe the captain was away.
20    Q    He might have signed off on it.
21        MS. HARTLEY: Let him finish his answer
22    before you jump in.
23        MS. HARTLEY: You're very expressive
24    today, Jill. I don't know where your energy is

34

1    coming from.
2    A    I believe one might have been signed by Chief
3 Reilly.
4    Q    Do you have your copies of that?
5    A    That I do not. I don't believe I do.
6    Q    Do you recall that you're allowed to keep the
7 triplicate, like the yellow one or whatever?
8    A    Yes.
9    Q    Do you remember that?
10    A    Yes.
11    Q    It's a tear off thing?
12    A    Right.
13    Q    You didn't bother to store that anywhere that
14 you recall?
15    A    I don't recall if I have that.
16    Q    It's not a big deal? I'm just curious.
17    A    To me it wasn't a significant event like you
18 said. I wasn't concerned about it.
19    Q    You didn't need to keep it?
20    A    Yeah. I may have it in a drawer or a box.
21    Q    When you became a lieutenant, who did you
22 supervise? Was there a certain number of sergeants that
23 you recall you supervised?
24    A    When I was a lieutenant, first promoted I was

35

1 assigned -- I was in the property room. At the time, I
2 was a supervisor. I was the only sergeant. You had a
3 handful of officers. There could have been from three to
4 six people at different times.
5    Q    I didn't mean to cut you off.
6    A    Then I was promoted and I went back there for a
7 short period of time till they found a replacement
8 supervisor.
9    Q    Who replaced you in the -- I know it was a
10 sergeant.
11    A    Sergeant Paul Ciesinski.
12    Q    Do you know how to spell that? It's not a
13 spelling test.
14    A    Probably C-y-s-i-e-n-s-k-i. I know it's Paul
15 Ciesinski.
16    Q    Were there any civilians in the property room
17 when you were supervising there?
18    A    No.
19    Q    They're not allocated to do anything bookkeeping
20 or anything there?
21    A    No. The only civilian person that they were
22 transitioning the computer system, but that was it.
23    Q    It's just officers that are in charge of the
24 property room --

36

1    A    Yes, sir.
2    Q    -- when you were there?
3    A    Yes, sir.
4    Q    When you were responsible for the property room,
5 was there any misconduct that was alleged, not against you
6 personally but with regard to the property room, any
7 issues there?
8    A    Yes.
9    Q    Could you explain what occurred that you're
10 talking about.
11    A    Sure. There was one allegation. There was a
12 property and it was jewelry that the lady claimed -- well,
13 it wasn't there. I mean it's not an allegation. We could
14 not find it.
15    Q    Jewelry that was what, evidence?
16    A    It was evidence. Matter of fact, if you want a
17 little more detail, I can tell you a little about the
18 case.
19    Q    Yeah. I like a little more detail. It's not up
20 to Jill. I know you're looking at her.
21    A    I know.
22    Q    I'm not accusing you of anything. I'm curious
23 as to what happened there.
24    A    I'll give you the layout, the best picture that

37

1  I can for you.
2      Q    Sure.
3      A    The burglary -- it was a burglary of a house
4  that occurred --
5      Q    What date?
6      A    On September 11, 2001.
7      Q    Really?
8      A    Yes. Oddly enough, I was -- matter of fact, I
9  was at the time still assigned to the South police service
10  area. I was a south end supervisor. Myself and, matter
11  of fact, Lieutenant Mike Manzi were both in that area when
12  that occurred and responded to the house.
13     Q    You responded as a sergeant?
14     A    I was a sergeant and of course there were line
15  officers.
16     Q    Was it an active burglary?
17     A    It came in as an active burglary. We must have
18  just missed this person by minutes.
19     Q    You can keep going.
20     A    That was September 11. I guess I had no part of
21  this, but later, a couple hours later, the officers ended
22  up apprehending the perpetrator, burglar and they tagged
23  the evidence.
24     Q    Who is the officer? Do you recall?

A+ REPORTING SERVICES

38

1      A    I want to say -- and, if I believe correctly, I
2  want to say an Officer named Anthony or Tony Kozleradzki.
3      Q    Patrol officer?
4      A    Yeah. Line officer. You're in the area,
5  something comes in, you go. I wasn't specifically the
6  patrol sergeant for that area. You're right down the
7  street. It's an active crime. You're going to respond.
8  You're a police officer. Later in the day he makes an
9  arrest. They tag some jewelry. I still had not been
10  assigned to the property room. So that was tagged.
11  Months, months later --
12     Q    Tagged as stolen evidence?
13     A    Tagged as evidence.
14     Q    I mean property.
15     A    Right. It was recovered stolen in the burglary.
16  Months later I guess what happened, how it worked is --
17  I'm not sure how the case went, but on the form, it's
18  called form 200. And the judge orders the property to be
19  turned back to the rightful owner. Well, what had
20  happened is you asked about this one case. An officer --
21  Also I wasn't aware but it's Tommy Eldridge.
22     Q    In property?
23     A    Yes. Excellent, excellent officer. Just a
24  gentleman. Just a great person. And he was trying to

A+ REPORTING SERVICES

39

1  purge stuff. That was the goal of the property room.
2      Q    Clear stuff out?
3      A    Legally and lawfully purge stuff. He got the
4  order. Called the lady. I've got the order from the
5  court. Good news. You can come down and pick up your
6  belongings, jewelry and whatever else. There might have
7  been an article of clothing there. However, I guess he
8  had called her and then not to belabor it, I know we got
9  other questions here. He couldn't find all the jewelry
10  together that was listed.
11     Q    That was listed you mean?
12     A    It was listed. The lady alleges it was a few
13  thousand dollars in jewelry. We couldn't find it. We did
14  find partially what was hers, but we couldn't find it. To
15  this day, I don't have an explanation where that is.
16     Q    Aside from her allegation --
17     A    Whether it was in a different location. I still
18  suspect it will be found. Was it taken? These are
19  answers I don't know.
20     Q    As far as what you do know, there's no dispute
21  of the fact that you, not you personally, but the property
22  room was unable to produce the items that were logged in.
23  Is that fair to say?
24     A    Yes.

A+ REPORTING SERVICES

40

1      Q    She can say whatever. You're saying you're not
2  sure as to whether or not it might have been stolen or
3  lost within the property room. Is that fair?
4      A    That's fair.
5      Q    Even to this day, that's not resolved?
6      A    I don't believe it is. I don't believe that's
7  been found.
8      Q    Regardless of whether or not it was either
9  stolen or lost, it's still a problem if property's not
10  accounted for, right?
11     A    Yes, sir.
12     Q    Did you get disciplined in any way for that?
13     A    No.
14     Q    Because you really weren't responsible for when
15  it came in, right, they didn't charge you?
16     A    Right. Although I was in charge at the time
17  when the order came from the court. Oddly enough, I
18  happened to be one of the responding persons at that
19  burglary. And I wasn't assigned there. I've never seen
20  the package, never held it. Couldn't tell you the
21  contents of it. Never stored it, never moved it.
22          To give you a quick overview of the Hartford
23  police property room, there's several -- thousands and
24  thousands and hundreds of thousands of pieces of evidence.

