**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| ANN CODY, | : | CIVIL ACTION NO. |
|     Plaintiff, | | 3:02CV1789(SRU) |
| | : | |
| v. | | |
| | : | |
| CITY OF HARTFORD, et al. | | |
|     Defendants. | : | MAY 17, 2004 |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

This is an employment discrimination case brought by Ann Cody (the "Plaintiff") against the City of Hartford ("Hartford"), Robert Rudewicz ("Chief Rudewicz"), the former Chief of the Hartford Police Department ("HPD"), Mark Rudewicz, a former Sergeant of the HPD and Michael Manzi ("Manzi"), a Lieutenant of the HPD. The Plaintiff alleges that the Defendants discriminatorily transferred her from her position as a Community Service Officer ("CSO") to that of Police Officer in the Patrol Division, based upon her age and gender, and in retaliation for sexual harassment complaints she lodged some eight years earlier. According to the Third Amended Complaint ("the Complaint"), the Defendants' alleged actions violated the Plaintiff's civil rights as secured by 42 U.S.C. Section 1983, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. Section 621 *et seq.*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the Defendants now move for summary judgment with respect to the Complaint in its entirety, because there are no disputed issues of material fact and they are entitled to judgment as a matter of law.

1

Specifically, as set forth in more detail below, the Plaintiff's equal protection and discrimination claims must fail because she cannot make out a prima facie case of discrimination under either 42 U.S.C. § 1983 or the ADEA, or in the alternative, the Plaintiff cannot establish that Hartford's legitimate, non-discriminatory reason for transferring the Plaintiff is a pretext for discrimination.  This is because the Plaintiff cannot overcome the cumulative probative weight of the evidence of the Defendants' proffer that the Plaintiff was transferred for performance reasons and the decision of the State Board of Mediation and Arbitration ("the Board"), which concludes that the Plaintiff's transfer was not discriminatory. Moreover, the Plaintiff cannot establish that she has suffered an adverse employment action, which is a requisite element of her discrimination claims.

Similarly, the Plaintiff's First Amendment retaliation claim must also fail because she cannot establish : 1) that she engaged in constitutionally protected speech; 2) that she has suffered an adverse employment action; and 3) the requisite nexus between the sexual harassment complaints she made in 1992 and her transfer in 2000.

Further, the Defendants are entitled to summary judgment on the Plaintiff's procedural due process claim because the Plaintiff does not have a constitutionally protected interest in a particular job at the HPD.

Moreover, the Defendants are entitled to summary judgment on the Plaintiff's substantive due process claim because the Plaintiff's alleged injury can be vindicated through other, more specific constitutional provisions.

The individual Defendant, Chief Rudewicz is entitled to summary judgment on the Plaintiff's Section 1983 claims because the Plaintiff cannot establish the requisite causal

2

connection between Chief Rudewicz's conduct and Plaintiff's alleged constitutional injury, and because Chief Rudewicz's actions are protected by the doctrine of qualified immunity.

Finally, the Defendant, Hartford is entitled to summary judgment on the Plaintiff's Section 1983 equal protection and First Amendment claims because the Plaintiff cannot establish that the City violated her civil rights as part of an official municipal policy or custom.[1]

## II. FACTS

### A.    The Plaintiff's Transfer

The HPD hired the Plaintiff as a Police Officer on or about December, 1983. (Local Rule 56(a)1 Statement[2], ¶1). In or about 1993, the HPD assigned the Plaintiff to the Community Response Division as a CSO, serving the southwest community of the City of Hartford. (Local Rule, ¶2.)

The position of CSO primarily involved serving as a liaison between various community groups and the HPD. (Local Rule, ¶3.) This means that CSOs were expected to maintain a high profile in their respective communities. As part of the high profile they were expected to maintain in their communities, CSOs were required to attend community meetings and relay community concerns back to the Patrol Division in order to provide more effective

---

[1]    Although the Complaint makes reference, in the Preliminary Statement, to a cause of action for intentional infliction of emotional distress, this is an apparent scrivener's error. Specifically, there is no substantive count of the Complaint alleging intentional infliction of emotional distress, because counsel for the Plaintiff and counsel for the Defendants reached an agreement with respect to the Defendants' Motion to Dismiss whereby counsel for the Plaintiff agreed to voluntary withdraw Plaintiff's claim for intentional infliction of emotional distress.

[2]    Hereinafter referred to as "Local Rule, ¶ __."

delivery of police services.  (Local Rule, ¶3.)   By the Plaintiff's own admission, attending community meetings was an important aspect of her job as a CSO.  (Local Rule, ¶4.)

The community meetings that the Plaintiff was required to attend as the CSO for the southwest Hartford community were known as "Behind the Rocks" meetings.  In addition to the Plaintiff, one or more of the Plaintiff's supervisors regularly attended these community meetings. (Local Rule, ¶52.)  Regardless of whether a supervisor attended, the Plaintiff was still required to attend the meeting.  (Local Rule, ¶5.)   As the CSO for the area, the Plaintiff was often expected to speak at the meetings, to advise residents of what was happening in the neighborhoods and to describe how the HPD was addressing ongoing issues and concerns. (Local Rule, ¶6.)   In addition, the Plaintiff was required to listen to residents' complaints, usually regarding quality of life issues, such as loitering, speeding, noise and the like.  (Local Rule, ¶6.)   The Plaintiff was expected to regularly provide information or statistics regarding these quality of life issues.  (Local Rule, ¶6.)

The June 2000 Behind the Rocks meeting was held on June 19th.  (Local Rule, ¶¶7, 9.) The Plaintiff did not attend this meeting.  (Local Rule, ¶7.)   However, her supervisor, Mark Rudewicz did.  (Local Rule, ¶9.)   After the meeting, Mark Rudewicz was approached by one of the members of the southwest community who advised Mark Rudewicz that she and other members of the community were dissatisfied with the Plaintiff's performance of her job duties as their CSO.  (Local Rule, ¶9.)

In response to the foregoing complaints from the community, on June 27, 2000, Mark Rudewicz conducted an inspection and concluded that the Plaintiff was spending too much time

4

in her office.  (Local Rule, ¶10.)   Specifically, the Plaintiff was scheduled to work from 9:45

a.m. until 5:45 p.m. on that day, and Mark Rudewicz determined that the Plaintiff's patrol car

was parked in front of her office – suggesting that the Plaintiff was in the office, rather than

patrolling the neighborhood – for the first three hours or so of her shift.  (Local Rule, ¶10.)

  Accordingly, on June 29, 2000, Mark Rudewicz had a counseling session with the

Plaintiff.  (Local Rule, ¶11.)   The purpose of the counseling session was to advise the Plaintiff

of the apparent deficiencies in her performance, and give her the opportunity to respond and

formulate a plan of action for improvement.  (Local Rule, ¶11.)

  As Mark Rudewicz was addressing the foregoing issues with the Plaintiff, the Plaintiff

got up, and stated that she would submit a voluntary request for reassignment that day.  (Local

Rule, ¶12).  The Plaintiff also handed in her office keys.

  As promised, the Plaintiff submitted her voluntary Request for Reassignment that day.

(Local Rule, ¶13).  Ironically, the Plaintiff sought reassignment from her position in the

Community Response Division to the Patrol Division,  the very transfer which –  when initiated

by the HPD in October 2000 – gave rise to this lawsuit.  (Local Rule, ¶13).

  The Plaintiff ultimately decided not to pursue the Request for Reassignment.  (Local

Rule, ¶14).  Accordingly, the Plaintiff's office keys were eventually returned to her.

  The Plaintiff continued to miss community meetings, however.  (Local Rule, ¶7).   For

example, the Plaintiff missed the July 17th meeting – the next scheduled meeting after Mark

Rudewicz's counseling session with the Plaintiff to discuss the importance of attending

community meetings.  (Local Rule, ¶7).   In addition, the Plaintiff missed the August 21st

meeting and the October 16th meeting.[3]    (Local Rule ,¶7).   The Plaintiff also failed to appear in court on October 16th in response to a subpoena.  (Local Rule, ¶15).

At this point, Manzi instructed Mark Rudewicz to submit disciplinary action against the Plaintiff for her failure to appear in court and failure to attend yet another community meeting.  Said disciplinary action consisted of two counts of "negligent failure to comply with lawful orders, procedures, or directives, written or oral," pursuant to Article 5, Section 5.08 of the Code of Conduct.  (Local Rule, ¶16).

Shortly thereafter, Manzi and Mark Rudewicz decided to recommend that the Plaintiff be transferred from Community Service to Patrol.  The decision to transfer the Plaintiff was communicated to her on or about October 20, 2000, in a meeting that included Mark Rudewicz, Manzi, and Captain Michael Fallon.[4]  (Local Rule, ¶19).   The Plaintiff testified that, after being advised of the transfer, she responded, "I'm not going to sit here and listen to this bullshit." (Local Rule, ¶21).  The Plaintiff further testified that she may have begun to cry and may also have used other profanity.  (Local Rule, ¶21).

