## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **ANN CODY,** | : | **CIVIL ACTION NO.** |
| **Plaintiff,** | | **3:02CV1789(SRU)** |
| | : | |
| **v.** | | |
| | : | |
| **CITY OF HARTFORD, et al.** | | |
| **Defendants.** | : | **JULY 22, 2004** |

### MEMORADUM IN OPPOSITION TO DEFENDANTS'
### MOTION FOR SUMMARY JUDGMENT

Plaintiff, Ann Cody, submits this Memorandum in Opposition to the Motion for Summary Judgment submitted by the Defendants, City of Hartford, Mark Rudewicz, Robert Rudewicz and Michael Manzi    Defendants' Motion should be denied as issues of material fact in dispute necessitate a jury trial in this case.

## I. PRELIMINARY STATEMENT

This action arises under Title 42 U.S.C. § 1983; violations of the First and Fourteenth Amendments to the United States Constitution; and violations of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §621 et seq., ("ADEA").  Defendants, acting under color of state and federal law, charter, ordinance, regulation, custom or usage, have unlawfully violated plaintiff's Fourteenth Amendment rights to equal protection and due process and plaintiff's First Amendment right to free speech by retaliating against her and depriving plaintiff of her liberty without due process of law.

## II. FACTS

Plaintiff was hired by the Hartford Police Department as a Police Officer in December, 1983. The plaintiff was assigned to the Community Response Division as a Community Service Officer ("CSO") in 1993. Lt. Manzi (hereinafter "Manzi") was the plaintiff's supervisor when once Manzi became the commander of Community Response Division (hereinafter "CRD") in January, 2000. From the time that Manzi became the commander of the CRD until the time that the plaintiff was transferred out of CRD, the plaintiff was the only female CSO in the South Police District. In 2000, the responsibilities of a CSO included working with the community, attending community meetings as needed and serving as a communications conduit between the community and the police department. The position allowed for a variation in the schedule to accommodate the position's needs. In 2000, Sergeant Mark Rudewicz (hereinafter, "Rudewicz") was the plaintiff's Sergeant in the CRD. Up until the time that Rudewicz became the plaintiff's Sergeant, the plaintiff had a clean employment history. As the only female CSO, the plaintiff answered 2,537 calls for service in 1999 and 2000. Out of 67 CSOs only five (5) CSOs responded to more calls than the plaintiff. In 1999, there were 67 CSOs and only 8 were females between both the North Police Service Area and South Police Service Area. When the plaintiff was transferred, she was over forty (40) years old.

### LT. MANZI AND SRGT. RUDEWICZ'S INVESTIGATION

On June 27, 2000, Rudewicz reported to Manzi via a memorandum that a community member had complained that plaintiff was spending too much time at the Zion St community service building and was not attending community meetings. This memorandum was dated more than one week after the alleged complaint was made on June 19, 2000. In a memorandum dated June 28, 2000, Rudewicz again reported to Manzi that he had observed

plaintiff at Zion Street for an extended time. In the memorandum dated June 28, 2000, Rudewicz further stated that he had met with the plaintiff on June 29, 2000. Manzi ordered Rudewicz to investigate the complaint allegedly made on June 19, 2000.

Manzi and Rudewicz testified that their investigation of the community member's complaint against the plaintiff consisted of Rudewicz observing the plaintiff's cruiser parked at one location for two hours. Neither Manzi nor Rudewicz asked the plaintiff if she had parked the cruiser at the community center so that she could canvas the neighborhood on foot. Neither Manzi nor M Rudewicz checked the activity log to see if she had parked her cruiser and walked around the neighborhood. At the same time that Manzi and Rudewicz observed the plaintiff's cruiser at the community center there were two other officers' cruisers parked with the plaintiff's cruiser and those officers were not investigated or questioned for parking at the building. Manzi and Rudewicz did inspectional activity reports of the plaintiff including checking on how long her cruiser had been parked outside the Community Center, checking on whether the plaintiff had properly cleared herself at a school traffic post and by attending community meetings to check on whether she had attended but did not do this for other officers who had missed community meetings and Manzi admitted that he would not do such an investigation on the other guy CSOs.

**COMMUNITY MEETINGS**

Plaintiff had never been advised of the July community meeting held at Behind the Rocks, therefore plaintiff did not attend the meeting. The plaintiff often had Sunday and Monday as scheduled days off which frequently coincided with the community meetings. Manzi and Rudewicz attended the July meeting to check up on the plaintiff. Neither Manzi

nor Rudewicz notified the plaintiff that she would be transferred if she did not improve her performance  The plaintiff missed the traffic court appearance on October 16, 2000 and stated that she forgot about it but it was the first time in seventeen (17) years that she had missed a court appearance.  The Plaintiff was excused from attending the May 17, 2000 the September 18, 2000 community meetings.  T**he** meetings that were excused were still counted against her and used to justify her transfer.  Manzi in his response to interrogatory questions as part of the Internal Affairs investigation conducted by Assistant Chief Jones, Manzi states that the plaintiff missed seven (7) meetings, which was not true.

**DISCIPLINE LEADING UP TO TRANSFER**

On October 17, 2000, Sergeant Rudewicz issued an oral reprimand against the plaintiff for failing to attend a court appearance on October 16, 2000, which was authorized by Chief Rudewicz on October 23, 2000.  On October 18, 2000, Sergeant Rudewicz issued an oral reprimand against against the plaintiff for allegedly failing to attend a Problem Solving Meeting on October 16, 2000, which was authorized by Chief Rudewicz on October 23, 2000.  The written discipline that the plaintiff received for missing the October 16, 2000 meeting was prepared after she was transferred.  The plaintiff received discipline for missing the court date and the community meeting on October 16, 2000, however, she received the written discipline after she had been transferred and it was the first written discipline she had received for missing any meeting.  The written discipline for missing the court appearance was the first time she had missed a court appearance in seventeen years.  The plaintiff had not received any discipline for the four other meetings she had missed.