A+ REPORTING SERVICES

1    It's all listed and it's catalogued and categorized. But
2    that one thing we just we couldn't find. And we looked
3    and looked.
4        Q    It is a restricted area?
5        A    Yes, it is.
6        Q    Even within officers. Just because you're an
7    officer, you can't walk in there, right?
8        A    Correct.
9        Q    You have limited access, right?
10       A    Correct.
11       Q    Do you know if that was investigated by anybody?
12       A    Yeah. I want to say that Internal Affairs
13   Division would follow up on that.
14       Q    Did they interview you, anybody from IA?
15       A    Yes, sir.
16       Q    Who did that?
17       A    Sergeant John Horvath.
18       Q    Without belaboring it, did you basically tell me
19   what you're telling me as far as what happened?
20       A    Absolutely.
21       Q    It is it still an active IAD investigation? Do
22   you know?
23       A    That I couldn't tell you.
24       Q    You're retired.

1        A    That I wouldn't know.
2        Q    Do you know if it ever became a criminal
3    investigation?
4        A    No, I don't believe it has.
5        Q    If someone believed that evidence was stolen by
6    anybody, even if it was an outside job, somebody sneaking
7    in there, that would be a crime?
8        A    Right.
9        Q    Whether it was an officer or a non officer?
10       A    Absolutely.
11       Q    And you don't know of anybody that was even
12   rumored to have had any misconduct involved in this
13   jewelry issue, do you?
14       A    No.
15       Q    Did you hear like we think that officer so and
16   so might have pocketed it or anything like that?
17       A    No.
18       Q    None of that stuff flew around the department?
19       A    No. That I did not hear.
20       Q    Was there any other issues at the property room
21   that you're aware of?
22       A    No.
23       Q    I shouldn't say issues. I'm talking about
24   something that was investigated by IA.

1        A    No. investigated or disciplinary, no.
2        Q    You got along with your subordinates there?
3        A    Yes. When you're a supervisor, you're not
4    always going to please everybody.
5        Q    When you worked in the Community Response
6    Division --
7        A    Yes, sir.
8        Q    CRD?
9        A    CRD.
10       Q    -- did you have to take any specialized training
11   to be a supervisor in that division? Did they send you to
12   any school or anything?
13       A    I can't say they sent you to a school for
14   Community Response Division. But what the police
15   department did do for everybody was offer continuous
16   training and education through -- of course, we have to go
17   for recertification. But they would send you to
18   everything from customer relations, customer service
19   training.
20       Q    Where would you take that training?
21       A    The city would -- usually Prospect Street, 10
22   Prospect.
23       Q    An office building?
24       A    Yeah. The old Hartford Times building. The

1    city would bring in an independent person to teach it or
2    sometimes folks in the Police Academy. They would try to,
3    and it's not just for Community Response because I think
4    the whole direction that the organization wanted to take
5    was being user friendly, being customer service oriented.
6    So they would offer trainings geared towards that.
7        Q    Did you ever have any training in sexual
8    harassment like supervisor training not in sexually
9    harassing people but --
10       A    I understood. But over the years, I believe
11   every officer and person was pretty much mandated to go
12   through these type of training. Hartford police offered
13   those sexual harassment trainings.
14       Q    When's the last training in that regard that you
15   recall receiving?
16       A    You know --
17       Q    Even a year.
18       A    I'd have to say it was a few years back.
19       Q    Let me break it down.
20       A    I don't want to try to nail it to a year because
21   I don't want to give you inaccurate information.
22       Q    I'll break it down. Do you recall getting any
23   training in sexual harassment, prevention of sexual
24   harassment in the time period that you were a lieutenant?

45

1    A    I have to tell you honestly I don't recall.
2  There were certain trainings we had to attend.
3    Q    I'm talking about that.
4    A    I honestly can't recall specifically if I
5  attended something on sexual harassment.
6    Q    If you did, there would be a record, right?
7    A    Yes, sir. I would believe there would be a
8  record of it.
9    Q    You didn't review anything in that regard for
10  the deposition, what kind of training you took?
11    A    No, sir.
12    Q    In the time period that you were a sergeant, did
13  you receive any sexual harassment prevention training?
14    A    Yes.
15    Q    Do you recall when?
16    A    The dates, no, but in the period that I was a
17  supervisor, because I was a supervisor for probably nine
18  or ten years so in that period sure.
19    Q    It's a long time frame.
20    A    Absolutely. To give you an exact date, I can't
21  but to say in that span of time, sure I would.
22    Q    You know the law changes constantly?
23    A    Correct.
24    Q    You know all laws, criminal, sexual harassment,

A+ REPORTING SERVICES

46

1  they change. You do realize that, right?
2    A    Yes, sir.
3    Q    You don't know when the last even refresher
4  course or anything that you took for sexual harassment is?
5    A    No, I do not. I will say that Hartford Police
6  Department and the training academy would put out
7  different bulletins and different orders. We would get
8  periodic memorandums from the City of Hartford on that
9  subject to try to keep up with amended laws and changed
10  laws. Some were as minor, not as minor but -- let me
11  retract that. I don't mean minor to downplay that
12  specific training.
13        The way it was disseminated was not always in
14  formal classroom structure. It might have been taught at
15  roll call training or in your own squad, a division where
16  you work three or four persons assigned, go over the order
17  like different things.
18    Q    Like an update?
19    A    Right. Exactly.
20    Q    Do you have any recollection of anything
21  specific -- let me rephrase the question. Do you have any
22  recollection of anything specific that you got out of your
23  sexual harassment prevention training that you can tell me
24  now?

A+ REPORTING SERVICES

47

1    A    No.
2    Q    Was there any general guidelines that you can
3  recall now that you got from that kind of training? Buzz
4  words? Anything like that?
5    A    Quid pro quo and different terminologies.
6    Q    That's what I'm asking.
7    A    Right.
8    Q    Anything like that that you can tell me that
9  kind of stuck in your mind from the training?
10    A    I would say obviously that did and certain --
11    Q    Anything else?
12    A    No.
13    Q    Let's focus on you mentioned quid pro quo. What
14  was your understanding of what that means?
15    A    I don't remember. I remember the terminology.
16    Q    It's Latin. Do you know what it means?
17    A    No. I want to say -- and excuse me if I'm
18  wrong.
19    Q    You can be wrong. Just be honest.
20    A    I don't know if that means I'll do this for you
21  if you do this for me, whether you're trying to use force
22  compulsion. You want your job, you're going to do this or
23  we're going to do this. I remember that as being the
24  worst case scenario in the ladder of offenses.