On or about October 22, 2000, in the absence of Chief Rudewicz, who had taken the day off, Kevin Jones ("Jones"), the Acting Assistant Chief entered an order that the Plaintiff be

---

[3]

The Plaintiff also missed the May 17th meeting, for which she was excused, and the September 18th meeting, because she had complained of chest pains and that she was not feeling well.  (Local Rule, ¶8). All in all, the Plaintiff missed six consecutive monthly meetings, but only had legitimate excuses for two of the absences.  (Local Rule ¶8).

[4]    Captain Fallon has not been named as a defendant in this lawsuit.

6

transferred from the Community Response Division to the Patrol Division.[5]  (Local Rule, ¶22).
The transfer from Community Response to Patrol entailed no decrease in salary or benefits and
no loss of promotional opportunities.  (Local Rule, ¶24).  The Plaintiff testified during her
deposition that the title of Patrol Officer was, for all intents and purposes, the same as that of
CSO.  (Local Rule, ¶25).   Moreover, the Plaintiff testified that her skills as a CSO were readily
transferrable to her job as a Patrol Officer.  (Local Rule, ¶25).   Finally, the Plaintiff does not
claim that her transfer from Community Response to Patrol resulted in any significant increased
risk to her safety.  (Local Rule, ¶26).[6]

On or about October 25, 2000, the Plaintiff forwarded a letter to Chief Rudewicz,
alleging that, during the meeting in which she was informed of her transfer, Manzi told her, "we
need a younger guy more dynamic for this position."  (Local Rule, ¶27).   The Plaintiff also
requested that Chief Rudewicz conduct an investigation into these allegedly "discriminatory
practices."  (Local Rule, ¶27).  In response to the Plaintiff's request, Chief Rudewicz assigned
Jones to investigate.  (Local Rule, ¶28).

Jones performed a thorough investigation, which included submitting written
interrogatories to those present at the meeting in question (Manzi, Fallon and Mark Rudewicz),
as well as Officer Thomas Hardwick ("Hardwick"), the union representative to whom the

---

[5]    Jones has also not been named as a defendant in this lawsuit.

[6]
In transferring the Plaintiff, Jones was constrained under the Charter of the City of Hartford by
policies established by the Court of Common Council and the City Manager, which policies Jones had
no ability to alter.  (Local Rule, ¶¶41-63).   There is absolutely no evidence in the record that the Court
of Common Council or the City Manager had any knowledge of the Plaintiff's transfer.

Plaintiff had also complained.  (Local Rule, ¶29).   Jones also met with the community resident who initially complained about the Plaintiff.  (Local Rule, ¶30).   Jones' investigation concluded that the decision to transfer the Plaintiff was appropriately based upon performance concerns regarding the Plaintiff and was not arbitrary or discriminatory.  (Local Rule, ¶31). The investigation further concluded that the Plaintiff's allegation that Manzi told her that they "need a younger guy more dynamic" for the CSO position was unsupported.  (Local Rule, ¶31).

The Plaintiff also grieved her transfer through the fourth and final step of the grievance process at the Board.  (Local Rule, ¶32).   Prior to reaching step 4 of the grievance process, however, the Plaintiff's transfer was subject to review by the Personnel Director, who was empowered to hear and decide – and when deciding, even reverse – a grievance such as the Plaintiff's that is not settled by steps 1 or 2 of the grievance process.  (Local Rule, ¶69).   At step 4 of the grievance process, the following issue was presented to a panel consisting of three independent arbitrators at the Board: whether Hartford discriminated against the Plaintiff on the basis of her age and gender in violation of the collective bargaining agreement between Hartford and the Hartford Police Union.  (Local Rule, ¶32).  Following a full and fair hearing in which the arbitrators heard testimony from relevant witnesses and reviewed relevant documentary evidence, the Board rendered its decision upholding the Plaintiff's transfer. (Local Rule, ¶33).  Specifically, in its Arbitration Award dated September 6, 2002, the Board ruled on in favor of Hartford on the merits of the Plaintiff's discrimination claim, concluding that Hartford did not discriminate against the Plaintiff in violation of the Collective Bargaining Agreement between Hartford and the Hartford Police Union.  (Local Rule, ¶33).

**B.    The Plaintiff's Sexual Harassment Complaints**

Some eight years before the Plaintiff's transfer, on or about September 15, 1992, Charles Natitus ("Natitus"), a Lieutenant with whom the Plaintiff was apparently working, allegedly pulled her hair.  (Local Rule, ¶34).   In response, the Plaintiff retained a union steward to make a complaint.  (Local Rule, ¶34).  According to the Plaintiff, she verbally warned Natitus not to touch her. (Local Rule, ¶34).  Approximately three months later, however, Natitus allegedly pulled the Plaintiff's hair again.  (Local Rule, ¶35).  In response, the Plaintiff got a union steward and filled out the necessary paperwork.  (Local Rule, ¶35).  The Plaintiff sent the information regarding her sexual harassment complaints to James Meehan, who was at that time the Assistant Chief of the HPD.  (Local Rule, ¶35).  According to the Plaintiff, no action was taken with respect to her complaints.  (Local Rule, ¶36).

The Plaintiff never spoke to any of the Defendants in this lawsuit regarding these prior complaints, and could offer  no evidence that any of the Defendants in this lawsuit were aware of the Plaintiff's sexual harassment complaints made in 1992 at the time that the decision to transfer the Plaintiff was made in 2000.  (Local Rule, ¶37).  Indeed, the Plaintiff's claim that the Defendants retaliated against her for making these prior complaints was supported solely by her opinion that "word" somehow "travels" at the HPD.  (Local Rule, ¶39).

## III.  ARGUMENT AND AUTHORITIES

**A.    The Movant's And Non-Movant's Respective Burdens On Summary Judgment.**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). <u>See</u> <u>Celotex v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Chambers v. TRM Copy Centers Corp.</u>, 43 F.3d 29, 36 (2d Cir. 1994). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). Fed. R. Civ. P. 56 "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." <u>Celotex</u>, 477 U.S. at 324 (1986) (<u>citing</u> Fed. R. Civ. P. 56).

In considering a motion for summary judgment, "the trial judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 249. In doing so, "[t]he district court must draw all reasonable inferences and resolve all ambiguities in favor of the nonmoving party and grant summary judgment only if no reasonable trier of fact could find in favor of the nonmoving party." <u>Sutera v. Schering Corp.</u>, 73 F.3d 13, 15 (2d Cir. 1995) (citation omitted).

For the reasons that follow, summary judgment should enter for the Defendants on the Complaint in its entirety.

**B. The Plaintiff Cannot Establish a Prima Facie Case of Discrimination Under The Equal Protection Clause or the ADEA, Or In The Alternative, The Plaintiff Cannot Establish That Hartford's Legitimate, Non-Discriminatory Reason For Transferring The Plaintiff Is A Pretext For Discrimination.**

10

The Defendants are entitled to summary judgment because, as set forth below,  the

Plaintiff cannot establish a prima facie case of discrimination under Section 1983 or the ADEA,

or in the alternative, the Plaintiff cannot establish that Hartford's legitimate, non-discriminatory

reason for transferring the plaintiff is a pretext for discrimination.

1.    **The Plaintiff Cannot Establish That Her Transfer Occurred Under Circumstances Giving Rise To Or Supporting An Inference Of Discrimination.**

Employment discrimination claims brought under Section 1983 and the ADEA are

analyzed using the familiar McDonnell Douglas burden-shifting rubric.[7]  In order to make out a

prima facie case of employment discrimination under Section 1983 or the ADEA, a plaintiff

must establish, *inter alia*: (1) that she suffered an adverse employment action, (2) under

circumstances giving rise to an inference of discrimination.  McDonnell Douglas Corp. v.

Green, 411 U.S. 792 (1973).[8]

In this case, the Plaintiff cannot establish that her transfer occurred under circumstances

giving rise to or supporting an inference of discrimination.  This is because the Plaintiff cannot

overcome the cumulative probative weight of the evidence of a legitimate, non-discriminatory

reason for her transfer and the Board's Arbitration Award, which concludes that the Plaintiff's

---

[7]    See, e.g., Sorlucco v. New York City Police Dept., 888 F.2d 4, 7 (2d Cir. 1989)
applying McDonnell Douglas burden shifting analysis to Section 1983 case); Ascione v. Pfizer,
No. 03CIV244(VM), 2004 WL 741673, at *3 (applying McDonnell Douglas burden shifting
analysis to ADEA case).

[8]    It is also well settled that, assuming the plaintiff meets her initial burden, and the
defendant articulates a legitimate, non-discriminatory reason for its action, the plaintiff has the
burden of establishing, by a preponderance of the evidence, that the defendant's proffered reason
is merely a pretext for discrimination.  McDonnell Douglas, 411 U.S. at 804.

transfer was not discriminatory.

The Defendants proffer the following legitimate, non-discriminatory reason for the Plaintiff's transfer: the Plaintiff's documented performance problems, which largely consisted of missing a number of community meetings, attendance at which was an important part of the Plaintiff's job; and failing to appear in court in response to a subpoena.[9]  (Local Rule, ¶20). Notably, the Plaintiff failed to attend the very next community meeting following her June counseling session with Mark Rudewicz, in which he underscored the requirement that the Plaintiff attend such meetings.  (Local Rule, ¶7).