**THE TRANSFER**

On October 20, 2000 the plaintiff was called to the Community Response Division by Sergeant Mark Rudewicz and was informed that they were going to meet with Lieutenant Manzi in his office. No one told the plaintiff what the meeting was about and did not afford the plaintiff to get a union steward because she did not know that the purpose of the meeting was to transfer her to patrol. Lt. Manzi "advised me that I was being transferred because , A, the missed community meeting and the traffic subpoena. And I explained to him—justified my actions and what happened. And Manzi stated we know your home life is very important. We really need a younger guy more dynamic … for this position." Present at this meeting were the plaintiff's supervisors, Sergeant Rudewicz, Lieutenant Manzi, Captain Fallon and the plaintiff. During the meeting the plaintiff was informed that she was being transferred from the Community Response Division to the Patrol Division, effective October 29, 2000. The Community Response Division was a coveted position in the Department. During the meeting on October 20, 2002, Manzi told the plaintiff that she was being transferred and that he wanted a "younger guy more dynamic" for the CSO position. The plaintiff was emotionally distraught upon learning of the transfer and felt intimidated by the presense of her three male supervisors who were commenting on her inability as a older female to properly perform the job as a CSO. Manzi admitted at his deposition that he told the plaintiff on October 20, 2000, that "we need a newer officer for this position" and that the CSO position "will be designed for the newer officer". In response to interrogatory questions as part of the Internal Affairs investigation conducted by Assistant Chief Jones, Sergeant Rudewicz stated that Lt. Manzi told the plaintiff that the CSO position is designed for "newer

officers". As set forth in interrogatory responses as part of the Internal Affairs investigation conducted by Assistant Chief Jones, Officer Thomas Hardwick, the union representative for the plaintiff, stated that he approached Lt. Manzi and asked him if he had said "we need a younger guy more dynamic for the position", without telling Lt. Manzi that the quote pertained to the plaintiff, and Lt. Manzi asked if Hardwick had spoken to Ann Cody. Manzi testified at his deposition that Captain Fallon told the plaintiff on October 20, 2000, that she was being transferred for the good of the organization.

**INVESTIGATION INTO THE TRANSFER AND MANZI'S CONDUCT**

The plaintiff filed a grievance for her involuntary transfer to patrol and for the conduct of Lt. Manzi and Sergeant Rudewicz. On October 25, 2000, the plaintiff requested that Acting Chief Robert Rudewicz investigate the discriminatory practices which occurred at the October 20, 2000 meeting, including the transfer to Patrol and the comments made by Lt. Manzi indicating that age and gender were the reason for the transfer. In the plaintiff's complaint and request for an investigation by Chief Rudewicz, she stated that Lt. Manzi had told her that "We need a younger guy more dynamic for this position." The next day, on October 26, 2000, the plaintiff was driving to work when she suffered severe stress induced chest pains that resulted in her treatment at St. Francis' Hospital and a medical leave from work for two weeks. Chief Rudewicz directed Assistant Chief Jones to investigate the plaintiff's complaint even though Jones had authorized the plaintiff's transfer. Chief Rudewicz did not direct Assistant Chief Jones to investigate whether the plaintiff's transfer was discriminatory and did not direct anyone else to investigate whether the transfer was legitimate because he assumed the transfer itself was proper. Chief Rudewicz directed

Assistant Chief Jones to investigate the complaint even though Jones was a witness. Assistant Chief Jones told Chief Rudewicz that the plaintiff was transferred because she missed too many meetings.  Two days later, on October 27, 2000, Acting Chief Robert Rudewicz cited the plaintiff in an interdepartmental memorandum for recognition of excellent performance in the Community Response Division.  Approximately one week before the plaintiff's transfer, Chief Rudewicz singled out the plaintiff at a CRD meeting for doing  a good job as a CSO.  The plaintiff was recognized on October 24, 2000, by the Honorable Raymond Norko for her hard work and commitment to enforcing "quality of life" crimes.

## CREDIBILTY ISSUES OF LT. MANZI

Lieutenant Manzi admits to lying to a Hartford Police Lieutenant in 1995.  Lieutenant Manzi has committed perjury in a federal criminal case, USA v. Reynaldo Arroyo, 3:03CR179(SRU).  Lieutenant Manzi's perjury resulted in a reversal of a guilty jury verdict in a federal criminal case, USA v. Reynaldo Arroyo, 3:03CR179(SRU).  Manzi knows that it is illegal to single out and discriminate against an officer based upon age or gender.  Chief Rudewicz and Sergeant Rudewicz are cousins.  On July 26, 2000, Lt. Manzi was in a motor vehicle accident which was found to be chargable by the Review Board and he was found to have violated the code of conduct  Lt. Manzi was charged with the commission of a crime on January 19, 2001.  The criminal charges stemmed from a complaint by Cheryl Lynch a resident of Columbia, CT, who was intimidated and harassed by both Lt. Manzi and Sergeant Rudewicz on September 13, 2000.  Lt. Manzi and Sergeant Rudewicz stole her horse and harassed her at her home.  Ms. Lynch's allegations against Manzi and Sergeant Rudewicz

include: " I have found witnesses that during the day of 9/13/00, Manzi and Rudewicz visited 17 frmas (in uniform in my area, showing a picture of myself and this horse telling people I had 'stolen a horse!' Lt. Manzi has also called me at my home, harassing and threatening me. Prior to 9/13/00, Lt. Manzi had full knowledge and acknowledged that this horse had been given to me by Sgt. Hammick and Capt. Jones.  Therefore he knowingly and blatantly lied on 9/13/00 in an effort to exact a personal vendetta against me and to slander my reputation." Sergeant Rudewicz would make offensive comments to the plaintiff such as : "when are getting married."  Sergeant Rudewicz was in control of approving overtime to the CSOs and would deny the plaintiff's request to accommodate her schedule so that she could earn overtime but he would accommodate the male CSOs' schedules.  Prior to Sergeant Rudewicz becoming her supervisor in 1999, the plaintiff did not have difficulty earning overtime.  The only other CSO female, Holly Donahue, who was assigned to the canine division was also denied overtime by Sergeant Rudewicz and Lt. Manzi.  Several months prior to the plaintiff's transfer, Sergeant Rudewicz told a male officer that he was going to transfer the plaintiff out of the South P.S.A. so that the male officer could take her place.  The plaintiff was transferred so that Officer Castagna could replace her so that Castagna would not have to work the foot beat when the new Chief (Marquis) started.  The plaintiff was targeted so a male officer could replace her.  The vacancy for the plaintiff's position was not posted and Officer Castagna was verbally offered the position.