A+ REPORTING SERVICES

48

1    Q    Under sexual harassment?
2    A    Under sexual harassment.
3    Q    I think you passed that test. That is what it
4  means. Sort of this for that. In other words, sex for
5  favorable job assignments or promotions and things like
6  that. You were aware of that as being illegal conduct for
7  a supervisor or for anybody to do that?
8    A    Right.
9    Q    Do you know any other aspects of sexual
10  harassment that you learned from either training or
11  experience?
12    A    Yeah. Yes, sir.
13    Q    What else?
14    A    It doesn't necessarily have to be as extreme as
15  this for that, but it can be a subtle -- little subtle
16  things. It can be words. It can be I imagine a comment.
17  It could be touches. It could be looks. I would imagine
18  it's --
19    Q    How about pulling someone's hair?
20    A    Depending on the way the person interprets it,
21  the individual.
22    Q    How about pulling someone's hair? If a male
23  supervisor pulled a subordinate female's hair, do you
24  think that would fall under that type of harassment?

A+ REPORTING SERVICES

49

50

1    A    I would imagine. That's pretty extreme.

2    Q    As a lieutenant or sergeant?

3    A    Pulling hair. I mean it's sexual harassment and

4    maybe --

5    Q    Maybe an assault too, right?

6    A    (Witness nodding.)

7    Q    You have to answer audibly.

8    A    Sure. Yes.

9    Q    You don't have to say yes but you have to say

10    something.

11    A    Yes. You're going to the extreme of pulling

12    somebody's hair.

13    Q    You're saying there's other things if you look

14    at the circumstances that might fall under sexual

15    harassment? That's your understanding of it?

16    A    Yes, sir.

17    Q    Do you think that words alone can constitute

18    sexual harassment?

19    A    Sure.

20    Q    Do you think that scrutinizing, like say you're

21    a male scrutinizing a female more than the males might be

22    sexual harassment?

23    MS. HARTLEY: Objection to the form of the

24    question.

A+ REPORTING SERVICES

1    Q    You can still answer unless she tells you not

2    to.

3    A    Okay. Yeah. Sure. If it's done in the fashion

4    you're saying, sure, if you're targeting someone based on

5    their gender. Sure.

6    Q    If you saw one of your subordinates when you

7    were a lieutenant, one of your subordinate supervisors

8    sort of as you pointed out targeting a female for more

9    discipline or more scrutiny, what would you do?

10    A    Well, when you say targeting, I mean you can be

11    a female and also be investigated.

12    Q    I understand that.

13    A    There's a difference between being investigated

14    and targeting. If somebody brought it to my attention

15    saying I don't like officer so and so and whatever,

16    because that person -- because of gender or personal

17    dislikes absolutely it's wrong. If there's --

18    Q    Go ahead.

19    A    Based on an investigation or a complaint or

20    something you're following up as a supervisor, you have a

21    right to do that regardless of obviously gender.

22    Q    Right. Do you know of any complaints made by

23    anyone against you when you were a sergeant in the

24    Community Response Division?

A+ REPORTING SERVICES

51

52

1    A    A complaint?

2    MS. HARTLEY: Objection to the form of the

3    question.

4    Q    I'm talking about a citizen complaint.

5    A    You know, I don't. I honestly do not recall.

6    Q    You went through that time and position sort of

7    unscathed by any citizens complaining about you didn't do

8    this or you didn't respond or things like that?

9    A    You know, I have to tell you I honestly don't

10    recall. In this job, people are not always satisfied with

11    the delivery of service that's provided.

12    Q    It's a difficult job?

13    A    It truly is. People will call. They will

14    express their concern or what they perceived, that

15    individual perceived as a lack of service delivered to

16    them for whatever reason. So people do call and complain

17    and look to always speak to the chief or the next in the

18    chain of command. But to say that I remember somebody

19    making a specific complaint against me --

20    Q    Yes. Exactly. Like you're saying, like

21    Sergeant Rudewicz didn't respond enough to my concerns?

22    A    I'm not going to say that. I don't remember it

23    occurring, but I'll say it may have occurred. People do

24    make complaints and I don't remember.

A+ REPORTING SERVICES

1    Q    You've been there a long time?

2    A    Yes.

3    Q    With regard to that, would you say that -- I

4    call it CRD. Is that okay with you?

5    A    That's fine, sir.

6    Q    Just so we're on the same wavelength. Would you

7    say in the CRD there are certain constituents, citizens,

8    civilians, whatever you want to call them that were more

9    likely to complain than others?

10    A    Yes.

11    Q    This is not meant to be disparaging about these

12    people. Everybody's got their role. I got mine. You got

13    yours. Jill's got hers. God knows Jill has got her role

14    here. Just kidding.

15    For instance, in Hartford you've got various

16    ministers and some are more outspoken than others that go

17    out in front of the police department and protest, right?

18    A    Correct.

19    Q    That would fall under the mission of the

20    Community Response Division, dealing with activists?

21    A    Yeah. Community people, right.

22    Q    These ministers. It's no secret. There's

23    various -- you got the Behind the Rocks group, HEART, I

24    think it's called.

A+ REPORTING SERVICES

1    A    Right.
2    Q    You know better than me. I see them in the
3  paper. There's a bunch.
4    A    Yes. There's several organizations.
5    Q    They're not government groups. They're
6  volunteer organizations. Is that fair?
7    A    I do believe that's correct.
8    Q    They do get some kind of support from the city
9  to facilitate them getting their message out. They get a
10  forum from the city?
11    A    We will meet with various organizations and
12  listen to their concerns and their complaints.
13    Q    I remember years ago HEART was involved in
14  trying to clean up the hookers around some area. That was
15  a big deal for them. And they made changes by their
16  activism, right?
17    A    Right. Absolutely.
18    Q    You said right?
19    A    Right. Absolutely.
20    Q    Are there certain people in these groups that
21  are like leaders? I think it's called Behind the Rocks or
22  HEART group. Do they have a leader?
23    A    Right. Usually a coordinator.
24    Q    And the CSOs were your subordinates when you

1  were a sergeant, right?
2    A    Yes, sir.
3    Q    They would be responsible for meeting with these
4  groups?
5    A    That's correct.
6    Q    That's all over the city. You got some in the
7  North end, South end, middle? .
8    A    Right.
9    Q    Those people would be more -- is it fair to say
10  that some of those people would be more hypersensitive
11  about getting responded to when they had a complaint?
12        MS. HARTLEY: Objection to the form of the
13  question.
14    Q    Do you understand what I'm asking?
15    A    Yes, I understand.
16    Q    You can go ahead and answer.
17    A    Okay. I would say this, that the person, the
18  coordinator -- let me lay this out. You attend the
19  community meeting. The coordinator is the point person
20  kind of that deals with not just the CSO but maybe has
21  interactions with other agencies and deals with their home
22  base. I'll use HEART or Behind the Rocks.
23    Q    Whatever is easier.
24    A    The coordinator for that specific area as far as