Moreover, the Plaintiff grieved her transfer through the fourth and final step of the grievance process, which consisted of an arbitration before a panel of three neutral arbitrators from the Board.  (Local Rule, ¶32).   The issue presented to the panel was whether Hartford had discriminated against the Plaintiff in violation of provisions of the Collective Bargaining Agreement prohibiting discrimination on the basis of *inter alia*, age and gender.  (Local Rule, ¶32).  After hearing testimony from witnesses and reviewing relevant documents, the panel concluded that Hartford did not discriminate against the Plaintiff in transferring her from the Community Response Division to the Patrol Division.  (Local Rule, ¶33).   In so concluding, the panel stated, "[w]hat is evident to this Board is that the decision to transfer the [Plaintiff] was simply based on her lacking performance" and not based on her age and/or gender. (Local Rule ¶33).

---

[9]   The Plaintiff's transfer is also supported by complaints from the community with regard to the Plaintiff's job performance as CSO.  However, proof of such complaints is not necessary to support this dispositive motion.

12

While pursuit of a remedy under a collective bargaining agreement does not preclude a plaintiff from later bringing a federal lawsuit, the arbitral decision may be admitted as evidence in the federal suit and accorded such weight as the court deems appropriate. Alexander v. Gardner-Denver Co., 415 U.S. 36, 60 (1974). Although the Gardner-Denver court declined to adopt a standard as to the weight a court should accord an arbitral decision, the Court noted that where a prior arbitral decision gives full consideration to the statutory rights an employee seeks to have vindicated in the subsequent lawsuit, a court may properly accord the arbitral decision "great weight." Id. n. 21. "This is especially true where the issue is solely one of fact, specifically addressed by the parties and decided by the arbitrator on the basis of an adequate record." Id.

The appropriate amount of weight to be accorded an arbitral decision that squarely addresses issues raised in a subsequent lawsuit extends to the granting of summary judgment. Specifically, where, as here, the Plaintiff cannot overcome the cumulative probative weight of the evidence of a legitimate reason for the employment action taken and an arbitration board decision upholding the employment action, summary judgment is appropriate. See, e.g., Collins v. New York City Transit Auth., 305 F.3d 113, 119 (2d Cir. 2002) (affirming district court's grant of summary judgment in favor of employer, holding that due to probative weight of arbitration decision, circumstances of termination did not give rise to or support an inference of discrimination or retaliation). In Collins, the plaintiff, James Collins worked as a Power Maintainer's Helper for the defendant, the New York City Transit Authority. Id. at 115. There was a collective bargaining agreement in place that provided, among other things, a multi-step grievance procedure regarding disciplinary actions against Transit Authority employees. Id. at

13

115-16.  The final step of the grievance process consisted of binding arbitration.  Id. at 116.

Collins had what can only be described as a troubled working relationship with two different

supervisors.  Id.  The situation came to a head when Collins' supervisor alleged that Collins

shouted profanities and threats at him, and then punched him in the face while at a work site

and during working hours.  Id. at 117. Collins denied ever touching the supervisor.  Id.  The

Transit Authority thereafter terminated Collins' employment, in accordance with its standard

procedure for an employee assault.  Id.  Collins grieved his termination through the final step of

the grievance process, binding arbitration.  Id.  The arbitration board issued an opinion finding

that Collins had physically assaulted his supervisor and upholding Collins' termination.  Id.

Collins' termination was then implemented.[10]  Id.   After exhausting his administrative

remedies, Collins subsequently brought a federal suit alleging, among other things,

discriminatory and retaliatory discharge in violation of Title VII.  Id. at 117-18.  The district

court granted summary judgment in favor of the Transit Authority, and Collins appealed.  Id. at

118.

        In affirming the trial court, the Second Circuit held that Collins did not make out a

prima facie case of discrimination or retaliation, because he had not established that the

circumstances of his termination gave rise to or supported an inference of discrimination or

---

[10]

    Although, unlike in the instant case,  the plaintiff's termination in Collins was not implemented until
*after* the arbitration decision was issued, this distinction is of no moment, since the arbitration panel in
this case had the power to reverse the Plaintiff's transfer and order that she be reinstated as a CSO, if it
had determined that the Plaintiff's transfer was discriminatory.

retaliation.[11]  Id.  Specifically, the court reasoned that the arbitration decision was based on

substantial evidence and was rendered by an undisputedly independent, neutral and unbiased

adjudicator that had the power to prevent the termination, which the court determined was

highly probative of the absence of discriminatory intent in that termination.  Id. at 119 (citations

omitted).  Accordingly, the court concluded, "Collins has offered insufficient evidence of

causation linking his termination to motives of retaliation or discrimination to overcome the

cumulative probative weight of evidence of a legitimate reason for his discharge and of the final

termination decision by the arbitration board."  Id. (citations omitted).[12]

---

[11]

    The Second Circuit noted in Collins that the Transit Authority's defense may be viewed as either on attack on Collins' showing of an inference of discrimination or retaliation in the prima facie case or as an attack on Collins' satisfaction of the subsequent requirement that a proffered legitimate reason for an employment action be shown to be pretextual.  Although the court treated the Transit Authority's defense as an attack on Collins' prima facie case, the court also expressly did not preclude treatment of such a defense as an attack on a claim of pretext.  The subsequent cases cited herein are mixed in terms of whether the courts hold that the plaintiff has failed to establish a prima facie case or whether the plaintiff has failed to establish that the defendant's proffered non-discriminatory reason is a pretext for discrimination.  The Defendants herein argue, in the alternative, that the Plaintiff has failed to satisfy her burden on both fronts.

[12]

    Other courts in this circuit have accorded arbitral decisions similar "great weight" in granting summary judgment to the defendant.  See, e.g., VanHorne v. New York City Transit Auth., No. 00-CV-1144 (NG), 2003 WL 21738424, at *4 (E.D.N.Y. July 22, 2003) (granting summary judgment to the defendant upon determining that, after according great weight to an arbitrator's decision upholding the plaintiff's termination, the plaintiff had failed to establish a prima facie case of discrimination); Hawana v. City of New York, 230 F. Supp. 2d 518, 529 (S.D.N.Y. 2002) (granting summary judgment to defendant on plaintiff's discrimination claims, holding that plaintiff could not overcome the weight of defendant's non-discriminatory reasons for its employment action, which reasons were upheld by an independent arbitrator); Weeks v. New York State Div. of Parole, No. 00CV5865 SJ, 2002 WL 32096593, at *5-7 (E.D.N.Y. Nov. 25, 2002) (granting summary judgment in favor of defendant after according significant weight to arbitration decision upholding plaintiff's termination, even though arbitration proceeding did not address plaintiff's claims of discrimination); Brinson v. New York City Transit Auth., 60 F. Supp.2d 23, 31 (E.D.N.Y. 1999) (granting summary judgment to defendant, holding that arbitral decision sustaining employee's termination combined with employee's extensive and

In the instant case, the arbitration decision should be accorded the greatest possible weight, because the arbitration involved the very issues being litigated in this lawsuit – i.e., whether Hartford discriminated against the Plaintiff based on her age and sex when it transferred her from the Community Service Division to the Patrol Division in October, 2000. (Local Rule ¶32).  In Collins v. New York Transit Authority, for example, the issue before the arbitration board was not whether the Transit Authority discriminated against Collins on the basis of his race, but rather, whether Collins had assaulted his supervisor.[13]  Nevertheless, the district court held, and the Second Circuit affirmed, that Collins could not make out a prima facie case of discriminatory discharge in the face of the arbitration decision holding that Collins had assaulted his supervisor.  If the probative weight of the arbitration decision in Collins was too great for the plaintiff to overcome, then the same should also be true in this case, where the "arbitral determination [gave] full consideration to [the] employee's [statutory] rights." Alexander v. Gardner-Denver Co., 415 U.S. 36, 60 n.21 (1974).

---

progressive disciplinary record served as legitimate, non-discriminatory basis for her termination that no reasonable jury could find to be merely pretext for race discrimination); Umpierre v. Brockport, No. 95CV887RSPDS, 1997 WL 599314, at *4-5 (N.D.N.Y. Sept. 26, 1997) (granting summary judgment to defendant, holding that no rational factfinder could conclude that the defendant terminated the plaintiff for any other reason than because the arbitrator found her guilty of misconduct after hearing evidence over ten days).  Although the foregoing cases all involve causes of action arising under Title VII, the same rationale has been applied to cases brought under the ADEA.  See, e.g., Tomasino v. Mount Sinai Medical Center and Hosp., No. 97 Civ. 5252 (TPG), at * 9-13 (S.D.N.Y. March 13, 2003) (granting summary judgment to defendant on plaintiff's ADEA claims, and holding that arbitrator's decision was entitled to great weight).

[13]

Similarly, the arbitrations in Brinson and Umpierre did not address the plaintiffs' discrimination claims, but in both cases, the court accorded significant weight to the arbitration decisions in granting summary judgment to the defendant.

Accordingly, the Court should grant summary judgment to the Defendants because the Plaintiff cannot make out a prima facie case of discrimination under the equal protection clause of the Fourteenth Amendment or the ADEA, or in the alternative, because the Plaintiff cannot establish that Hartford's legitimate, non-discriminatory reason for transferring the Plaintiff was a pretext for discrimination.