**CHIEF ROBERT RUDEWICZ'S INVOLVEMENT**

Chief Rudewicz made the decision to transfer the plaintiff. Chief Rudewicz did not direct Assistant Chief Jones to investigate whether the plaintiff's transfer was discriminatory and did not direct anyone else to investigate whether the transfer was legitimate because he assumed the transfer itself was proper. Chief Rudewicz directed Assistant Chief Jones to investigate the complaint even though Jones was a witness. Chief Rudewicz knows that it is illegal to single out and discriminate against an officer based upon age or gender. Officer Mark Castagna replaced the plaintiff in her CSO position. Officer Castagna is younger and a male. Officer Castagna had a serious disciplinary history including a 120 day suspension in 1999 and violations of the Code of Conduct on October 4, 17, 1996. The last time Lt. Manzi had received sexual harassment training was in 1993. The last time Sergeant Rudewicz had received sexual harassment training was in 1994.

## III. LAW AND ARGUMENT

### A. STANDARD OF REVIEW

A motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure should be granted only when the "pleadings, depositions, and affidavits on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

Before a court can rule on a motion for summary judgment, the moving party must satisfy its burden of production, by either "putting evidence into the record which affirmatively disproves an element of the non-moving party's case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim". Celotex Corp. v. Catrett, 477 U.S. 317, 323-25 (1986). Once the moving party has met its burden of production,

the non-moving must provide specific facts showing a genuine issue for trial.  <u>Matsushita Elec.</u>

<u>Indus. Co. Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).

     A dispute regarding a material fact is genuine "if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." <u>Aldrich v. Randolph Cent. Sch. Dist.</u>, 963

F.2d 520, 523 (2d Cir. 1992).The court resolves "all ambiguities and draw[s] all inferences in

favor of the nonmoving party in order to determine how a reasonable jury would decide." <u>Id.</u>

Thus "[o]nly when reasonable minds could not differ as to the import of the evidence is summary

judgment proper." <u>Bryant v. Maffucci</u>, 923 F.2d 979, 982 (2d Cir.) <u>cert. denied</u>, 502 U.S. 849

(1991).  Moreover, not only must there be no genuine issue as to the evidentiary facts, but there

must also be no controversy regarding the inferences to be drawn from them.  <u>Diamontopulos v.</u>

<u>Brookside Corp.</u>, 683 F.Supp. 322, 325 (D.Conn. 1988), citing <u>Donohue v. Windsor Locks</u>

<u>Board of Fire Commissioners</u>, 834 F.2d 54, 57-58 (2d Cir. 1987).

     **B.**     **SUMMARY JUDGMENT STANDARD UNDER § 1983.**

     To state a cause of action under §§ 1983, the plaintiff must show (1) that the defendants

deprived him of a right "secured by the Constitution or laws of the United States"; and (2) that

they did so "under color of state law." <u>Am. Mfrs. Mut. Ins. Co. v. Sullivan</u>, 526 U.S. 40, 49-50

(1999); accord <u>Snider v. Dylag</u>, 188 F.3d 51, 53 (2d Cir. 1999); <u>Dwares v. City of New York</u>,

985 F.2d 94, 98 (2d Cir. 1993). The elements of a plaintiff's case are the same under Section

1981, Section 1983, or Title VII. Direct evidence is not necessary to prove employer acted with

discriminatory motive. <u>Randle v. City of Aurora</u>, 69 F.3d 441 (10th Cir. 1995). A showing of

pretext is evidence which allows a jury to infer discriminatory intent. <u>Randle v. City of Aurora</u>,

69 F.3d 441 (10th Cir. 1995). Because a jury may find illegal discrimination upon nothing more

than a prima facie case and pretext, such a showing at the summary judgment state is sufficient to get the case to the jury. <u>Randle v. City of Aurora</u>, 69 F.3d 441 (10th Cir. 1995).  Procedural irregularities can provide sufficient evidence of pretext to defeat summary judgment where the disregarded procedures directly and uniquely disadvantage a minority employee, ..." <u>Randle v. City of Aurora</u>, 69 F.3d 441 (10th Cir. 1995).

Due to the difficulty of proving a subjective state of mind, cases involving motivation and intent are usually inappropriate for summary judgment.  <u>Lac Du Flambeau Indians v. Stop Treaty Abuse-Wis.</u>, 991 F.2d 1249 (7th Cir. 1993). Evidence of mixed motives is "ordinarily not the gist for the summary judgment mill," and, where there was evidence that defendants were racists, ..." <u>Lac Du Flambeau Indians v. Stop Treaty Abuse-Wis.</u>, 991 F.2d 1249 (7th Cir. 1993). Trier of fact may consider the same evidence introduced to prove prima facie case in determining whether discipline was pretextual.  <u>Lowe v. City of Monrovia</u>, 775 F.2d 998 (9th Cir. 1985) Decision as to employer's motive is almost always for the trier of fact to determine at trial. <u>Lowe v. City of Monrovia</u>, 775 F.2d 998 (9th Cir. 1985).

Plaintiff may defeat summary judgment in a discrimination or retaliation case if he or she can present evidence that the proffered reason for the adverse action was pretextual or "unworthy of belief" or if he or she can otherwise introduce evidence of illegal motive.  <u>Beaird v. Seagate Technology, Inc.</u>, 145 F.3d 1159 (10th Cir. 1998)**.** To survive summary judgment, a plaintiff will prevail "by either a) discrediting the employer's proffered reasons, either circumstantially or directly or b) by adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determining cause of the adverse employment action." <u>Torres v. Casio Inc.</u>, 42 F.3d 825 (3rd Cir. 1994).

### C. THE PLAINTIFF HAS ESTABLISHED CLAIMS OF DISCRIMINATION PURSUANT TO THE ADEA AND GENDER DISCRIMINATION IN VIOLATION OF THE EQUAL PROTECTION CLAUSE.

#### 1. The Plaintiff's Transfer Was Discriminatorily Motivated By Her Age and Gender.

A prima facie case of age discrimination is set forth by establishing: (1) that she suffered an adverse employment action (2) under circumstanced giving rise to an inference of discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Grady v. Affilliated Central, Inc. 130 F.3d 553, 559 (2d Cir. 1997). "The nature of the plaintiff's burden of proof at the prima facie stage is *de minimis*." Fisher v. Vassar College, 114 F.3d 1332, 1335, 1340 & n.7 (2d Cir. 1997) (en banc); cert. denied, 52 U.S. 1075 (1998); Dister v. The Continental Group, Inc., 859 F.2d 1108, 1114 (2d Cir. 1988). "*McDonnell Douglas* requires only a minimal showing of qualification to establish a prima facie claim." Owens v. New York Housing Authority, 934 F.2d 405, 408 (2d Cir. 1991), cert. denied, 112 S.Ct. 431 (1991).