1  I know, I've never been part of the HEART organization,
2  will answer to keep abreast their supervisors in that
3  organization. However, let me say that the coordinators
4  are not always the most vocal when talking about the
5  delivery of service.
6    Q    There are certain members of these organizations
7  that might be more prone to complain about services than
8  say like the average citizen?
9    A    Not necessarily.
10    Q    No?
11    A    Well, no. Because I have to tell you, you know,
12  folks have concerns for their neighborhoods and sure they
13  want police service and some folks have -- there have been
14  some folks that will call and they have perceived that the
15  delivery of service didn't meet with their demands.
16  However, I've dealt with folks too over the years that
17  were of no affiliation to any one of these several
18  Hartford area groups. They were just a concerned
19  resident, a concerned neighbor. They would call and keep
20  us informed of what's going on and in no uncertain terms
21  let us know what they expected.
22        It wasn't always an organization or a
23  coordinator or a leader who was the vocal person.
24    Q    Was there any other sergeant supervising the

1  CSOs when you had that position?
2    A    When I transitioned in there, there was -- I
3  don't think he had much hands on, but Charlie Lilley....
4  worked operations.
5    Q    For CRD?
6    A    For South, yeah. You know, I'm drawing a blank.
7  There was another sergeant. I can't think of who it was.
8    Q    That worked in your division?
9    A    Yeah. How it was there was more personnel
10  assigned to that. So they broke it down with CSOs and I
11  covered canine. And you covered the school resource
12  officer. Then there was a sergeant that worked with
13  operations and we had the strike at the Trinity Hill or
14  Avery Heights. I want to say Sergeant Donald Camp. Nice
15  guy.
16    Q    Is it fair to say that you directly supervised
17  CSOs?
18    A    Yes, I did.
19    Q    Including the plaintiff, Ann Cody?
20    A    Correct.
21    Q    Do you recall during the time that you were the
22  supervisor of these CSOs who the other officers were other
23  than Ann?
24    A    Sure.

1  Q  Do you know who they were?

2  A  Yes.

3  Q  Can you list them?

4  A  Sure. Danny Laffin. Daniel Laffin is his name.

5  Gates Landry.

6  Q  The union president now?

7  A  He's the union president now. Anthony Santos,

8  Ann Cody, Hector Robles, Emory Hightower.

9  Q  Mayor Peter's friend?

10  A  Yeah.

11  Q  Go ahead. He's a sergeant now?

12  A  Did I name seven?

13  MS. HARTLEY: You named six.

14  A  I'm trying to think if I missed anybody.

15  Q  To the best of your recollection.

16  A  I want to give you accurate information. I'm

17  drawing a blank. There was another one. I do apologize.

18  Q  You don't have to apologize. It's a matter of

19  record, right?

20  A  Yes, sir.

21  Q  It's not a big issue.

22  A  I'd be glad to provide that for you.

23  Q  I think we have it somewhere. If not, we can

24  get it. When you were the supervisor of the CSO, other

1  than Ann Cody, was there any other woman that you

2  supervised?

3  A  That I supervised, no.

4  Q  Your direct report, the person you reported to

5  was who?

6  A  Lieutenant Mike Manzi.

7  Q  What was his description? He was the Community

8  response Division commander?

9  A  Yeah. He would be the division commander, yes,

10  sir.

11  Q  Who did he report to, if you know?

12  A  Captain Michael Fallon.

13  Q  Who was what?

14  A  He would be the bureau commander. Maybe he

15  covered one or more divisions.

16  Q  Sure. And then Fallon, Michael Fallon would

17  report to who, the chief?

18  A  The chiefs, yeah. Assistant chiefs and up the

19  ladder to the chief.

20  Q  Have you ever had any training or did you learn

21  that it's illegal to discriminate against an employee on

22  the basis of their age?

23  A  Sure.

24  Q  What do you know about that?

1  A  Well, I mean the written language of the law I

2  do not know. Common sense, sure.

3  Q  What your understanding is.

4  A  Sure. My understanding is it is unlawful or

5  illegal and wrong to do that, based on someone's age.

6  Q  Do you know if there's a certain age that you

7  have to be in order to fall under the Age Discrimination

8  Employment Act?

9  A  I do not, to be honest with you.

10  Q  You don't know that?

11  A  I do not, sir.

12  Q  Do you recall any specific training regarding

13  age discrimination that you received?

14  A  In these trainings, I'll say that that may have

15  been touched on. It might have been incorporated with

16  other trainings.

17  Q  In what way though?

18  A  You talked about sexual harassment different

19  trainings that we received. That would be clearly a form

20  of harassment, I would think. I want to say that it may

21  have been kind of incorporated into a training. To say

22  that I've attended a whole day just on that, I don't

23  recall.

24  Q  It's not like you got an order to go to age

1  discrimination training today. You don't recall that?

2  A  Right. The instructor may have touched on

3  different scenarios and forms of discrimination.

4  Q  I think you answered that. But you never had a

5  class that was devoted to age discrimination that you

6  recall?

7  A  No. I don't think I have.

8  Q  You are familiar that government employees have

9  rights to be treated equally. You understand that?

10  A  Sure.

11  Q  That's a law?

12  A  I would imagine any employee has that right.

13  Q  Do you know what equal protection means under

14  the constitution?

15  MS. HARTLEY: Objection to the form of the

16  question.

17  A  No.

18  Q  You don't have to know. I'm asking if you do.

19  A  I'd like to say I can guess what I think it

20  means, but to say I know, no, I do not know, sir.

21  Q  Other than in this case here, have you ever been

22  sued by anybody?