## 2. The Plaintiff Cannot Establish That She Suffered An Adverse Employment Action.

The Defendants are also entitled to summary judgment on the Plaintiff's equal protection and ADEA discrimination claims because she cannot establish that her transfer from the Community Response Division to the Patrol Division constituted an adverse employment action. It is well-settled that in order to make out a prima facie case of employment discrimination, a plaintiff must show that she has suffered an adverse employment action. See, e.g., Ascione v. Pfizer, Inc., No. 03 Civ 244 (VM), 2004 WL 741673, at *3 (S.D.N.Y. 2004) (citing Collins v. New York City Transit Auth., 305 F.3d 113, 118 (2d Cir. 2002)). For an employment action to be adverse, it must materially affect the terms and conditions of one's employment. Zuffante v. Elderplan, Inc., No. 02 Civ. 3250 WHP, 2004 WL 744858, at *4 (S.D.N.Y March 31, 2004) (citing Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000)). "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." Id. (citing Galabya, 202 F.3d at 640). Put another way, "[a] materially adverse change must be more disruptive than a mere inconvenience or an alteration

17

of job responsibilities." <u>Mercer v. Brunt</u>, 299 F. Supp.2d 21, 28 (D. Conn. 2004) (quotation omitted). That is, "not everything that makes an employee unhappy is an actionable adverse action." <u>Phillips v. Bowen</u>, 278 F.3d 103, 117 (2d Cir. 2002) (quotation omitted).

In this case, it is undisputed that the Plaintiff did not suffer a reduction in salary or benefits as result of her transfer from the Community Response Division to the Patrol Division. (Local Rule, ¶24). Moreover, the Plaintiff did not suffer a loss of promotional opportunities. (Local Rule, ¶24). In addition, the Plaintiff testified that being a CSO is, for all intents and purposes, the same as being a Police Officer. (Local Rule, ¶25). Significantly, in June of 2000, the Plaintiff voluntarily requested, but ultimately did not pursue, the very transfer that she now complains of. (Local Rule, ¶13). Thus, like the plaintiff in <u>Galabya</u>, the Plaintiff here cannot establish that "the transfer was to an assignment that was materially less prestigious, materially less suited to [her] skills and expertise, or materially less conducive to career advancement." <u>Galabya</u>, 202 F.3d at 641 (affirming trial court's grant of summary judgment to defendant, holding that transfer did not constitute an adverse employment action).

"The key inquiry with regard to an involuntary transfer is whether the transfer constitutes a negative employment action tantamount to a demotion." <u>Chu v. City of New York</u>, No. 99 Civ. 11523, 2000 WL 1879851, at *4 (S.D.N.Y. Dec. 27, 2000) (quotation omitted). For this reason, and in contrast to the instant case, those cases in which courts have determined that job transfers could constitute adverse employment actions involved material changes in the terms and conditions of employment. For example, in <u>De la cruz v. New York Human Resources</u>, 82 F.3d 16, 21 (2d Cir. 1996), the court determined that a transfer to a less prestigious unit of the Department of Social Services, with reduced opportunities for

18

professional growth, constituted an adverse employment action. This is simply not the case here. The Plaintiff testified that a CSO is essentially the same as a Police Officer and that she has suffered no loss of advancement or promotional opportunities as a result of her transfer. (Local Rule, ¶¶24-25).[14]

Simply put, "[a] purely lateral transfer that involves no demotion in form or substance," such as the transfer at issue in this case, "is not a materially adverse [employment] action." Galabya v. New York City Board of Ed., 202 F.3d 636, 640 (2d Cir. 2000) (citation omitted). Accordingly, the Defendants are entitled to summary judgment on the Plaintiff's equal protection and ADEA discrimination claims because the Plaintiff cannot establish that her transfer constituted an adverse employment action.

### C.    The Plaintiff's Retaliation Claim Must Also Fail Because She Cannot Establish a Prima Facie Case of First Amendment Retaliation.

---

[14]

Similarly, in Rodriguez v. Board of Education, 620 F.2d 362, 366 (2d Cir. 1980), the court held that the transfer of a twenty-year middle school art teacher to an elementary school could constitute an adverse employment action, because the transfer would render utterly useless the teacher's twenty years of experience, as well as both a bachelor's and a master's degree directed to middle school art studies. Once again, these considerations are not present in the instant case. Specifically, the Plaintiff holds no special degree and has not undergone any significant special schooling unique to the CSO position. Moreover, the Plaintiff testified that her skills as a CSO are readily transferrable to her position as a Police Officer in the Patrol Division. (Local Rule, ¶25).

Finally, in Patrolmen's Benevolent Assoc. v. City of New York, 310 F.3d 43, 51 (2d Cir. 2002), the court held that the involuntary transfer of a police officer from one precinct to another could constitute an adverse employment action where the new assignment carried significant additional safety concerns. Specifically, the plaintiff in that case testified that community members shouted abusive comments at him, and that he feared for his safety because the level of mistrust among the other officers in the precinct prevented the open communication necessary to effective police work. Id. In this case, however, there is no evidence of record that the Plaintiff's transfer carried such significant additional safety concerns. In fact, even when prompted about whether her new assignment was in a rough area, the Plaintiff merely testified that "[i]t can be." (Local Rule, ¶26). This hardly rises to the level of a significant additional safety concern akin to that present in Patrolmen's Benevolent Association.

19

_____The Plaintiff's retaliation claim must also fail because she cannot establish a prima facie case of First Amendment retaliation. Specifically, in order to make out a prima facie case of First Amendment Retaliation, a plaintiff must establish the following three elements: (1) that her speech was constitutionally protected; (2) that she suffered an adverse employment action; and (3) that a causal connection exists between her political activity and the allegedly adverse employment action such that her political activity was a motivating factor in taking the adverse employment action. Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999) (citation omitted). In this case, the Plaintiff cannot establish any of the three requisite elements.

### 1.    The Plaintiff Cannot Establish That Her Speech Was Constitutionally Protected.

The Plaintiff claims that she was transferred in relation for the complaints of sexual harassment she made in 1992.[15] It is well established that, in order to constitute constitutionally protected speech for purposes of a First Amendment retaliation claim, the speech at issue must involve a matter of public concern. Pickering v. Board of Educ., 391 U.S. 563, 568 (1968). But "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by [a public employer] allegedly in reaction to the employee's

---

[15]

Although the Complaint alleges that the Plaintiff was retaliated against for complaints she made in 1992 and 2000, the only complaint the Plaintiff made in 2000 was her complaint about having been transferred. The Plaintiff cannot argue that she was transferred in retaliation for her 2000 complaint, since the decision to transfer the Plaintiff had obviously already been made by the time the Plaintiff complained about it.

behavior." Connick v. Myers, 461 U.S. 138, 147 (1983). In the instant case, the Plaintiff's sexual harassment complaints were "personal in nature and generally related to her own situation." Ezekwo v. New York City Health & Hospitals Corp., 940 F.2d 775, 781 (2d Cir.) (holding that resident's complaints about aspects of residency program that negatively affected her did not implicate matters of public concern). Specifically, "there is no indication that the plaintiff wanted to debate issues of sex discrimination, that her suit sought relief against pervasive or systemic misconduct by a public agency or its officials, or that her suit was part of an overall effort to correct allegedly unlawful practices or bring them to public attention." Saulpaugh v. Monore Community Hosp., 4 F.3d 134, 143 (1993) (dismissing plaintiff's First Amendment retaliation claim based upon sexual harassment complaint, reasoning that the plaintiff's complaints "were motivated and dealt with her individual employment situation.") Rather, the Plaintiff's complaints were limited to Lieutenant Natitus' alleged pulling of her hair and did not implicate allegedly systemic misconduct of any kind. (Local Rule, ¶¶34-35). Since, like the plaintiff in Saulpaugh, the Plaintiff here has failed to establish that her speech implicates a matter of public concern, she cannot make out a prima facie case of First Amendment retaliation. Summary judgment should enter for the Defendants on the Plaintiff's retaliation claim, accordingly. See Knight v. City of New York, 303 F. Supp.2d 485, 501 (S.D.N.Y. 2004) (dismissing plaintiff's First Amendment retaliation claim, which was based on complaints of sexual harassment, reasoning that such complaints "were related solely to his employment status and doe not amount to protected speech on a matter of public interest"); Osier v. Broome County, 47 F. Supp.2d 311, 329-30 (N.D.N.Y. 1999) (same).

   2.    **The Plaintiff Cannot Establish That She Has Suffered An Adverse Employment Action.**

For the reasons set forth in Section III.B.2. *supra*, the Plaintiff cannot establish that her transfer constituted an adverse employment action.[16]  Since this is also a requisite element of her retaliation claim, summary judgment should enter in favor of the Defendants on the Plaintiff's First Amendment retaliation claim, accordingly.