The defendants argue that the plaintiff has failed to establish that the plaintiff was transferred under circumstances giving rise to an inference of age discrimination. An inference of age discrimination is demonstrated when the plaintiff's position remained open and was ultimately filled by a younger person. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 313 (1996); Montana v. First Fed. Sav. & Loan Ass'n, 869 F.2d 100, 104 (2d Cir. 1989).

To prove a triable issue of fact that the plaintiff was replaced, the plaintiff need only present some evidence that another employee assumed the duties or functions of her position. Meiri v. Dacon, 759 F.2d 989, 995-6 (2d Cir. 1985). Officer Mark Castagna replaced the plaintiff in her CSO position. Officer Castagna is younger and a male. Plaintiff's Material Facts

In Dispute ¶ 69.  Officer Castagna had a serious disciplinary history including a 120 day

suspension in 1999 and violations of the Code of Conduct on October 4, 17,1996. Plaintiff's

Material Facts In Dispute ¶ 69.

The plaintiff was transferred so that Officer Castagna could replace her so that Castagna

would not have to work the foot beat when the new Chief (Marquis) started. Plaintiff's Material

Facts In Dispute ¶ 63  The plaintiff was targeted so a male officer could replace her. Plaintiff's

Material Facts In Dispute ¶ 63.  The vacancy for the plaintiff's position was not posted and

Officer Castagna was verbally offered the position. Plaintiff's Material Facts In Dispute ¶ 64.

Officer Castagna was younger and assumed the same job functions as the plaintiff after she was

terminated, therefore raising an inference of age and gender discrimination. Reeves, supra, 530

U.S. at 143; O'Connor, supra, 517 U.S. at 313; Montana, supra, 869 F.2d at 104;  Meiri, supra,

759 F.2d at 995-6.

The CRD is a male dominated division of the Department. When Manzi became

commander of CRD in January 2000, the plaintiff was the only female Community Service

Officer (hereinafter "CSO") under Manzi's supervision until the day she was transferred and

then there were no female CSOs. Plaintiff's Material Facts In Dispute ¶ 5.  In 1999 and 2000,

there were 67 CSOs and only 8 were females in both the North Police Service Area and South

Police Service Area. Plaintiff's Material Facts In Dispute ¶ 10.

A triable issue of fact exists as to whether Liuetenant Manzi, in the presence of Captian

Michael Fallon and Sergeant Mark Rudewicz, told the plaintiff that she was being transferred

because the CSO position needed a "Younger guy more dynamic."  On October 20, 2000 the

plaintiff was called to the Community Response Division by Sergeant Mark Rudewicz and was

informed that they were going to meet with Lieutenant Manzi in his office. Plaintiff's Material Facts In Dispute ¶ 29. No one told the plaintiff what the meeting was about and did not afford the plaintiff to get a union steward because she did not know that the purpose of the meeting was to transfer her to patrol. Plaintiff's Material Facts In Dispute ¶30.

Lt. Manzi "advised me that I was being transferred because , A, the missed community meeting and the traffic subpoena. And I explained to him—justified my actions and what happened. And Manzi stated we know your home life is very important. We really need a younger guy more dynamic … for this position." Plaintiff's Material Facts In Dispute ¶ 31.

Manzi admitted at his deposition that he told the plaintiff on October 20, 2000, that "we need a newer officer for this position" and that the CSO position "will be designed for the newer officer". Plaintiff's Material Facts In Dispute ¶ 37.

In response to interrogatory questions as part of the Internal Affairs investigation conducted by Assistant Chief Jones, Sergeant Rudewicz stated that Lt. Manzi told the plaintiff that the CSO position is designed for "newer officers". Plaintiff's Material Facts In Dispute ¶38. As set forth in interrogatory responses as part of the Internal Affairs investigation conducted by Assistant Chief Jones, Officer Thomas Hardwick, the union representative for the plaintiff, stated that he approached Lt. Manzi and asked him if he had said "we need a younger guy more dynamic for the position", without telling Lt. Manzi that the quote pertained to the plaintiff, and Lt. Manzi asked if Hardwick had spoken to Ann Cody. Plaintiff's Material Facts In Dispute ¶ 38.

Between Hardwick's testimony, the plaintiff's sworn and consistent testimony Manzi's own admissions, and Manzi and Sergeant Rudewicz's credibility issues (Plaintiff's Material

Facts In Dispute Section VII),  the plaintiff has established an issue of fact of whether Lt. Manzi told the plaintiff that she was being transferred because he wanted a "younger guy more dynamic."

Beyond the actual comment that Lt. Manzi made, which provides insight into his motivation behind the transfer, Lt. Manzi and Sergeant Rudewicz have a history of gender discrimination and discriminatory and harassing treatment of women, which provides further insight into Manzi and Sergeant Rudewicz character and motivation.  Lt. Manzi  and Sergeant Rudewicz were charged with the commission of a crime on January 19, 2001, for stealing a woman's horse and harassing her at her home.  Ms. Lynch's allegations against Manzi and Sergeant Rudewicz include: " I have found witnesses that during the day of 9/13/00, Manzi and Rudewicz visited 17 farms (in uniform in my area, showing a picture of myself and this horse telling people I had 'stolen a horse!' Lt. Manzi has also called me at my home, harassing and threatening me. Prior to 9/13/00, Lt. Manzi had full knowledge and acknowledged  that this horse had been given to me by Sgt. Hammick and Capt. Jones.  Therefore he knowingly and blatantly lied on 9/13/00 in an effort to exact a personal vendetta against me and to slander my reputation." Plaintiff's Material Facts In Dispute ¶ 57.

Sergeant Rudewicz would make offensive comments to the plaintiff such as : "when are getting married." Plaintiff's Material Facts In Dispute ¶58.  Sergeant Rudewicz was in control of approving overtime to the CSOs and would deny the plaintiff's request to accommodate her schedule so that she could earn overtime but he would accommodate the male CSOs' schedules. Plaintiff's Material Facts In Dispute ¶59.