23  A  This case right here?

24  Q  Ann Cody, the one we're here on.

61

1    A    As you know, I'm named in another suit.
2    Q    I've had this come up where people don't
3 remember that they're sued.
4    A    I had the other Michael Fago case I'm named in
5 so yes, I guess I am.
6    Q    Who is your lawyer in Michael Fago?
7    A    Chuck Howard.
8    Q    Did you tell him you were being deposed today?
9        MS. HARTLEY:  Objection to the form of the
10 question.  You're asking what he told his
11 lawyer?
12        MR. BREWER:  You made an issue before that
13 Chuck doesn't know somehow?  You opened the
14 door.
15        MS. HARTLEY:  I'm objecting to the
16 question, not just the form.  I'm objecting to
17 the question, sir.
18        MR. BREWER:  You're calling me sir.
19        MS. HARTLEY:  All right, Jimmy.  I'm
20 objecting to the question and I'm instructing
21 the witness not to answer on the grounds it
22 calls for attorney/client privilege.
23    Q    I'll still call you Mark if you want because
24    I - -

62

1    A    That's fine.
2        MR. BREWER:  We don't need the hostility.
3 But, Jill, you shouldn't, in front of witnesses
4 and on the record call me Jimmy, because you
5 know I don't like to be called that.  Were you
6 doing it because you're angry?
7        MS. HARTLEY:  I'm not angry.
8        MR. BREWER:  You were a little hyper about
9 the whole thing.  You brought up the issue.
10        MS. HARTLEY:  I'm not going to argue with
11 you.
12        MR. BREWER:  Don't call me Jimmy.  Call me
13 Jim on the record.
14        MS. HARTLEY:  Don't try to get my witness
15 to blurt out --
16        MR. BREWER:  It's on the record.
17    Q    Without telling me about anything you discussed
18 with your attorney because -- I'm assuming you're going to
19 follow your lawyer's advice and not answer that last
20 question, correct?
21    A    Yes.
22    Q    Nothing wrong with that.  It's her, not you.
23        MR. BREWER:  I think it's a bogus
24 objection.  Let the judge decide.

63

1    Q    Other than what you said to your lawyers at
2 Shipman & Goodwin, do they know that you're being deposed
3 today?
4        MS. HARTLEY:  Objection to the question.
5 I instruct the witness not to answer.  It calls
6 for disclosure of attorney/client
7 communications.
8        MR. BREWER:  It doesn't call for that.  It
9 calls for knowledge of whether or not they know
10 the deposition is going on.
11        MS. HARTLEY:  The only reason --
12        MR. BREWER:  I understand why you wouldn't
13 want him to answer that, Jill, because now it
14 calls into question your veracity in telling
15 the witness and telling me and maybe the court,
16 Well, I got to call Chuck Howard and let him
17 know about this deposition when he probably
18 already knows.
19        MS. HARTLEY:  I stand on my objection.
20        MR. BREWER:  You can object, but I think
21 it's improper for you to tell him whether or
22 not he knows that they've been informed.  Are
23 you telling him he can't answer that question,
24 about his knowledge?

64

1        MS. HARTLEY:  Yes.  I'm instructing him
2 not to answer that question.
3        MR. BREWER:  Let the judge decide.  We'll
4 make an issue.
5    Q    You're a defendant in the Fago case, right?
6    A    Yes, sir.
7    Q    Did you prepare with anyone from Shipman &
8 Goodwin about your deposition today?  You don't have to
9 look at her.
10        MR. BREWER:  That shows what's going on
11 here.  The witness, after I asked that
12 question, is now because of the interference of
13 Attorney Hartley is looking --
14        MS. HARTLEY:  You can ask --
15        MR. BREWER:  Don't interrupt me. -- at
16 his lawyer to see if she's going to interfere
17 with the deposition and raise an objection.
18        MS. HARTLEY:  I'm instructing him not to
19 answer.  He doesn't know what the privilege is.
20        MR. BREWER:  I'm sure you told him the
21 privilege before he refused to answer the
22 question.  He should know what the privilege
23 is.
24        MS. HARTLEY:  You're wasting time.

1   MR. BREWER: You're wasting my time.
2   MS. HARTLEY: If you want to ask him if he
3   met with Shipman & Goodwin before this
4   deposition, you can ask him that. I'm not
5   going to allow him to answer anything --
6   MR. BREWER: Let the judge decide. The
7   record's clear.
8   Q   You're refusing to answer that question, whether
9   or not Shipman & Goodwin knows you're here today?
10   MS. HARTLEY: Yes. That question I
11   instruct him not to answer.
12   MR. BREWER: That's what I want him to
13   say. You're not the witness, Jill, even though
14   you want to take his place.
15   Q   You're not a marionette. Are you refusing to
16   answer that question? It's your choice. It's your
17   privilege, not Jill Hartley's. When you refuse to answer
18   the question, since she doesn't want to let you know about
19   the privilege, it's your privilege. You can say I don't
20   really care about this because I don't want to protect
21   Shipman & Goodwin or other people. I did tell them. Or
22   you can say no. I have a privilege of what my discussions
23   were with my counsel. I don't want to discuss that.
24   That's fine. It's your privilege.

A* REPORTING SERVICES

---

66

1   A   Okay.
2   Q   My question is not what you said to Chuck Howard
3   or anybody over there, it's whether or not you notified
4   them, which has nothing to do with any substance in these
5   cases, that you were being deposed here today. If you
6   don't want to answer that --
7   MS. HARTLEY: That's a different question.
8   MR. BREWER: It's not a different
9   question.
10   MS. HARTLEY: I'm objecting to that
11   question on the grounds of attorney/client
12   privilege and instructing the witness not to
13   answer.
14   Q   I still need you to answer. I hope you
15   understand what the privilege is a little bit more. Your
16   lawyer is not allowed to tell you not to answer something.
17   She can instruct you.
18   A   Right.
19   Q   Which means it's on you. I'm not saying it to
20   try to threaten you.
21   A   I understand.
22   Q   You need to be aware of that. If we have to
23   come back, it's an inconvenience upon you. That's the
24   reason I say that. It's not that big a deal.

A* REPORTING SERVICES

---

67

1   MS. HARTLEY: The answer to him is are you
2   yes, going to follow my instructions or not?
3   A   Yes. No disrespect to you.
4   Q   None taken. I've been around a long time, Mark.
5   I don't take it personally.
6   A   On the advice of counsel.
7   Q   In any event, with regard to the Fago --
8   A   Yes, sir.
9   Q   -- complaint against you, do you think that
10   would make you a little biased about your testimony that
11   you gave earlier, the fact the guy's suing you might make
12   you a little biased about your testimony about him?
13   A   No.
14   Q   It didn't bother you that he sued you?
15   A   You're asking me --
16   Q   This is a new question.
17   A   -- does that change my opinion?
18   Q   No. New question. Does it bother you that he
19   sued you?
20   A   No.
21   Q   Does it bother you that Ann Cody sued you?
22   A   No.
23   Q   Doesn't bother you at all?
24   A   No.