   3.    **The Plaintiff Cannot Establish A Causal Connection Between The Sexual Harassment Complaints She Made In 1992 And Her Eventual Transfer In 2000.**

The Defendants are entitled to summary judgment on the Plaintiff's First Amendment retaliation claim for the further reason that the Plaintiff cannot establish a causal connection between the sexual harassment complaints she made in 1992 and her transfer in 2000.

         a.    **The Plaintiff Cannot Establish That Any Of The Defendants Had Any Knowledge Of Her Prior Sexual Harassment Complaints At The Time That The Decision to Transfer The Plaintiff Was Made In 2000.**

         As an initial matter, the Plaintiff has absolutely no personal knowledge or other evidence tending to establish that, at the time the decision was made to transfer the Plaintiff in 2000, any of the Defendants had any knowledge of the sexual harassment complaints she made in 1992.  (Local Rule, ¶37).  The Court should therefore hold, as a matter of law, that the Plaintiff cannot establish a causal connection between her sexual harassment complaints and

---

[16]

   It is clear that, even for First Amendment purposes, evidence of some tangible harm is required in order to establish an adverse employment action.  A plaintiff's subjective feelings concerning an employer's actions are insufficient as a matter of law.  See, e.g., Islamic Society of Fire Dept. Personnel v. City of New York, 205 F. Supp.2d 75, 87 (citation omitted).

22

her subsequent transfer, some eight years later.  See Kalb v. Wood, 38 F. Supp.2d 260

(S.D.N.Y. 1999) (granting summary judgment to defendant on First Amendment retaliation

claim, finding no causal connection between the adverse employment action and the protected

conduct, where evidence showed that the manager who denied the plaintiff's employment

benefits had no knowledge of protected activity).  See also Gordon v. New York City Bd. of

Educ., 232 F.3d 111, 117 (2d Cir. 2000) ("The lack of knowledge on the part of particular

[decision makers] is admissible as some evidence of a lack of a causal connection . . .").  The

Defendants are therefore entitled to summary judgment on the Plaintiff's First Amendment

Retaliation claim.

> **b.**    **Too Much Time Had Lapsed Between The Plaintiff's Sexual
> Harassment Complaints And Her Transfer To Enable Her To
> Establish A Causal Connection Between Them.**

The passage of eight years between the Plaintiff's sexual harassment complaints and her

transfer is far too long a time to suggest any causal relationship between the two.  While the

Second Circuit has not established a bright line rule as to when the temporal link between

protected activity and allegedly adverse employment action becomes too attenuated to

demonstrate causation, courts in this circuit have consistently found time periods far shorter

than eight years to be too long.  See, e.g., Hawana v. City of New York, 230 F. Supp.2d 518,

530 (S.D.N.Y. 2002) (holding that misconduct charges against employee were too remote in

time from employee's prior administrative discrimination complaint to establish retaliation

claim, where charges came almost two years after complaint was filed)[17]; <u>Lynk v. Henderson</u>, No. 98 Civ 2086 (MGC), 2000 WL 178859, at *4 (S.D.N.Y. Feb. 15, 2000) (three years between EEOC complaint and reprimand too great to show causal relationship); <u>Castro v. Local 1199, Nat'l Health & Human Servs. Employees Union</u>, 964 F. Supp. 719, 728 (S.D.N.Y. 1997) (one year is too long to show a causal connection between filing of EEOC complaint and termination). As one court so aptly observed, "[c]laims of retaliation are routinely dismissed when as few as three months elapse between the protected . . . activity and the alleged act of retaliation. . . . Surely, two-and-one-half years is far too long to warrant an inference of discriminatory retaliation." <u>Nicastro v. Runyon</u>, 60 F. Supp.2d 181, 185 (S.D.N.Y. 1999) (citations omitted).

Based on the foregoing authority, the Court should hold that, as a matter of law, an eight year gap between the Plaintiff's protected activity and her transfer is too great to support an inference regarding causation. Accordingly, the Court should grant summary judgment to the Defendants on the Plaintiff's First Amendment retaliation claim.

**D.     The Defendants Are Entitled To Summary Judgment On The Plaintiff's Substantive Due Process Claim Because This Claim Is Covered By Other Specific Constitutional Provisions.**

---

[17]      <u>See also</u> <u>Clarke v. One Source, Inc.</u>, No. 99 Civ. 2323 (RPP), 2002 Wl 31458238 (S.D.N.Y. Nov. 1, 2002) (discrimination complaints made some two years prior to adverse employment action too remote in time to support retaliation claim); <u>Greco v. County of Nassau</u>, 146 F. Supp.2d 232, 245 (E.D.N.Y. 2001) (adverse employment action taken approximately two years after employee had filed EEOC charge was "far too remote in time to establish any inference regarding a causal connection.").

The Defendants are also entitled to summary judgment with respect to the Plaintiff's substantive due process claim because this claim is covered by other specific constitutional provisions. Specifically, the Plaintiff alleges the same set of facts to support her First Amendment, substantive due process, procedural due process and equal protection claims. Even the Plaintiff, therefore, views her substantive due process claim as covered by the First Amendment and the procedural due process and equal protection clauses of the Fourteenth Amendment. It is well settled that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." Velez v. Levy, 274 F. Supp.2d 444, 454 (S.D.N.Y. 2003) (quoting Albright v. Oliver, 510 U.S. 266, 272 (1994). See also U.S. v. Lanier, 520 U.S. 259, 272 n.7 ("If a constitutional claim is covered by a specific constitutional provision . . . the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.") (citation omitted). Since the Plaintiff's substantive due process claim in this case is based on the same set of facts as her claims under the more specific constitutional provisions set forth above, the Court should enter summary judgment in the Defendants' favor on the Plaintiff's Fourteenth Amendment substantive due process claim. See McKenna v. Wright, No. 01 Civ. 6571 (HB), 2004 WL 102572, at * 8 (S.D.N.Y. Jan. 21, 2004) (dismissing Fourteenth Amendment substantive due process claim where claim covered by Eighth Amendment).[18]

---

[18]
    In the alternative, the Court should grant summary judgment in the Defendants' favor because the Plaintiff cannot establish that the Defendants engaged in conduct "that is so outrageously arbitrary as to

**E.**     **The Defendants Are Entitled To Summary Judgment On The Plaintiff's Procedural Due Process Claim Because The Plaintiff Does Not Have A Constitutionally Protected Interest In A Particular Job At The HPD.**

The Defendants are entitled to summary judgment on the Plaintiff's Procedural Due Process Claim because she does not have a constitutionally protected interest in a particular job at the HPD.  Specifically, it is undisputed that Hartford has not terminated the Plaintiff's employment, but rather, has transferred her from one division to another within the HPD without affecting her salary, benefits or promotional opportunities.  (Local Rule, ¶¶2, 24-25).  Thus, Plaintiff's argument necessarily hinges on the premise that the Plaintiff had a constitutionally protected interest *in her job as a CSO.*  Case law instructs, however, that this is not a constitutionally cognizable interest.  Looby v. City of Hartford, 152 F. Supp.2d 181, 190 (D. Conn. 2001) ("Plaintiff's claim here is not that he was prevented from being a fireman, but rather that the Chief refused to promote him to captain.  This is not a constitutionally protected liberty right.") (citation omitted).   "Although there is a recognized constitutional liberty right to pursue an occupation, the cases have consistently drawn a distinction . . . between occupational liberty and the right to a specific job . . . It is the liberty to pursue a calling or occupation, and not the right to a specific job, that is secured by the Fourteenth Amendment."  Looby v. City of

---

constitute a gross abuse of governmental authority."  Lisa's Party City, Inc. v. Town of Henrietta, 185 F.3d 12, 17 (2d Cir. 1999).  It is well settled that conduct which is merely arbitrary, capricious and/or without rational basis will not satisfy this high standard – the conduct at issue must be truly egregious.  See County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998) ("only the most egregious conduct can be said to arbitrary in the constitutional sense").  This Court should hold, as a matter of law, that the transfer at issue in this case could never meet the standard of such egregious conduct, particularly in the face of the Defendants' documented justification for their decision to transfer the Plaintiff, and the decision of a neutral arbitration panel upholding the Defendants' decision.

Hartford, 152 F. Supp.2d 181, 190 (D. Conn. 2001) ("As the Seventh Circuit has noted, 'being a police officer is an occupation; being a police lieutenant is not.'") (citation omitted). The Court should enter summary judgment in favor of the Defendants on the Plaintiff's Fourteenth Amendment Procedural Due Process claim, accordingly.

> **F.  The Defendant, Chief Rudewicz Is Entitled to Summary Judgment On The Plaintiff's Section 1983 Claims Because The Plaintiff Cannot Establish The Requisite Causal Connection Between Chief Rudewicz's Conduct And The Plaintiff's Alleged Constitutional Injury.**

In addition, the Defendant, Chief Rudewicz is entitled to summary judgment on the Plaintiff's Section 1983 claims because the Plaintiff cannot establish the requisite causal connection between Chief Rudewicz's conduct and the Plaintiff's alleged constitutional injury. Specifically, it is well-settled that there are two essential elements to a Section 1983 claim: "(1) the defendant acted under color of state law; and (2) as a result of defendant's actions, the plaintiff suffered a denial of her federal statutory rights, or her constitutional rights or privileges." Annis v. County of Westchester, 136 F.3d 239, 245 (2d Cir. 1998). In this case, the Plaintiff cannot establish any nexus between Chief Rudewicz's actions and her alleged injury, i.e. the Plaintiff's transfer from Community Response to Patrol. Specifically, it is undisputed that Chief Rudewicz was away, and did not order the Plaintiff's transfer. (Local Rule, ¶23). The Plaintiff's transfer was ordered by Jones, who has not been named as a defendant in this lawsuit. (Local Rule, ¶22). Chief Rudewicz did not sign off on or otherwise approve the Plaintiff's transfer. (Local Rule, ¶¶22). Rather, Jones informed Chief Rudewicz of the transfer when Chief Rudewicz returned to work, after the transfer had already been effectuated. (Local Rule, ¶¶22). Moreover, it is undisputed that Chief Rudewicz was not

present at the meeting at which the Plaintiff was informed of her transfer.  (Local Rule, ¶19).