In proving that an inference of age and gender discrimination exists, the plaintiff has

established that a younger, male with less seniority replaced the plaintiff through a process that did not follow the normal procedure for reasons that were to accommodate the male officers needs. The plaintiff has established that she was targeted by Sergeant Rudewicz and Lt. Manzi (Plaintiff's Material Facts In Dispute Section II) in order to oust her from her position so that Officer Castagna could be transferred out of his current position. The plaintiff has established that both Sergeant Rudewicz and Lt. Manzi have a history of discriminatory practices and harassing treatment toward females. Further the plaintiff has established that an issue of fact exists as to Lt. Manzi's statement when he transferred the plaintiff, which leads to an issue of fact as to Lt. Manzi's discriminatory motivation . The plaintiff has established that she was transferred under circumstances giving rise to an inference of age and gender discrimination. Therefore, the defendants' Motion should be denied.

### 2. The plaintiff's was transferred in Violation of the Equal Protection Clause.

"Equal Protection means simply that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., Inc, 473 U.S. 432 439 (1985). To prove a Fourteenth Amendment Equal Protection violation, "the plaintiff must prove that (1) in comparison with others similarly situated, she was selectively treated, and (2) such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Lisa's Party City, Inc. v. Town of Henrietta, 185 F.3d 12, 16 (2d Cir. 1999).

"[A] plaintiff's burden of establishing a prima facie case in the context of employment discrimination law is 'minimal.' McGuinness v. Lincoln Hall, 263 F.3d 49, 52 (2d Cir.2001) The same burden shifting analysis set forth by the U.S. Supreme Court in McDonnell Douglas

Corp. v. Green, 411 U.S. 792 (1973) for claims brought under Title VII apply to employment discrimination cases under § 1983. See Sorlucco v. New York City Police Dep't, 888 F.2d 4, 7 (2d Cir.1989). In this test, the initial burden is on the plaintiff to establish a prima facie case by showing that she (1) belongs to a protected class, (2) was qualified for the position, (3) suffered an adverse employment action, and (4) that the adverse employment action occurred in "circumstances giving rise to an inference of discrimination". See McDonnell Douglas, 411 U.S. at 802.

As discussed above, the plaintiff has established circumstances giving rise to an inference of discrimination. In proving that an inference of age and gender discrimination exists, the plaintiff has established that a younger, male with less seniority replaced the plaintiff through a process that did not follow the normal procedure for reasons that were to accommodate the male officers needs. The plaintiff has established that she was targeted by Sergeant Rudewicz and Lt. Manzi (Plaintiff's Material Facts In Dispute Section II) in order to oust her from her position so that Officer Castagna could be transferred out of his current position. The plaintiff has established that both Sergeant Rudewicz and Lt. Manzi have a history of discriminatory practices and harassing treatment toward females. Further the plaintiff has established that an issue of fact exists as to Lt. Manzi's statement when he transferred the plaintiff, which leads to an issue of fact as to Lt. Manzi's discriminatory motivation. The plaintiff has established that she was transferred under circumstances giving rise to an inference of age and gender discrimination. Therefore, the defendants' Motion should be denied.

> **3.     Defendants Have Provided Nondiscriminatory Reasons for Their Actions, But They Are Not Legitimate, As the plaintiff's Work Performance was Satisfactory and The Defendants' Reason is Merely A Pretext.**

Defendants have not provided legitimate and nondiscriminatory reasons for their actions, therefore they were improperly motivated and acted arbitrarily and plaintiff meets the burden delineated in McDonnell Douglas. Id.

After the plaintiff establishes a prima facie case, the defendant must offer a legitimate and nondiscriminatory reason for its actions. James v. New York Racing Ass'n., 233 F.3d 149, 154 (2d Cir.2000). If the defendant meets this burden, then the plaintiff must demonstrate that this rationale is merely a pretext for discrimination. See Id. Under Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000), "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." Id. at 2102.

The defendants claim that the plaintiff's job performance was not satisfactory. "In a case where the plaintiff's job performance is an issue the plaintiff only needs to demonstrate that he possesses the basic skills necessary for performance of the job." Owens v. New York Housing Authority, 934 F.2d at 408. Although a court may not question the reasonableness of the defendant's standards for determining whether the plaintiff's performance is satisfactory, as part of the prima facie case, the plaintiff is required only to raise issues that cast some doubt about

the existence of these standards and/or whether they were applied in good faith.  Thornely v.

Penton Publishing, Inc., 104 F.3d 26, 29 (2d Cir. 1997).  Where the employer departs from its

own regulation or practices that is evidence that the employer's reason for termination was not

true and was a pretext for discrimination.  Stern v. Trustees of Columbia Univ., 131 f.3d 305, 13

(2d Cir. 1997); Kirschner v. Office of Comptroller, 973 F.2d 88, 93 (2d Cir. 1992); Gallo v.

Prudential Residential Services, 22 F.2d at 1227.

The plaintiff's work was not called into question until one year prior to the transfer when

Sergeant Rudewicz became her supervisor. Plaintiff's Material Facts In Dispute ¶ 8. As the only

female CSO, the plaintiff answered 2,537 calls for service in 1999 and 2000. Plaintiff's Material

Facts In Dispute ¶ 9. Out of 67 CSOs only five (5) CSOs responded to more calls than the

plaintiff.  Plaintiff's Material Facts In Dispute ¶ 9.

While the plaintiff did not attend the meeting and court appearance on October 16, 2000,

it was the first court appearance she had missed in seventeen years.  The investigation into the

plaintiff by Lt. Manzi and Sergeant Rudewicz, upon which  Manzi based his reason to transfer

the plaintiff, was done in order to oust the plaintiff and they did not actually do a thorough or

objective investigation of her.  Plaintiff's Material Facts In Dispute Section II.  The

investigation and transfer were motivated by Lt. Manzi and Sergeant Rudewicz's desire to

remove the last female CSO and replace her with a male officer.

**4.      The plaintiff suffered an Adverse Employment Action.**

To constitute an adverse employment action, a change in working conditions must be

"materially adverse." Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000).

A materially adverse change "must be more disruptive than a mere inconvenience or an

alteration of job responsibilities" and "might be indicated by a termination of employment, a

demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of

benefits, significantly diminished material responsibilities, or other indices . . . unique to a

particular situation." Id. (internal quotation and citation omitted). See also Wanamaker v.

Columbian Rope Co., 108 F.3d 462, 466 (2d Cir. 1997). A lateral transfer that does not result in

a reduction in pay or benefits may be an adverse employment action so long as the transfer alters

the terms and conditions of the plaintiff's employment in a materially negative way. See de la

Cruz v. New York City Human Resources Admin. Dep't of Social Servs., 82 F.3d 16, 21 (2d Cir.