A* REPORTING SERVICES

---

68

1   Q   Has anyone told you, other than your lawyer,
2   that you don't have to worry about personal liabilities in
3   these lawsuits?
4   A   No.
5   Q   You know that you're a defendant in these suits?
6   A   Yes, sir. I realize that.
7   Q   It doesn't bother you that somebody's trying to
8   say that you acted illegally, that you sexually harassed
9   somebody in this case and in Fago's case, there's
10   constitutional claims?
11   A   It's definitely -- it's not a fun process to go
12   through. But it -- how do I word this? I mean it
13   sometimes goes with the territory, with the job. Going
14   back to supervision. Not everybody's going to be happy.
15   People perceive things in certain ways. That's why they
16   have the right to exercise and utilize attorneys.
17   Q   Have you ever sued anybody in your life?
18   A   You know what, I don't believe I have.
19   Q   I hate to hear that. Never? Not even an auto
20   accident or anything? Never? Small claims?
21   A   You know what, once again, let me say for the
22   record, I don't recall.
23   Q   Everything's on the record.
24   A   I don't recall. 45 years. I don't think I

A* REPORTING SERVICES

1   could remember what I ate for breakfast this morning. I
2   don't think I have. No.
3       Q    There's nothing wrong with that.
4       A    No. No reason to.
5       Q    Jill gets upset with those kind of answers.
6   There's no reason to defend if not enough people are
7   suing, which I've always wondered about. With regard to
8   Ann Cody, did you think that she brought this lawsuit
9   against you to get back at you for some reason?
10      A    No.
11      Q    Prior to her being transferred, how would you
12  describe your relationship with Ann?
13      A    Good. Good. I got along with Ann Cody.
14      Q    There was no friction that you can point out,
15  right?
16      A    No, not at all.
17      Q    Did she ever make -- when I say ever, I mean
18  that you know of. It's not limited to this relationship
19  in this division. Did she ever make any complaint about
20  you prior to the complaints that are part of this lawsuit?
21      A    No. I don't believe so.
22      Q    In other words, there's no history between you
23  two?
24      A    No.

A+ REPORTING SERVICES

1       Q    Would you --
2       MS. HARTLEY:  Can I take a quick break.
3       (Whereupon, a short break was taken.)
4       (Whereupon, back on the record.)
5       (Whereupon, the pertinent question and testimony
6   was read back by the court reporter.)
7       Q    Other than what you documented, which I'm not
8   going to drag through everything. Other than what you
9   documented about deficiencies in Ann Cody's work -- let me
10  rephrase. Is there anything other than what you
11  documented that you found deficient in Ann Cody's work
12  when you supervised her?
13      A    There's a couple documents that I did document.
14  Up to that point, there had been a couple things that were
15  part of the investigation.
16      Q    If you could describe what you're referring to.
17      A    Well, missed meetings. You have the documents.
18      Q    Yes. There were missed meetings that you didn't
19  document. Is that what you're saying?
20      A    That were documented.
21      Q    Only undocumented. If you have a recollection,
22  like I should have documented that she did A,B or C,
23  whatever it was, but I didn't. If you could tell me what
24  that is now, if anything.

A+ REPORTING SERVICES

1       A    Well, it's documented. Say this incident of
2   over the past couple months, a few months of missing
3   meetings. Not every individual -- let me -- I'm trying to
4   provide you accurate information. In terms of documented,
5   I'm looking at it as disciplinary document.
6       Q    Written? Something that we have that is
7   tangible. I've been through the case already. I don't
8   want to waste my time with it.
9       A    I don't think every -- it was somewhere written
10  down, but maybe not formal document sent on every
11  occurrence.
12      Q    I think what you're talking about is missed
13  meetings?
14      A    Yes, sir.
15      Q    Those were all documented somewhere, right?
16      A    Yes.
17      Q    One way or another?
18      A    Yes.
19      Q    Other than that, something that is not
20  documented that you thought she was deficient in that you
21  can recall.
22      A    That I can recall right now, I'd have to say no,
23  other than this case.
24      Q    Yes.

A+ REPORTING SERVICES

1       A    No.
2       Q    And, you know, it's funny you say that you can
3   recall now because usually the next question is if you
4   might say you have something to refresh my recollection
5   with a document. There's nothing that would refresh your
6   recollection about undocumented deficiencies?
7       A    When you say undocumented, my history with
8   Officer Cody goes back years and years.
9       Q    I'm talking about when you were her supervisor
10  or just when you supervised her, something she did that
11  you thought was deficient but it did not become documented
12  anywhere. If you can recall.
13      A    You know, I can't recall. It could have. It
14  may have happened.
15      Q    My next question is -- obviously it's important.
16  In fairness to you, is there anything that you could look
17  at that would refresh your recollection as to that
18  question? I don't know what it would be, frankly, because
19  it would have to be a document.
20      A    Not here today.
21      Q    Anywhere. If you went and looked at the sun and
22  it gives you an inspiration. That's the rule. Anything
23  could refresh your recollection. Even talking to Jill or
24  something. You don't have to tell me about it, but you

A+ REPORTING SERVICES

73

74

**Page 73**

1  can say I was talking with the lawyers and Hey, you told
2  me X, Y and Z. Anything that would refresh your
3  recollection?
4      A    Nothing that I have here that would refresh my
5  memory.
6      Q    I'm not restricting it to here.
7      A    I understand. It's kind of -- I guess in my
8  terms, I have a lot of years on the job as does Officer
9  Cody. And in supervising not just Officer Cody but in
10 others over the course of years, sometimes people have
11 done things or it's viewed as maybe not--let me see how I
12 word this--in accordance of policy or procedure or viewed
13 as the right tactic. Could have been a mistake of the
14 heart, judgment. You don't always document.
15     Q    That's what I'm asking you.
16     A    As a supervisor, you sometimes have that
17 latitude.
18     Q    That's exactly why I'm asking you that. Because
19 you don't document it, but it's still obviously -- as a
20 supervisor, you still retain it to some degree?
21     A    Well, let me clarify that. When you say
22 document, formal interdepartmental memorandum?
23     Q    Any way.
24         MS. HARTLEY: I think he means in writing.

**Page 74**

1      Q    Yes.
2      A    Supervisors, as probably in any organization,
3  you keep little notes of something of occurrence maybe for
4  your own, for their own files. Maybe people do that.
5      Q    Did you keep notes like that when you supervised
6  Ann Cody?
7      A    I would imagine I did. Not just on Ann Cody.
8      Q    I know that.
9      A    Supervisor on things that go on you keep
10 records.
11     Q    Where would those be?
12     A    I don't know if I'd even have any of those, sir.
13     Q    Are they personal or is it in the personnel
14 file?
15     A    They would be interdepartmental memorandums.
16     Q    I'm talking about notes. Did you keep any of
17 that?
18     A    I don't know if I have that stuff.
19     Q    Did you do that though?
20     A    I would say at times, sure.
21     Q    But you didn't retain them is what you're
22 saying?
23     A    Right.
24     Q    They're not in her file somewhere or in a file