The Court should therefore enter summary judgment in favor of the Defendant, Chief Rudewicz on the Plaintiff's Section 1983 claims, because the Plaintiff cannot establish the requisite nexus between any action of Chief Rudewicz and the Plaintiff's alleged constitutional injury.

**G.    In The Alternative, Chief Rudewicz Is Entitled To Summary Judgment On His Affirmative Defense Of Qualified Immunity To The Plaintiff's Section 1983 Claims.**

In the alternative, even assuming that the Plaintiff can establish that some action taken by Chief Rudewicz caused the constitutional injury she now complains of, the Plaintiff still cannot prevail because Chief Rudewicz's actions are protected by the doctrine of qualified immunity.

Government officials who are sued in their individual capacity may invoke the qualified immunity doctrine as an affirmative defense to liability for civil damages "when their conduct does not violate clearly established statutory or constitutional rights which a reasonable person would have known." African Trade & Info. Center, Inc. v. Abromaitis, 294 F.3d 355, 359 (2d Cir. 2002) (quotation omitted).  When qualified immunity has been invoked as an affirmative defense in a Section 1983 case, summary judgment is an appropriate mechanism "to weed out truly insubstantial lawsuits prior to trial."  Crawford-El v. Britton, 523 U.S. 574, 600 (1998). Indeed, summary judgment is particularly appropriate because the qualified right to immunity relates to immunity to suit, a right that is "effectively lost if a case is erroneously permitted to go to trial." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).

The Second Circuit has identified three circumstances in which a government official would be entitled to qualified immunity: "(1) if the conduct attributed to him was not prohibited by federal law . . . or (2) where the conduct was so prohibited, if the plaintiff's right not be subjected to such conduct by the defendant was not clearly established at the time it occurred . . . or (3) if the defendant's action was objectively reasonable in light of the legal rules that were clearly established at the time it was taken." Munafo v. Metropolitan Trans. Auth., 285 F.3d 201, 210 (2d Cir. 2002).

Chief Rudewicz, who made neither the initial nor the final decision to transfer the Plaintiff, is entitled to summary judgment on his qualified immunity defense. First, Chief Rudewicz's conduct is not prohibited by law because Plaintiff cannot establish that any action attributable to Chief Rudewicz caused an intentional deprivation of the Plaintiff's constitutional rights. (Local Rule, ¶22).

In addition, there is no evidence of record indicating that Chief Rudewicz was in a position to know whether there was any alleged discriminatory or retaliatory intent by any of the Defendants in recommending Plaintiff's transfer to Jones through the established chain of command. Therefore, it was objectively reasonable for Chief Rudewicz not to reverse the Plaintiff's transfer in reliance on the information provided by his subordinates, which indicated that the Plaintiff's transfer was based upon her documented performance problems, which included failure to attend community meetings, spending too much time in her office instead of patrolling her community, and complaints from a community member. See, e.g., Brennan v. City of White Plains, 67 F. Supp.2d 362, 376-77 (S.D.N.Y. 1999) (summary judgment based on

29

qualified immunity granted to personnel director who relied on input from assistants and was therefore not personally responsible for alleged deprivations of constitutional rights).  Similarly, it was objectively reasonable for Chief Rudewicz to request one of his subordinates – against whom there are no allegations of discrimination in this case – to conduct a thorough investigation into the Plaintiff's transfer, in response to her letter of October 25, 2000.  This is because, quite simply, there was no evidence – then or now – that Chief Rudewicz was aware of any discriminatory or retaliatory intent on the part of Jones when he conducted the investigation.  See e.g. Lee v. Coughlin, 26 F. Supp.2d 615, 637 (S.D.N.Y. 1998) ("Qualified immunity protects a defendant based on the objective reasonableness of his own actions in light of his knowledge of the facts at the time he acted.")

Accordingly, the Court should enter summary judgment in favor of the Defendant, Chief Rudewicz on his affirmative defense of qualified immunity to the Plaintiff's Section 1983 claims.

**H.    The Defendant, Hartford Is Entitled to Summary Judgment On Plaintiff's Section 1983 Claims Because The Plaintiff Cannot Establish That Hartford Violated Her Civil Rights As Part Of An Official Municipal Policy Or Custom.**

The Defendant, Hartford is entitled to summary judgment on the Plaintiff's Section 1983 claims because the Plaintiff cannot establish that Hartford violated her civil rights as part of any official municipal policy or custom.  Specifically, a party seeking to recover from a municipality under Section 1983 must prove, not only that conduct under color of state law caused him to be deprived of a constitutional or statutory right, but also that  a "policy" or

"custom" of the municipality caused the deprivation. <u>Monell v. New York Department of Social Services</u>, 436 U.S. 658, 691-94 (1978) (no respondeat superior liability under Section 1983); <u>Jett v. Dallas Independent School District</u>, 49l U.S. 701, 736 (1989) (same); <u>Zahra v. Town of Southold</u>, 48 F.3d 674, 685 (2d Cir. 1995) (same).

The Plaintiff asserts that the requisite "policy"[19] may be found in (1) the actions of the Individual Defendants, whom the Plaintiff asserts are final policy makers for purposes of establishing personnel policy;[20] or (2) the failure by official policymakers to properly train or supervise the Individual Defendants.[21]  Complaint, Count Two, ¶¶ 46 & 46 [sic].  The Plaintiff cannot establish a policy of discrimination or retaliation through the actions of the Individual Defendants, as they are not final policy makers for purposes of personnel actions as a matter of law.  In addition, the Plaintiff cannot establish a policy of discrimination or retaliation through the failure of Hartford policymakers to adequately supervise or train the Individual Defendants because the record is devoid of evidence suggesting that in supervising or training the Individual Defendants Hartford policymakers displayed deliberate indifference to Plaintiff's constitutional rights.  Finally, the Plaintiff cannot establish the existence of a policy of

---

[19]

The Plaintiff's Complaint contains no specific allegation that her constitutional harm resulted from a Hartford "custom."  Nevertheless, the Defendants note that the record is devoid of any evidence suggesting that a widespread pattern of gender and/or age discrimination existed which was "so permanent and well-settled as to constitute a 'custom or usage' with the force of law." <u>Adickes v. S.H. Kress & Co</u>., 398 U.S. 144, 167-168 (1970).

[20]

<u>See</u> <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 483-84 (1986); <u>Jeffes</u>, 208 F.3d 49, 57 (2d Cir. 2000) (official in question must be responsible under state law for making policy in that particular business area in which conduct is at issue).

[21]  <u>See</u> <u>City of Canton v. Harris</u>, 489 U.S. 378, 388 (1989).

31

discrimination or retaliation through the alleged failure to train the Individual Defendants for the further reason that she can neither identify deficiencies in their training nor prove that any such deficiencies actually caused her constitutional harm.

**1.    The Individual Defendants Were Not Final Policymakers Because Their Discretion To Make Personnel Decisions Was Both Constrained By Pre-Existing HPD Policies And Subject To Meaningful Review.**

Whether an official in question possessed final policy-making authority in a particular area[22] is a legal question to be answered on the basis of state law.  Jeffes v. Barnes, 208 F.3d 49, 57 (2d Cir. 2000) (trial judge looks to state law, including local positive law and custom or usage having force of law, in deciding whether official is final policymaker as matter of law) (citation omitted).  Federal courts typically look to the existence of two factors to determine whether an official possesses such final policy-making authority.  First, they examine whether an official's actions are constrained by policies enacted by others.  City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988).  Second, they look to whether the official's decisions made are subject to meaningful review.  Id.  The application of the foregoing standards to this case compels the conclusion that Jones' discretionary authority, in Chief Rudewicz's absence,[23] to administer personnel policy adopted by others does not render him a final policymaker for

---

[22]

It is well established that, in order for Section 1983 liability to attach, "the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area of the city's business."  City of St. Louis v. Praprotnik , 485 U.S. 112, 123 (1988) (emphasis in original).

[23]

Jones, in Chief Rudewicz's absence, possessed final decision making authority with regard to the decision to transfer Plaintiff.  Hence, if neither he nor Chief Rudewicz is final policy maker for personnel purposes, it necessarily follows that the other Individual Defendants, their subordinates, are not final policymakers as a matter of law as well.

purposes of imposing municipal liability under Section 1983.