1996) (transfer to "less prestigious" unit of social services department with reduced opportunities

for professional growth was adverse employment action); Rodriguez v. Board of Educ., 620 F.2d

362, 366 (2d Cir. 1980) (transfer of experienced middle school art teacher to elementary school

constituted adverse action). In Patrolmen's Benevolent V. City of New York, *310 F.3d 43* (2nd

Cir. 2002), the plaintiff had received training in domestic violence issues and had worked as a

caseworker for agencies serving domestic violence victims but was involuntarily transferred he

unsuccessfully sought an assignment as a domestic violence officer.  The court found that the

transfer had a sufficiently material negative impact on the terms and conditions of Espinal's

employment with the NYPD to constitute an adverse employment action.

The plaintiff was transferred from a coveted and preferred position in the CRD as a

Community Service Officer to a patrol officer.  While there was no reduction in salary, the

plaintiff plaintiff's responsibilities were changed and she was extremely upset that she was

removed from a position where she excelled for seven years and enjoyed her job. Defendants'

56(a) Statement ¶14, 25, 26.  The defendants took adverse employment action the plaintiff.

**D.    POLICE DEFENDANTS RETALIATED AGAINST THE PLAINTIFF IN VIOLATION OF HER FIRST AMENDMENT RIGHTS.**

To prevail on a First Amendment retaliation claim, the plaintiff must establish: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." Garcia v. S.U.N.Y. Health Sciences Center, 280 F.3d 98 (2nd Cir. 2001). Plaintiff has sufficiently alleged retaliation for First Amendment activity.

The Supreme Court has stated that the First Amendment "protects state employees not only from patronage dismissals but also from even an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to punish her from exercising her free speech rights." Rutan, 497 U.S. 62, 75 n..8 (1990). Since the Rutan decision, the Second Circuit "allows a combination of seemingly minor incidents to form the basis of a constitutional retaliation claim once they reach a critical mass." Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir. 2002)

**1.    The Plaintiff's Speech Was Protected Because It Was A Matter Of Public Concern.**

Whether speech addresses a matter of public concern is determined "by the content, form, and context of a given statement, as revealed by the whole record." Connick v. Myers, 461 U.S. 138, 147-48 (1983). "To fall within the realm of public concern, moreover, an employee's speech must 'relate to a ... matter of political, social, or other concern to the community.'" Locurto v. Giuliani, 269 F. Supp. 2d 368, 385 (2d Cir. 2003) (quoting Connick v. Myers, 461 U.S. 138, 146 (1983)).

If a plaintiff's complaint implicates system-wide discrimination" they become a matter of public concern. *See* <u>Marshall v. Allen</u>, 984 F.2d 787 (7th Cir.1993) (allowing Section 1983 claim where plaintiff was discharged following his support of other employees who had filed suit for gender discrimination); <u>Auriemma v. Rice</u>, 910 F.2d 1449, 1460 (7th Cir.1990) (in banc) (finding public interest where there was a "wholesale change in the highest police echelons allegedly only on a racial basis"), *cert. denied,* 501 U.S. 1204, 111 S.Ct. 2796, 115 L.Ed.2d 970 (1991). In addition, such a decision requires a "focus on the motive of the speaker . . . to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." <u>Lewis v. Cowen</u>, 165 F.3d 154, 163-64 (2d Cir. 1999). "Speech on a purely private matter, such as an employee's dissatisfaction with the conditions of his employment, does not pertain to a matter of public concern." <u>Id.</u> at 164 (citing <u>Connick</u>, 461 U.S. at 147). "Speech is more likely to be of public concern if the speaker is speaking as a citizen on matters of public interest, and not solely as an employee on matters only of personal interest." <u>Sacco v. Pataki</u>, 982 F. Supp. 231, 240 (S.D.N.Y. 1997). "Virtually every citizen has a personal interest in matters of public concern; after all, each citizen is a member of the public and is, in some way, impacted by the resolution of societal problems. The determinative question is whether that interest arises from the speaker's status as a public citizen or from the speaker's status as a public employee." <u>Blum v. Schelegel</u>, 18 F.3d 1005, 1012 (2d Cir. 1994). Statements regarding internal employment policies may raise at once issues that are of both personal and public concern for purposes of state statute prohibiting employer from discharging employee for exercising rights under First Amendment. <u>Daley v. Aetna Life & Cas. Co.</u>, 249 Conn. 766 (1999).

**2. Defendants Took Adverse Action Against Plaintiff.**

The plaintiff was transferred from a coveted and preferred position in the CRD as a Community Service Officer to a patrol officer. While there was no reduction in salary, the plaintiff plaintiff's responsibilities were changed and she was extremely upset that she was removed from a position where she excelled for seven years and enjoyed her job. Defendants' 56(a) Statement ¶14, 25, 26. The defendants took adverse employment action the plaintiff.

**3. There Is A Causal Connection between the Protected Speech and Defendant's Actions.**

To establish a causal connection, the courts look to whether there is an inference that defendants had a retaliatory motive. Morales v. Mackalm, 278 F.3d 126 (2d Cir. 2002). "The causal connection must be sufficient to support the inference 'that the speech played a substantial part' [in the adverse action]." Dawes, supra, 239 at 492, quoting Ezekwo v. NYC Health & Hosp. Corp., 940 F.2d 775, 780-91 (2d Cir. 1991).

**E.    THE DEFENDANTS VIOLATED THE PLAINTIFF'S  RIGHT TO SUBSTANTIAL DUE PROCESS.**

"'Where a particular amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'" Russo v. City of Hartford, 184 F. Supp. 2d 169, 184 (D. Conn. 2002) (finding plaintiff properly alleged substantive due process violation) (quoting Albright v. Oliver, 510 U.S. 266, 273, 127 L. Ed. 2d 114 (1994)).

### 1.    Defendants' actions "shock the conscience".

Defendants' behavior toward plaintiff "shock the conscience" and constitute a violation of his substantial due process rights. A claim for a substantive due process violation must "shock the conscience." Rochin v. California, 342 U.S. 165, 172 (1952); see e.g. Russo v. City of Hartford, 184 F. Supp. 2d 169, 196-97 (D. Conn. 2002) (finding allegations that police chief had refused to investigate police officer's allegations of physical threats by supervisors or to take steps to prevent potential harm by fellow police personnel to police officer sufficiently stated a claim for a violation of substantive due process); Jensen v. City of Oxnard, 145 F.3d 1078, 1084 (9th Cir. 1998) (finding that, notwithstanding Collins, plaintiff police officer properly states a claim for substantive due process violation where police officer alleges intentional or reckless acts of a government employee directed against another government employee).