75

**Page 75**

1  you kept somewhere?
2      A    Not that I recall.
3      Q    You're sure?
4      A    Not that I recall.
5      Q    We're entitled to that.
6      A    I'm not trying to give you a hard time. I'm not
7  saying with Ann Cody.
8      Q    You're not giving me a hard time.
9      A    I'm trying to give you honest answers.
10     Q    If there's notes that you took down and they
11 were put somewhere, then they were retained, whether you
12 personally did it.
13     A    I understand.
14     Q    You don't know?
15     A    I don't recall doing that specifically.
16     Q    Retaining them?
17     A    Retaining them or writing them down specifically
18 on Officer Cody.
19     Q    So now I'm not sure. You did take notes or you
20 didn't take notes on your CSOs?
21     A    Well, you know what? I can't say I took a lot
22 of notes as far as -- sometimes supervisors keep their own
23 personal little, not a file but a note about say something
24 that may have transpired or may have occurred; but it's

76

**Page 76**

1  not formal documentation. It's something, maybe.
2      Q    I'm not asking you that.
3      A    It's a mnemonic device for you to remember so you
4  know this occurred.
5      Q    I'm not asking the basis or authority. I'm just
6  asking if you took them.
7      A    I have to tell you -- I have to answer this way,
8  that it could have happened but I don't know specifically
9  if I did do that.
10     Q    Is there someplace you could check to see if
11 they still exist or that you could point us to as to where
12 they might be held?
13     A    No. Because a lot of my stuff I purged.
14     Q    When you retired you mean?
15     A    Yes.
16     Q    Did you use notes regarding the discipline that
17 was imposed upon Ann Cody for the missed meetings and
18 stuff like that? I know we got these documents. I'm
19 talking about notes.
20     A    I don't know if I wrote notes.
21     Q    Do you know Detective Juan Roman?
22     A    Yes.
23     Q    Are you friends with him?
24     A    I know him. And, once again, he had a lot of

77

78

1  time on the job. To say I'm friends with him, no. He's
2  an acquaintance, somebody you work with.
3      Q    You were friendly with him though?
4      A    Yeah. You know, Hello and goodbye. Very
5  cordial, I guess.
6      Q    Did you ever complain about Joe Buyak to
7  anybody, the new ombudsman for the department, Captain Joe
8  Buyak?
9      A    No.
10     Q    Did you get along with Joe?
11     A    Yes.
12     Q    Did Joe ever use profanity in your presence?
13     A    You know, I have to say that Joe -- no, no. I
14  can't say ever because, once again, we go back 20 years.
15  And I can't recall every word that was spoken by another
16  individual. But I'll say that Joe Buyak is a well-spoken
17  individual. And he's a polite individual. He's a
18  gentleman.
19     Q    Do you know of any relationship or do you know
20  what the relationship is between Joe Buyak and Laura
21  Buyak, Officer Laura Buyak?
22     A    Yes.
23     Q    What are they?
24     A    Brother and sister.

A+ REPORTING SERVICES

1      Q    Do you know if they got along when they worked
2  at the HPD?
3      A    This is just -- I would imagine they did.
4      Q    If you don't know, you don't know.
5      A    I don't know. I don't know if they worked
6  together or --
7      Q    Were you friendly with Laura Buyak?
8      A    Yes.
9      Q    Did you ever go out with her?
10     A    Yes, I did.
11     Q    I don't know if that's the right term. Dated
12  her?
13     A    Yes, I did.
14     Q    So you had a relationship with her?
15     A    Yeah. I dated her, yes.
16     Q    When was that?
17     A    Several years back. The exact dates I will say
18  don't hold me to the dates.
19     Q    I'm not going to tell her, so don't worry.
20     A    Maybe in the '90s, early '90s.
21     Q    Did the relationship end amicably or was there
22  any kind of falling out?
23     A    No.
24     Q    Was her brother ever angry about you going out

A+ REPORTING SERVICES

79

1  with her?
2      A    No.
3      Q    Joe?
4      A    No. I wouldn't believe so.
5      Q    But I mean you don't have a current relationship
6  with Laura Buyak, like you're not still friends with her
7  or anything?
8      A    Well, I wouldn't say -- well, whatever. I
9  haven't seen her since I've retired, but I have to say
10  that when I did see her in the hallway --
11     Q    When did you retire?
12     A    October 25.
13     Q    Of 2003?
14     A    2003, yes, sir.
15     Q    I think I forgot to ask you that.
16     A    I will say I had a friendly relationship with
17  her. If I saw her in the hallway, I'd say Hello. I'd ask
18  How's your mom? How's your dad? We were friendly to
19  talk.
20     Q    It wasn't like it was cold?
21     A    No. No reason to be.
22     Q    Do you recall anyone making any offensive
23  remarks, at least you might construe as offensive about
24  your relationship with Laura Buyak?

A+ REPORTING SERVICES

80

1      A    Well, the only person that would have a problem
2  with it or I would say did would be Michael Fago.
3      Q    He made offensive remarks about your
4  relationship with her?
5      A    Yeah. Yes, sir.
6      Q    What did he say?
7      A    I can't recall, like I said, once again every
8  word spoken by Mr. Fago, but the dates and times, sure
9  there have been words. He has said things and he has done
10  things.
11         MS. HARTLEY: Hold on a second. Are you
12  finished with your response?
13     A    Yes.
14         MS. HARTLEY: You represented, Jim, to the
15  court that you were done asking questions about
16  the Fago case.
17         MR. BREWER: I represented nothing. I
18  said we were going to do a motion.
19         MS. HARTLEY: You told Barbara we had an
20  agreement. The agreement was you were done
21  with the questions --
22         MR. BREWER: We don't have an agreement.
23  I said I was done with that questioning. This
24  is ridiculous. You know you're going to lose

A+ REPORTING SERVICES

1    this like the other thing you did.
2        MS. HARTLEY: If you have more questions
3    about Fago --
4        MR. BREWER: I have questions about
5    whatever I want. It's about Mr. Rudewicz, not
6    Fago.
7        MS. HARTLEY: If you're going to ask
8    questions about the Fago case, I'm going to
9    call Chuck Howard.
10        MR. BREWER: Call him. Tell him to come
11    down. What is Chuck Howard going to do? Is he
12    going to come in here and cast a spell on all
13    this, take Mark out and hit him with the
14    whipping stick and make sure he says the right
15    thing? Is that what it's about? Or is it
16    about getting the truth out of the witness or
17    making sure Chuck comes in here and tells this
18    witness what to say? Is that what you need?
19        MS. HARTLEY: You don't have to raise your
20    voice.
21        MR. BREWER: You raised your voice a long
22    time ago. I'm not raising my voice. You had
23    your hand in my face and called me Jimmy.
24        MS. HARTLEY: It's 12:15.