      **a.**     **The Individual Defendants' Efforts, And Jones' Ultimate Order To Transfer Plaintiff Were Constrained By Policies Enacted By The Council Or Manager.**

Jones cannot be deemed to be a final policymaker as a matter of law because in transferring Plaintiff he was constrained under the Charter of the City of Hartford[24] ("Charter") by policies established by the Court of Common Council (the "Council") and the City Manager (the "Manager"), which policies Jones had no ability to alter. (Local Rule, ¶¶ 39-65). The Charter vested final policy-making authority regarding the organization, conduct and operation of all City departments (including the authority to make personnel policy through both the adoption of ordinances contained in the Hartford Municipal Code and the approval of regulations promulgated by the Personnel Board and contained in the Personnel Rules) with the Council. (Local Rule, ¶¶42-47, 55).

The Charter also established the Manager as the City's chief executive officer, and mandated that he or she was responsible to the Council for the administration of certain departments, including the HPD. (Local Rule, ¶¶50-52). The Manager was also empowered to establish personnel policy pertaining to the HPD through negotiation and execution of the Police Contract between the City and the Hartford Police Union ("HPU"). (Local Rule, ¶¶50, 54-55; Conn. Gen. Stat. § 7-474).

The Police Contract, as negotiated and executed by the Manager, incorporates all personnel provisions of the Charter, Municipal Code, and the Personnel Rules not expressly

---

[24]   References to the Charter pertain to the Charter in effect prior to January 1, 2004.

superceded therein. (Local Rule, ¶¶ 55-57, 59).  The Police Contract also mandates compliance with the Rules and Procedures of the HPD, including the Code of Conduct, and the Police Officer Bill of Rights.  (Local Rule, ¶¶ 56-57, 59).  Thus, personnel policy pertaining to Hartford police officers ("Police Personnel Policy") is enacted by the Council and Manager and expressed, either specifically or through reference, in the Police Contract.  (Local Rule, ¶¶ 39-59).

Nothing in the Charter granted Jones the authority to set Police Personnel Policy, much less to establish such through the transfer of Plaintiff.  (Local Rule, ¶¶ 39-40).  Moreover, in transferring Plaintiff, Jones was required to strictly adhere to established Police Personnel Policy.  (Local Rule, ¶¶ 39-65). Specifically, the Charter dictates that the Chief[25]  must: (1) appoint and remove all employees based upon merit and fitness *in accordance with* the Charter, Municipal Code and Personnel Rules; (2) enact rules and regulations *in conformity with* the Charter, Municipal Code and Personnel Rules; and (3) administer discipline *in accordance with* the Charter, the Municipal Code and the Personnel Rules.  (Local Rule, ¶¶ 39-40, 55).  Jones was similarly constrained under the Police Contract and state labor law to follow all such personnel policies contained or incorporated therein.  (Local Rule, ¶¶ 53-70 ; Conn. Gen. Stat. §§ 7-468, 7-469, 7-470, 7-474).[26]

---

[25]

For purposes of this Memorandum, all references to the "Chief" also pertain to the Assistant Chief, who is authorized to order transfers of police officers in the Chief's absence, such as occurred in this case.  (Local Rule, ¶18).

[26]

Contract repudiation and unilateral action violate Conn. Gen. Stat. § 7-470(a)(4); See Local 818 of Council 4 AFSCME AFL-CIO v. Town of East Haven, 42 Conn. Supp. 227,  614 A.2d 1260 (Conn. Super. Ct. 1992); Conn. Gen. Stat. § 31-105.

The Charter, the Municipal Code, and the Personnel Rules all contain provisions specifically prohibiting discriminating against employees on the basis of their gender and age. (Local Rule, ¶¶44-48, 55-59, 61).  The Municipal Code also prohibits retaliating against individuals who exercise their First Amendment rights.  (Local Rule, ¶ 44).  Additionally, the Police Contract, besides incorporating these provisions, also specifically prohibits the Police Chief from exercising his authority to transfer employees for discriminatory reasons or from otherwise enforcing an order he knew to be unlawful or discriminatory.  (Local Rule ¶¶56-61, 63-65).  Thus, Jones was prohibited from transferring Plaintiff for discriminatory or retaliatory reasons or from rubber stamping such actions by his subordinates.  (Local Rule, ¶¶56-61, 63-65).

In light of the foregoing restrictions on Jones' discretion, neither he nor his subordinates are final policy makers as a matter of law on personnel matters such as the transfer at issue here. On the contrary, because the statutory power to make policy with regard to these grants of authority resided within individuals and entities other than Jones -- the Council and the Manager -- liability for Jones' alleged conduct cannot attach itself to Hartford.

### b.    The Plaintiff's Transfer Was Subject To Meaningful Review And Potential Reversal By Hartford's Personnel Director.

Further evidence that Jones was not a final policymaker for purposes of determining municipal liability under Section 1983 is found in the fact that the transfer was subject to meaningful review.  Any personnel decision undertaken by the Chief that arises from or implicates rights embodied in the Police Contract may be grieved by the employee or the Union.  (Local Rule, ¶66).  More specifically, Jones' purported decision to discriminate against

35

the Plaintiff in the terms and conditions of her employment by transferring her because of her age and gender, could have been, and in fact was, grieved by the Plaintiff pursuant to the Police Contract. (Local Rule, ¶32-33, 58, 67). That Plaintiff possessed an avenue for meaningful review of the transfer is illustrated by the grievance procedure which empowers the Personnel Director to hear and decide – and, when deciding, even reverse – any grievances not settled by Steps 1 and 2, or those grievances that originate at Step 3. (Local Rule, ¶¶ 68-70).

Given the Plaintiff's inability to controvert the fact that the purportedly discriminatory or retaliatory transfer she suffered at the hands of Jones was reviewable, Jones can not be a final policymaker. See Oladeinde v. City of Birmingham, 230 F.3d 1275 (11th Cir. 2000) (noting that where opportunity for meaningful review of municipal official's decision exists, it divests that official of policy-making authority). Summary judgment should enter for Hartford, accordingly.

**2.    There Is Also No Basis In The Record For Imposing Liability On Hartford For Any Alleged Failure To Adequately Train Or Supervise The Individual Defendants Not To Discriminate or Retaliate Against Plaintiff.**

The Plaintiff's assertion that the requisite municipal custom or policy arises from Hartford's failed to properly train and/or supervise the Individual Defendants fails because the Plaintiff cannot establish that Hartford policymakers displayed a "deliberate indifference" to the Plaintiff's constitutional rights. Amnesty America v. Town of West Hartford, et al., 361 F.3d 113, 127 n.8 (2d Cir. 2004) (holding that failure to supervise claim requires showing that policymakers' failure to supervise displayed deliberate indifference to particular unlawful conduct against the Plaintiff and that failure to train claim requires showing that policymakers' failure to train displayed deliberate indifference to risk of future violations). The Plaintiff's

36

assertion that the requisite policy can be inferred from Hartford's failure to train Chief

Rudewicz and his subordinates fails for the further reason that the Plaintiff cannot establish

either: (1) that particular deficiencies in Hartford's training of its supervisor's existed; or (2)

that such deficiencies caused her constitutional deprivation.  <u>Amnesty America</u>, 361 F.3d at

129-130 (to establish policy for failure to train, a plaintiff must identify specific deficiencies in

training and show how those deficiencies caused the constitutional deprivation).

      **a.**    **<u>The Plaintiff Cannot Establish That Hartford's Alleged Failure To
Supervise Was So Severe As To Constitute "Deliberate Indifference" To
The Plaintiff's Constitutional Rights.</u>**

In order to establish that a municipality's failure to supervise amounted to deliberate

indifference, the Plaintiff must prove that the need for more or better supervision to protect the

Plaintiff from the allegedly discriminatory or retaliatory transfer was obvious to Hartford

policymakers who made no meaningful attempt to forestall or prevent the unconstitutional

conduct.  <u>Amnesty America v. Town of West Hartford, et al.</u>, 361 F.3d 113, 127 n.8 (2d Cir.

2004) (failure to supervise claim requires proof as to the particular violation itself and the

policymakers' reaction to it).   The summary judgment record is bereft of any evidence

suggesting that the transfer was of such a nature that it should have been obvious to Hartford

policymakers, namely the Council or Manager, that it was discriminatory or retaliatory. There is

little, if anything, about the Plaintiff's transfer for her admitted failure to perform her work

responsibilities which could indicate to the Council or Manager that the Plaintiff was being

subjected to unlawful discrimination or retaliation.

In fact, there is no evidence in the record that the Council or Manager even knew of the

transfer, let alone of the purportedly discriminatory or retaliatory motive behind it.

Accordingly, the Plaintiff cannot establish that Hartford policymakers "deliberately ignored an obvious need for supervision", and her failure to supervise claim must fail, as a matter of law.