The purpose to the Due Process Clause is to prevent the government 'from abusing [its] power, or employing it as an instrument of oppression.'" De Shaney v. Winnebago County Dept. of Social Services, 489 U.S.189, 196 (1989) quoting Davidson v. Cannon, 474 U.S. 344, 348 (1986).   Substantive due process is designed to protect against government actions that are "arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill-advised." Kaluczky v. City of White Plains, 57 F.3d 202, 211 (2d Cir.1995).The Second Circuit has pointed out that malicious and sadistic abuses of government power which are intended only to oppress or to cause injury and serve no legitimate government purpose unquestionably shock the conscience. Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 252 (2d Cir.2001)

Actions intended to injure in some way and unjustifiable by any government interest will

most likely be found conscience-shocking. Id. This is a fact-specific inquiry that requires a case by case analysis. Understanding that actions which would shock the conscience in one set of circumstances could be considered completely rational in another set of circumstances, the Supreme Court has established that the "deliberate indifference" standard will determine if an official's actions "shock the conscience." Sacremento v. Lewis, 523 U.S. at 850-51; see also Betts v. Brady, 316 U.S. 455, 462 (1942). Inherent to the word "deliberate" is the idea that the actor must contemplate her actions within a given time frame; split-second decisions that result in harm are not equal to those actions that are considered and implemented over a longer period of time. Pre-meditated actions are decidedly more egregious and therefore often rise to the level of constitutional violation. Id. A government official shocks the conscience and violates one's substantive due process rights when, given the opportunity to deliberate and decide upon a course of action that would intentionally harm an individual, that official carries through with such actions. Daniels v. Williams, 474 U.S. 327,331, 106 S.Ct. 662 (1986).

**F.    THE PLAINTIFF WAS DEPRIVED OF PROCEDURAL DUE PROCESS.**

The Fourteenth Amendment guarantees an individual due process of the law where the state deprives an individual of a constitutionally protected liberty or property interest. Board of Regents v. Roth, 408 U.S. 564, 569 (1972). If the state deprives a person of a protected interest, the state must provide such procedures as the circumstances demand. Mathews v. Eldridge, 424 U.S. 319,333 (1976) (the fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.) (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)). In order to have a protected property interest, plaintiff must establish that he has a legitimate, constitutionally based, claim of entitlement to the position sought, not merely an

unprotected unilateral expectation of employment. Id.

An interest protected or cognizable under the due process clause must have a basis in existing rules or understandings that stem from an independent source such as state law--rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." (Citations omitted; internal quotation marks omitted.) Hunt v. Prior, 236 Conn. 421, 436, 673 A.2d 514 (1996). Application of the ['clear entitlement'] test must focus primarily on the degree of discretion enjoyed by the issuing authority, not on the estimated probability that the authority will act favorably in a particular case." (internal citations omitted) Kelley Property Development, Inc., v. Town of Lebanon, 226 Conn. 314 (1993).

"Due process is inherently fact-bound because due process is flexible and calls for such procedural protections as the particular situation demands.... The constitutional requirement of procedural due process thus invokes a balancing process that cannot take place in a factual vacuum." (Internal quotation marks omitted.) Thalheim v. Greenwich, 256 Conn. 628, 648, 775 A.2d 947 (2001).

### 1.    Plaintiff Had a Property Interest.

"[T]o establish a violation of either substantive or procedural due process, plaintiff must initially show that [he] was deprived of a property or liberty interest." Gordon v. Nicoletti, 84 F. Supp.2d 304, 309 (D. Conn. 2000). In many circumstances a state employee may have a property interest in continued employment or a promotion. See, e.g., Harhay v. Town of Ellington Bd. of Educ., 323 F.3d 206, 212 (2d Cir. 2003) (finding contractual right to reappointment under a collective bargaining agreement to be an important interest as opposed to a trivial and insubstantial interest, and therefore a

property interest); <u>Board of Regents of State Colleges v. Roth</u>, 408 U.S. 564, 576, 33 L.

Ed. 2d 548 (1972) (discussing property interests in public employment created by tenure

provisions or employment contracts); Because courts recognize that a promotion is a type

of property interest, plaintiff has met the first requirement of this claim.


**F.    CHIEF RUDEWICZ WAS DIRECTLY INVOLVED IN THE PLAINTIFF'S
        TRANSFER AND INVESTIGATION OF HER COMPLAINT.**

Chief Rudewicz made the decision to transfer the plaintiff. Plaintiff's Material Facts In

Dispute ¶ 65. On October 25, 2000, the plaintiff requested that Acting Chief Robert Rudewicz

investigate the discriminatory practices which occurred at the October 20, 2000 meeting,

including the transfer to Patrol and the comments made by Lt. Manzi indicating that age and

gender were the reason for the transfer. Plaintiff's Material Facts In Dispute ¶42.   Chief

Rudewicz directed Assistant Chief Jones to investigate the plaintiff's complaint even though

Jones had authorized the plaintiff's transfer. Deposition of Chief Rudewicz, at 30-32, 34-36.

Chief Rudewicz did not direct Assistant Chief Jones to investigate whether the plaintiff's

transfer was discriminatory and did not direct anyone else to investigate whether the transfer

was legitimate because he assumed the transfer itself was proper. Plaintiff's Material Facts In

Dispute ¶ 66.  Chief Rudewicz directed Assistant Chief Jones to investigate the complaint even

though Jones was a witness. Plaintiff's Material Facts In Dispute ¶ 67.

Chief Rudewicz was involved in the transfer and knew that the transfer and Manzi's

conduct was illegal and authorized the transfer.  Therefore, the defendants' Motion should be

denied.

### G.     CHIEF RUDEWICZ IS NOT ENTITLED TO QUALIFIED IMMUNITY

Defendant Rudewicz is not entitled to qualified immunity. The doctrine of qualified immunity provides that: "government officials performing discretionary function, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Moffit v. Brookfield, 950 F. 2d 880, 885 (2d Cir. 1991).