1        MR. BREWER: You interfered too many
2    times.
3        MS. HARTLEY: Let's take a break for
4    lunch. You said we could break.
5        MR. BREWER: We're done for the day. I'm
6    not going to have my deposition interfered
7    with.
8        MS. HARTLEY: I'm going to call the court
9    then.
10        MR. BREWER: He's not there, Jill.
11        MS. HARTLEY: Then I'm going to call
12    Chuck.
13        MR. BREWER: Call Chuck.
14        MS. HARTLEY: Ask other things.
15        MR. BREWER: No, I'm not. I do it in my
16    sequence, not yours. You don't get to
17    interfere with the deposition.
18        MS. HARTLEY: I'm not. Ask whatever you
19    want.
20        MR. BREWER: Excuse me.
21        MS. HARTLEY: The other lawyer should be
22    here.
23        MR. BREWER: No, he shouldn't be here.
24    We've done that in the past. Mr. Rudewicz --

1    it's obvious by his refusal to answer the
2    question that Chuck knows he's here. We'll get
3    an affidavit together because we already know
4    that Chuck knows he's here.
5        MS. HARTLEY: I'm calling Chuck to come
6    over here. Let's break for lunch.
7        MR. BREWER: You need Chuck's help. I'm
8    not going through this. You've interfered with
9    the deposition on too many occasions for my
10    liking.
11        With all due respect to Mark Rudewicz, I'm
12    not trying to make it hard. We're going to do
13    one thing, stop right now. And when Judge
14    Underhill is able to make a ruling, we'll get a
15    ruling and stop this pattern of you interfering
16    with depositions. We're not going to have
17    Judge Garfinkle or Judge Fitzsimmons or anybody
18    else. Judge Underhill likes to handle these
19    himself. He's said that on other occasions,
20    other cases. He wants to deal with these and
21    nip them in the bud. I'm not going to be
22    wasting my time.
23        MS. HARTLEY: That's great. We can duke
24    it out with Judge Underhill. That's fine.

1        MR. BREWER: The issue about not finishing
2    the deposition is you interfered. You caused
3    me to lose my concentration. You made it
4    difficult for me to have a flow of questions.
5    You're coaching the witness.
6        MS. HARTLEY: I'm not coaching him at all.
7        MR. BREWER: You're telling him that he
8    doesn't have to answer questions about Mike
9    Fago when that is not what the question is.
10    It's about Laura Buyak.
11        MS. HARTLEY: No, no.
12        MR. BREWER: He offered Fago. And you
13    hear the buzz word Fago and you have this
14    Pavlovian response that you got to get Chuck in
15    here because somehow they're going to get hurt
16    by it. The truth may hurt them. If
17    Mr. Rudewicz wants to tell the truth, I
18    understand that. You can't handle the truth.
19    I have nothing more to say.
20        MS. HARTLEY: My position --
21        MR. BREWER: You can put your position on
22    the record. You can send the transcript.
23    Thank you for your time.
24        MS. HARTLEY: My position is that I do not

85

1    object to Attorney Brewer asking the witness
2    questions that relate to the Fago case. I
3    agree that he has a latitude to do so in this
4    deposition; however, my objection was for him
5    to continue to ask questions like that without
6    allowing counsel for Mark Rudewicz in the Fago
7    case to be present in this deposition.
8          I asked for permission from Jim Brewer on
9    two occasions to call counsel for Mark Rudewicz
10   and invite them to come to the deposition. I
11   also suggested that while we were waiting for
12   them to come to the deposition Mr. Brewer could
13   continue with his other questioning of the
14   witness.
15         The first time that I suggested that I
16   call counsel for Mark Rudewicz to attend the
17   deposition, Attorney Brewer said the deposition
18   would be over. He said he would sanction me.
19   Ultimately I called the Court. We ended up
20   talking to the Court together and in our
21   conversation with Barbara in Judge Underhill's
22   chambers, Attorney Brewer told her that he was
23   done asking these questions that pertain to a
24   different case brought by a different plaintiff

86

1    against the same witness and that we would
2    brief this issue and later raise it with the
3    judge but he was done asking those questions
4    for now.
5          I relied upon that representation;
6    however, subsequent to the phone call with
7    Barbara in Judge Underhill's chambers, Brewer
8    has persisted in asking questions of the
9    witness that pertain to the Fago case.
10         (Whereupon, the taking of the deposition was
11   suspended at 12:21 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24

87

1                    I N D E X
2
3    WITNESS                              PAGE
4    MARK RUDEWICZ
5    Direct examination by Mr. Brewer        4
6    DESCRIPTION                          PAGE
7    Plaintiff's Exhibit 1 - Notice of depo  4
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

88

1    STATE OF CONNECTICUT    :
2                                 S.S. WALLINGFORD
3    COUNTY OF NEW HAVEN     :
4          I, Elisa Ferraro, LSR, a Notary Public for the
5    State of Connecticut, do hereby certify that the
6    deposition of MARK RUDEWICZ, a witness, was taken before
7    me pursuant to the Federal Rules of Civil Procedure, held
8    at the Law Offices of Brewer & O'Neil, 818 Farmington
9    Avenue, West Hartford, CT, commencing at 10:15 a.m., on
10   Friday, January 23, 2004.
11         I further certify that the witness was first
12   sworn by me to tell the truth, the whole truth, and
13   nothing but the truth, and was examined by counsel, and
14   his testimony stenographically reported by me and
15   subsequently transcribed as hereinbefore appears.
16         I further certify that I am not related to the
17   parties hereto or their counsel, and that I am not in any
18   way interested in the event of said cause. Dated at New
19   Haven, Connecticut, this 7th day of February, 2004.
20
21                    _____
                       Notary Public
22   My Commission Expires:  December 31, 2006.
23   License #233.
24

1    STATE OF CONNECTICUT    :

2                          S.S. WALLINGFORD

3    COUNTY OF NEW HAVEN    :

4            I, Elisa Ferraro, LSR, a Notary Public for the

5    State of Connecticut, do hereby certify that the

6    deposition of MARK RUDEWICZ, a witness, was taken before

7    me pursuant to the Federal Rules of Civil Procedure, held

8    at the Law Offices of Brewer & O'Neil, 818 Farmington

9    Avenue, West Hartford, CT, commencing at 10:15 a.m., on

10   Friday, January 23, 2004.

11           I further certify that the witness was first

12   sworn by me to tell the truth, the whole truth, and

13   nothing but the truth, and was examined by counsel, and

14   his testimony stenographically reported by me and

15   subsequently transcribed as herebefore appears.

16           I further certify that I am not related to the

17   parties hereto or their counsel, and that I am not in any

18   way interested in the event of said cause.  Dated at New

19   Haven, Connecticut, this 7th day of February, 2004.

20                          _Elisa Ferraro_
                            Notary Public

21

22   My Commission Expires:  December 31, 2006.

23   License #233.

24

A+ REPORTING SERVICES