     **b.**    **The Plaintiff Cannot Establish That 's Alleged Failure To Train Displayed "Deliberate Indifference" To The Plaintiff's Constitutional Rights.**

In order to establish that the municipality's failure to train amounted to deliberate indifference, the Plaintiff must prove that Hartford policymakers displayed a  "conscious disregard for the consequences of their action." <u>Board of the County Comm'rs of Bryan County v. Brown</u>, 520 U.S. 397, 407 (1997).  The Second Circuit has established a three-prong test that a plaintiff must satisfy in order to prove that a municipality's alleged failure to adequately train amounted to deliberate indifference to citizens' constitutional rights.  <u>Walker v. City of New York</u>, 974 F.2d 293, 297 (2d Cir. 1992).  First, the plaintiff must show that the policymaker knows "to a moral certainty" that his or her employees will confront a given situation.  <u>Id.</u>  Thus, as the Second Circuit cautioned, a policymaker does not exhibit deliberate indifference by failing to train employees for rare or unforeseen events.  <u>Id.</u>  Second, the plaintiff must establish that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult, or that there is a history of employees mishandling the situation.  <u>Id.</u>  Finally, the plaintiff must show that the wrong choice by the city employee will frequently result in the deprivation of a citizen's constitutional rights. <u>Id.</u> at 298.  This allows "municipal policymakers . . . to appropriately concentrate training and supervision resources on those situations where employee misconduct is likely to deprive citizens of constitutional rights."  <u>Id.</u>

Plaintiff in this case cannot establish that Hartford policymakers knew "to a moral

certainty" that its Assistant Police Chiefs would discriminate or retaliate against individuals. This is borne out by the cases in which courts have found that the plaintiff satisfied the "moral certainty" requirement. In those cases, the situation the individuals confronted was so intertwined with their day-to-day job duties as to make such confrontation not only very predictable, but nearly inevitable.[27] . Here, in stark contrast, a supervisor's decision to recommend, or an Assistant Chief's decision to effectuate, a transfer for discriminatory or retaliatory reasons would appear to be a much rarer event, of the type not regularly encountered by Assistant Police Chiefs as an integral part of their job.

Likewise, the Plaintiff cannot satisfy the second prong of the <u>Walker</u> test. Specifically, the Plaintiff cannot establish that the failure to train its supervisory employees not to discriminate or retaliate against officers on the basis of their age or gender, would likely result in employees being discriminated or retaliated against. Put another way, simple common sense

---

[27]

    <u>See</u>, <u>e.g.</u>, <u>Pappas v. New Haven Police Dept.</u>, 175 F. Supp. 288, 294 (D. Conn. 2001) (reasonable jury could find that policymaker would know "to a moral certainty" that police officers would confront a situation where they subjectively believe that probable cause exists but judge nevertheless denies search warrant); <u>Wilson v. City of Hartford</u>, No. CIV A3: 97 CV 00671, 1998 WL 229819, at *3 (D. Conn. Mar. 24, 1998) (policymaker knew to a moral certainty that police officers would confront situations wherein the officers would have to use force to seize fleeing individuals); <u>Post v. Elser</u>, No. 92-CV-1146, 1996 WL 406843, at *4 (N.D.N.Y. July 19, 1996) (defendants conceded that policymakers should have known to a moral certainty that police officers would confront a situation, while effectuating an arrest, where they might be tempted to use excessive force). This is also consistent with the district court's interpretation of the "moral certainty" requirement in <u>Mejia v. City of New York</u>, 228 F. Supp.2d 234, 248 (E.D.N.Y. 2002). The <u>Mejia</u> court reasoned that the first prong of the <u>Walker</u> test, that the policymaker knows to a moral certainty that his employees will confront a given situation, actually consists of two elements. First, there must be some need for a policy regarding "a given situation." The court interpreted this as contemplating a significant level of specificity regarding the situation to be confronted by the employee. Second, the given situation must occur so frequently as to be a moral certainty. It follows, therefore, that the types of situations deemed by courts within this circuit to satisfy the "moral certainty" requirement are those that employees regularly encountered as an integral part of their job duties.

instructs that an Assistant Police Chief or his subordinates, as supervisors of police officers, should not tolerate or perpetuate personnel actions that discriminate against individuals on the basis of their age or gender, or retaliate against individuals for exercising their First Amendment rights. It is beyond cavil that these supervisors would not be acutely aware of this fact. This remains especially true, where, as here, both the City personnel policies and the HPD Code of Conduct prohibit such discrimination or retaliation. (Local Rule ¶¶ 44-47, 58-65). See also Cooper v. Masiello, No. 95-CV-0849E (H), 2000 WL 432813, at *3 (W.D.N.Y. April 14, 2000) (where the alleged misdeeds "relate to such basic norms of human conduct . . . in the ordinary case a municipal policymaker need not expend precious resources on training or supervision but can instead rely on the common sense of her employees" (citing Walker v. City of New York, 974 F.2d 293, 301 (2d Cir. 1992)).[28]

### c.      The Plaintiff Cannot Identify Any Specific Deficiencies In Hartford's Training Programs Or How Such Deficiencies Allegedly Caused Her Harm.

The Plaintiff's "failure to train" argument fails for the further reason that she has offered

---

[28]

Morrissey v. City of New York, 963 F. Supp. 270 (S.D.N.Y. 1997) is instructive with regard to the ability of municipal policymakers to rely on the common sense of their employees. In that case, the plaintiff was shot by another officer following a scuffle in which the plaintiff had called the officer a "rat," apparently referring to the officer's position as a cooperator in a police corruption investigation. Morrissey, 963 F. Supp. at 272. As part of his Section 1983 claim against the municipality, the plaintiff argued that the officer that shot him had been inadequately trained as a cooperator. According to the Morrissey Court, by making the argument that the officer's inadequate training had caused his injury, the plaintiff was suggesting that the municipality should have told the officer that he might encounter stress in connection with his role as a cooperator and that he should not attempt to release his stress by shooting fellow officers. Id. at 275. In dismissing the plaintiff's argument, the court reasoned, "This is quite clearly not a choice for which [the officer] needed to be trained because it is not a 'difficult' one as defined by the Second Circuit. . . . It is perfectly obvious to anyone that shooting people to relieve stress is not a proper course of action." Id. The same reasoning applies in the instant case, where it is perfectly obvious to any supervisory officer that transferring a subordiante officer because of her age or gender is not a proper course of action.

no proof that the alleged failure to train Jones and his subordinates actually caused her

constitutional harm.  Thus, the Plaintiff apparently relies solely upon the alleged occurrence of

the misconduct to establish the requisite causal link.  This is insufficient as a matter of law.

Amnesty America v. Town of West Hartford, et al., 361 F.3d 113, 130 (2d Cir. 2004)

(municipal liability under Section 1983 for failure to train "unequivocally requires ... that the

factfinder's inferences of inadequate training and causation be based on more than the mere fact

the misconduct occurred in the first place").

        In order to recover against Hartford pursuant to her failure to train theory, the Plaintiff

must, in addition to establishing deliberate indifference, "identify a specific deficiency in the

city's training program and establish that that deficiency is 'closely related to the ultimate

injury,' such that it 'actually caused' the constitutional deprivation."  Amnesty America, 361

F.3d at 129, quoting City of Canton, Ohio v. Harris, 489 U.S. 378, 391 (1989).  As the

summary judgment record contains no evidence of deficiencies in Hartford's training programs

for Assistant Police Chief or other supervisors, nor contains any facts suggesting how any such

deficiencies caused the Plaintiff's harm, she cannot prevail.  Amnesty America, 361 F.3d at 130

("it is impossible to prevail on a claim that the Town's training program was inadequate

without any evidence as to whether the Town trained its officers ... how the training was

conducted, how better or different training could have prevented the challenged conduct, or

how a 'hypothetically well trained officer would have acted' under the circumstances").  In

short, the Plaintiff cannot prove that her harm resulted from the alleged inadequate training of

the Individual Defendants and not from the negligent administration of a sound program or

other unrelated circumstance from which municipal liability can not attach.  Amnesty America,

41

361 F.3d at 129-130.

    As the mere acts of misconduct at issue are insufficient to establish causation, and as

Plaintiff can supply no proof evidencing such causation, Plaintiff cannot, as a matter of law,

recover against Hartford for its alleged failure to train or supervise Jones or his subordinates.

Summary judgment should enter for Hartford on such claims, accordingly.

## IV.  CONCLUSION

    For all the foregoing reasons, the Court should enter summary judgment in favor of the

Defendants on the Complaint in its entirety.

                                RESPECTFULLY SUBMITTED,
                                **DEFENDANTS, CITY OF HARTFORD, ROBERT**
                                **RUDEWICZ, MARK RUDEWICZ AND MICHAEL**
                                **MANZI**


                                By_____
                                        Jill Hartley
                                        Federal Bar CT 10570
                                        John P. Shea, Jr.
                                        Federal Bar CT 17433
                                        Lori Rittman Clark
                                        Federal Bar CT 19908
                                        Sabia & Hartley, LLC
                                        190 Trumbull Street, Suite 202
                                        Hartford, CT 06103
                                        Telephone: (860) 541-2077
                                        Facsimile: (860) 713-8944

## **CERTIFICATION**

I hereby certify that a copy of the foregoing was mailed, first class, postage prepaid, this ___ day of May, 2004 to James S. Brewer, Esq. and Erin O'Neil-Baker, Esq., Brewer & O'Neil, LLC, 818 Farmington Avenue, West Hartford, CT 06119.

_____
Lori Rittman Clark