"The relevant inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  Thus, as the Supreme Court has pointed out, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." (Emphasis added; internal quotations and citations omitted) Stephenson v. Doe, 332 F.3d 68, 77-78 (2d Cir. 2003).

"A courts evaluation of a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." Wilson v. Layne, 526 U.S. 603, 609 (1999).  If the court finds that a clearly established right of the plaintiff has been violated, the court must then determine whether the defendant's actions "could reasonably have been thought consistent with the rights they are alleged to have violated." Anderson v. Creighton, 483 U.S. 635, 638 (1987).  The Supreme Court has held that "a claim of immunity is conceptually distinct from the merits of the plaintiff's claim that his rights have been violated." Mitchell v. Forsyth, 472 U.S. 511, 527-28 (1985).  Qualified Immunity is an

affirmative defense, and as such the burden is on defendant to establish its existence.  See In re:
State Police, 88 F.3d 111, 123

"[A] suit for money damages may be prosecuted against a state officer in his individual
capacity for unconstitutional or wrongful conduct fairly attributable to the officer himself, so
long as the relief is sought . . . from the officer personally." Alden v. Maine, 527 U.S. 706, 757
(1999). Additionally, sovereign immunity "does not bar certain actions against state officers for
injunctive or declaratory relief." Id.

Chief Rudewicz knows that it is illegal to single out and discriminate against an officer
based upon age or gender.  Plaintiff's Material Facts In Dispute ¶68.

## H.    THE PLAINTIFF CAN PREVAIL ON HER CLAIMS AGAINST THE CITY OF HARTFORD.

"A plaintiff who seeks to recover against a municipality under § 1983 must show that the
violation of his constitutional rights resulted from a municipal policy or custom." Davis v. City
of New York, 75 Fed. Appx. 827, 829 (2d. Cir. 2003) (internal quotations and citations omitted).

There are four circumstances in which a policy or custom may be established. The
plaintiff may establish (1) a formal policy, officially promulgated or adopted by the municipal
defendant, Monell v. Department of Social Servs., 436 U.S. 658, 690, 56 L. Ed. 2d 611 (1978),
or (2) a specific action or decision by an official responsible for establishing final policy with
respect to the subject matter, if that action or decision caused the violation of plaintiff's
constitutional rights, Pembaur v. City of Cincinnati, 475 U.S. 469, 483-84, 89 L. Ed. 2d 452
(1986) (plurality opinion), or (3) the existence of an unlawful practice by subordinate officials so

permanent and well settled as to constitute a 'custom or usage' and proof that this practice was

so manifest or widespread as to imply the constructive acquiescence of the policy-making

officials, <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 127, 130, 99 L. Ed. 2d 107 (1988);

<u>Sorlucco v. New York City Police Dept</u>., 971 F.2d 864, 871 (2d Cir. 1992), or (4) the failure of

the City to train or supervise its employees in a fashion designed to prevent the violation of

plaintiff's rights, if such failure amounts to 'deliberate indifference' to the rights of those with

whom the municipal employees will come into contact. <u>Gottlieb v. County of Orange</u>, 84 F.3d

511, 518 (2d Cir. 1996); <u>Walker v. New York</u>, 974 F.2d 293, 297 (2d Cir. 1992).

"Actions by an individual with final decision-making authority in a municipality

constitute official policy for purposes of a § 1983 claim." <u>Anthony v. City of New York</u>, 339

F.3d 129, 139 (2d Cir. 2003) (<u>citing</u> <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 483-84, 89 L.

Ed. 2d 452 (1986). The individual must be responsible for establishing final government policy"

in order for municipal liability to attach." <u>Anthony v. City of New York</u>, 339 F.3d 129, 139 (2d

Cir. 2003).

"Whether the official in question possessed final policymaking authority is a legal

question, which is to be answered on the basis of state law. The relevant legal materials, include

state and local positive law as well as custom or usage having the force of law." .<u>Jeffes v.

Barnes</u>, 208 F.3d 49, 57 (2d Cir. 2000).

In applying the <u>Pembaur</u> standard, The Second Circuit has explained that where an

official has final authority over significant matters involving the exercise of discretion, the

choices he makes represent government policy.  An official has final authority if his decisions, at

the time they are made, for practical or legal reasons constitute the municipality's final decisions.

Anthony v. City of New York, 339 F.3d 129, 139 (2d Cir. 2003) (quoting Rookard v. Health & Hosps. Corp., 710 F.2d 41, 45 (2d Cir. 1983).  Such a policy may be inferred from circumstantial proof.  Gagne v. DeMarco, 281 F. Supp. 2d 390, 398 (D. Conn. 2003).

In O'Connor v. Barnes, 1998 U.S. Dist. LEXIS 3386 (N.D.N.Y. March 18, 1998) Judge Kahn was presented with the question of whether a County Sheriff is a policymaking official. Id. at 14.  Judge Kahn noted that the Sheriff is responsible for matters of supervision, discipline, scheduling and training within the Sheriff's Department.  Id. at 14-15.  The municipality argued that the Sheriff is not a policymaker for the County because he is an elected official and because the County does not direct or control personnel of the Sheriff's Department. Id. at 115.

Judge Kahn, relying on previous Second Circuit cases which found that a Sheriff is a policymaker for the County in which he is employed, found the Sheriff to be a policymaker. Id. (citing to Weber v. Dell, 804 F.2d 796, 803 (2d Cir. 1986) (1987);  Heisler v. Kralik, 981 F. Supp. 830, 841 (S.D.N.Y. 1997); Wagner v. County of Cattaraugus, 866 F. Supp. 709, 718 (W.D.N.Y. 1994) (County not liable for arrests made without probable cause where there was "no evidence that the Sheriff ever condoned or acquiesced in these arrests")).Judge Kahn then went on to find that retaliation was in the scope of the Sheriff's policymaking authority.  Id. at 17-21.

The plaintiff has established a specific action or decision by an official responsible for establishing final policy with respect to the subject matter, if that action or decision caused the violation of plaintiff's constitutional rights.  Chief Rudewicz was involved in the transfer and subsequent investigation of the plaintiff. He has established policy and practices in the Department that has created liability for the City.  Therefore, the defendants' Motion should be

denied.

## CONCLUSION

For the above stated reasons, both of Defendants' Motions for Summary Judgment

should be denied.

THE PLAINTIFF,

BY:_____

James Brewer
Brewer & O'Neil
818 Farmington Avenue
West Hartford, CT 06119
(860)523-4055
Federal Bar #ct07019