# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANN CODY, | : | CIVIL ACTION NO. |
| Plaintiff, | | 3:02CV1789(SRU) |
| | : | |
| v. | | |
| | : | |
| CITY OF HARTFORD, et al. | | |
| Defendants. | : | JULY 22, 2004 |

## PLAINTIFF'S LOCAL RULE 56(a)2 STATEMENT

1. The Hartford Police Department ("HPD") hired the Plaintiff, Ann Cody ("Plaintiff") as a Police Officer in or about December, 1983. Third Amended Complaint ("Complaint"), Count 1, ¶5.

   **Admit.**

2. The HPD assigned the Plaintiff to the Community Response Division as a Community Service Officer ("CSO") in or about 1993. Complaint, Count 1, ¶6.

   **Admit.**

3. The position of CSO primarily involved serving as a liaison between various community groups and the HPD. Deposition of Ann Cody dated May 2, 2003, attached hereto as "Exhibit A", p. 47.

   **Admit.**

4. By the Plaintiff's own admission, attending monthly community meetings is an

1

important aspect of a CSO's job.  Exhibit A,  pp. 15-16.

**Deny, "Not much time is devoted to the meetings." Defendants Exhibit A, p. 148.**

5.     In addition to the Plaintiff, one or more of the Plaintiff's supervisors regularly attended

these community meetings.  Regardless of whether a supervisor attended, the Plaintiff

was still required to attend the meeting.  Exhibit A, pp. 52-53.

**Admit in part, in that the plaintiff and the plaintiff's supervisors attended**

**the community meetings. Deny in part that the plaintiff was required to attend as**

**it was not part of the CSO job description. Deny, "Not much time is devoted to the**

**meetings." Defendants Exhibit A, p. 148. The job description states that CSO**

**should attend meetings as needed. Exhibit 6.**

6.     As the CSO for the area, the Plaintiff was often expected to speak at the meetings, to

advise residents of what was happening in the neighborhoods and to describe how the

HPD was addressing ongoing complaints and concerns.  In addition, the Plaintiff was

required to listen to residents' complaints, usually regarding quality of life issues, such

as loitering, speeding, noise and the like.  The Plaintiff was expected to regularly

provide information or statistics regarding those quality of life issues.  Exhibit A, pp.

48-52.

**Admit.**

7.     The Plaintiff failed to attend the community meetings held on May 17th, June 19th, July

17th, August 21at, September 18th and October 16th, 2000.  Declaration of Assistant

2

Chief Kevin Jones, attached as "Exhibit B", at Tab 1 (City of Hartford Interdepartmental Memorandum from Michael Manzi ("Manzi") to Kevin Jones ("Jones") dated November 1, 2000),p. 5; Exhibit A, pp. 100-101.

**Deny in part, in that the plaintiff's absence from the meetings was excused by her supervisors. Defendant's Exhibit A, pp. 99-100.**

8.      The Plaintiff was excused from attending the May 17th meeting and did not attend the September 18th meeting because she claimed to be experiencing chest pains that day and that she was not feeling well. The Plaintiff's absences from the remaining four meetings were unexcused. Exhibit B, at Tab 1, p. 5.

**Deny, the plaintiff did not attend the June and July meetings because she was not scheduled for those days. Defendants' Exhibit A, pp 104, 108. The plaintiff was not notified of the other three meetings. Further the meetings that were excused were counted against her and used to justify her transfer. Deny that the plaintiff claimed to have chest pains, the plaintiff did have chest pains. Defendants' Exhibit A, pp. 104-106.**

9.      The Plaintiff's Supervisor, Mark Rudewicz attended the June 19, 2000 community meeting. After the meeting, Mark Rudewicz was approached by one of the community residents, Jackie Fongemie, who advised Mark Rudewicz that she and other members of the community were dissatisfied with the Plaintiff's job performance as their CSO. Exhibit B, at Tab 2 (City of Hartford Interdepartmental Memorandum from Mark

3

Rudewicz to Manzi dated June 27, 2000).

**Deny, a community member had complained that the plaintiff was spending too much time at the Zion St community service building and was not attending community meetings. Deposition of Manzi, at 86. Ms. Fongemie never made a written complaint and no other community member came forward and complained about the plaintiff.  Id.**

10.    In response to the foregoing complaints from the community that the Plaintiff served, on June 27, 2000, Mark Rudewicz conducted a brief investigation and determined that the Plaintiff's patrol car was parked outside her office for the first three hours or so of her shift. Exhibit B, at Tab 3 (City of Hartford Interdepartmental Memorandum from Mark Rudewicz to Manzi dated June 28, 2000).

**Admit, in part that Manzi and Sergeant Rudewicz observed the plaintiff's cruiser, however, neither Manzi nor Sergeant Rudewicz asked the plaintiff if she had parked the cruiser at the community center so that she could canvas the neighborhood on foot. Deposition of Manzi, at 106-107. Neither Manzi nor M Rudewicz checked the activity log to see if she had parked her cruiser and walked around the neighborhood. Deposition of Manzi, at 106-107. At the same time that Lt. Manzi and Sergeant Rudewicz observed the plaintiff's cruiser at the community center there were two other officers' cruisers parked with the plaintiff's cruiser and those officers were not investigated or questioned for**

4

**parking at the building. Deposition of Manzi, at 243-4. The community center is the location where the plaintiff checked and responded to her voice mail, provided quality of life enforcement and effectuated radar. Defendants Exhibit A, pp. 60-62.**

11.  On or about June 29, 2000, Mark Rudewicz had a counseling session with the Plaintiff. The purpose of the counseling session was to advise the Plaintiff of the apparent deficiencies in her performance, and give her the opportunity to response and formulate a plan of action for improvement. Exhibit B, at Tab 3; Exhibit A, pp. 60-63.

**Deny, that it was a counseling session. Rudewicz, as testified to by the plaintiff, "in a very hostile environment, brought me into his office. He was very demeaning and made all for these allegations against me with no name on the complaints. And he insulted me and demeaned me." Defendants Exhibit A, pp. 60-61. Sergeant Rudewicz raised his voice at the plaintiff during the meeting. Defendants Exhibit A, pp. 63. Neither Sergeant Rudewicz nor Lt. Manzi told the plaintiff that the meetings were on Monday evenings, Defendants Exhibit A, pp. 79. Neither Sergeant Rudewicz nor Lt. Manzi told the plaintiff that she was having work performance problems between June 29, 2000 and October 16, 2000. Defendants Exhibit A, pp. 78.**

12.  At the conclusion of her June 29th meeting with Mark Rudewicz, the Plaintiff handed in the keys to her office and stated that she would be submitting a Request for

Reassignment by the end of the day.  Exhibit B, at Tab 3; Exhibit A, pp. 75-76.

**Admit. The plaintiff submitted a transfer request because: "I felt very demeaned, and that's why I initiated the transfer." Defendants Exhibit A, pp. 73.**

13.     The Plaintiff submitted a voluntary Request for Reassignment dated June 29, 2000, which requested reassignment from the Community Response Division to the Patrol Division.   Declaration of Colleen Kenton, attached as "Exhibit C", at Tab 1 (Request for Reassignment dated June 29, 2000).

**Admit. The plaintiff submitted a transfer request because: "I felt very demeaned, and that's why I initiated the transfer," Defendants Exhibit A, pp. 73, "because of the  allegations and the demeaning hostile environment." Defendants Exhibit A, pp. 75.**

14.     The Plaintiff ultimately decided not to pursue the request for reassignment.  Exhibit A, p. 77.

**Admit, the plaintiff decided to stay in the CSO position because: "I was committed to the neighborhood. I love my job. I wanted to continue to serve the residents in the southwest area. Defendants Exhibit A, pp. 75.**

15.     On October 16, 2000, the Plaintiff failed to appear in court in response to a subpoena. Exhibit B, at Tab 4 (Report of Disciplinary Infraction dated October 17, 2000); Exhibit A, p. 94.

**Admit.**

6

16.     The Plaintiff was disciplined for her failure to appear in court on October 16th and her
        failure to attend the community meeting held on that same date.  Said discipline
        consisted of two counts of "negligent failure to comply with lawful orders, procedures,
        or directives, written or oral," pursuant to Article 5, Section 5.08 of the HPD Code of
        Conduct.  Exhibit B, at Tab 4; Exhibit B, at Tab 5 (Report of Disciplinary Infraction
        dated October 18, 2000).

17.     The Chief of Police is the official responsible for assigning and transferring personnel
        within the HPD.  Exhibit C, at Tab 2 (Collective Bargaining Agreement Between The
        City of Hartford and The Hartford Police Union, 7/1/99 to 6/30/04), Section 4.1.C;
        Declaration of Daniel Carey, attached hereto as Exhibit D, at Tab 1 (Charter of the City
        of Hartford), Chapter X, Section 2.

        **Admit, Chief Robert Rudewicz was the Chief at the time of the plaintiff's transfer.**

18.     The Assistant Chief of Police is empowered to assign and transfer employees in the
        Chief's absence.  Exhibit C, at Tab 3 (Job Description for Assistant Chief).

        **Admit, Assistant Chief Kevin Jones was the Assistant Chief at the time of the
        plaintiff's transfer.**

19.     On or about October 20, 2000, the decision to transfer the Plaintiff was communicated
        to her in a meeting that included Mark Rudewicz, Manzi and Captain Michael Fallon
        ("Fallon").  Chief Rudewicz was not present at this meeting.  Exhibit B, Tab 1, p. 4;
        Exhibit A, pp. 77-80, 127.

**Admit in part, that the plaintiff was told on October 20, 2000, that she would be transferred to patrol.**

20. As understood by Acting Chief Rudewicz, the decision to transfer the Plaintiff resulted from feedback Jones had received regarding the Plaintiff's performance issues, as well as complaints Jones had received from one or more members of the community that the Plaintiff served. Exhibit E, pp. 32-33.

**Deny, Sergeant Rudewicz had allegedly received one complaint from a citizen. Defendants 56(a)(1) Statement 9.**

21. The Plaintiff admits that, after being advised of her transfer, she stated, "I'm not going to sit here and listen to this bullshit." The Plaintiff further testified that she may have begun to cry and may also have used other profanity. Exhibit A, p. 82.

**Admit.**

22. On or about October 22, 2000, Jones, as the Acting Assistant Chief of the HPD, ordered that the Plaintiff be transferred from the Community Response Division to the Patrol Division. Chief Rudewicz did not sign off on, or otherwise approve the transfer. (Deposition of Robert Rudewicz dated October 1, 2003, attached hereto as "Exhibit E", pp. 28-29).

**Admit, in that Jones authorized the transfer and Rudewicz did not sign off on the transfer.**

8

23.    Acting Chief Rudewicz ("Chief Rudewicz") was absent on October 22, 2000.  Exhibit

E, p. 29.

**Admit.**

24.    The transfer from Community Response to Patrol entailed no decrease in salary or

benefits and no loss of promotional opportunities.  Exhibit A, pp. 7, 120.

**Deny that there was no loss of promotional opportunities. Plaintiff's Affidavit,**

**Exhibit 14.**

25.    The Plaintiff admitted that the title of CSO was, for all intents and purposes, the same

as that of CSO.  Moreover, the Plaintiff testified that her skills as a CSO were readily

transferable to her job as Patrol Officer.  Exhibit A, pp. 6-7, 11.

**Deny, the responsibilities as a front desk duty officer and CSO differ. Defendants**

**Exhibit A, p. 8, 11; Plaintiff's Affidavit, Exhibit 14.  The transfer made the**

**plaintiff feel: "[v]ery humiliated. Especially because I was doing just as good of a**

**job as the males in the division. And I was the only females in there." Defendants**

**Exhibit A, p. 150.**

26.    The Plaintiff does not claim that her transfer from Community Response to Patrol

resulted in any significant risk to her safety.  In fact, when pressed as to whether the

area she was initially assigned to was a rough area, the Plaintiff merely stated, "it can

be."  Finally, shortly after being transferred to Patrol, the Plaintiff was assigned to desk

duty. Exhibit A, pp. 8-9.

**Deny.  The transfer to patrol increased the risk to the plaintiff's safety. Plaintiff's affidavit, Exhibit 14.**

27.    On or about October 25, 2000, the Plaintiff forwarded a letter to Robert Rudewicz alleging that, during the meeting in which she was informed of her transfer, Manzi told her, "we need a younger guy more dynamic for this position."  The Plaintiff also requested that Robert Rudewicz conduct an investigation into these allegedly "discriminatory practices."  Exhibit B, at Tab 6 (Letter from Plaintiff to Robert Rudewicz dated October 25, 2000).

**Admit.**

28.    In response to the Plaintiff's request, Chief Rudewicz assigned Jones to investigate. Exhibit E, p. 21.

**Admit.**

29.    Jones performed a thorough investigation, which included submitting written interrogatories to those present at the meeting in question (Manzi, Fallon and Mark Rudewicz), as well as officer Thomas Hardwick, the union representative to whom the Plaintiff had also complained.  Exhibit B, at Tab 7 (City of Hartford Interdepartmental Memorandum from Jones to Bruce P. Marquis, Chief of Police dated January 16, 2001).

**Deny.  The investigation was not thorough as it did not investigate whether the transfer was discriminatory or improperly motivated by gender or age.  The investigation was not thorough or properly conducted because Acting Chief Jones**

10

**should not have been assigned to investigate the plaintiff's complaint because Acting Chief Jones was responsible for approving and assessing the transfer initially, thus making Acting Chief Jones a witness to the transfer and should himself been under investigation, and not the investigator. Deposition of Chief Rudewicz, at 30-32, 34-36. Deposition of Chief Rudewicz, at 38, lines 15-21.**

30.     As part of his investigation, Jones also met with Ms. Fongemie, the community resident who initially complained about the Plaintiff.  Exhibit B, at Tab 7.

     **Admit.**

31.     Jones' investigation concluded that the decision to transfer the Plaintiff was appropriately based upon performance concerns regarding the Plaintiff and was not arbitrary or discriminatory.  The investigation further concluded that the Plaintiff's allegation that Manzi told her that they "need a younger guy more dynamic" for the CSO position was unsubstantiated.  Exhibit B, at Tab 7.

     **Admit that Jones investigation did conclude that there was no substance to the plaintiff's complaint.  Deny that Jones investigated whether transfer was discriminatory or improperly motivated by gender or age. Deposition of Chief Rudewicz, at 30-32, 34-36. Deposition of Chief Rudewicz, at 38, lines 15-21.**

32.     The Plaintiff grieved her transfer through the fourth and final step of the grievance process at the State Board of Mediation and Arbitration ("the Board").  The Plaintiff's grievance was heard by a neutral and independent three member arbitration panel.  The

issue presented to the panel was whether the City of Hartford ("Hartford") discriminated against the Plaintiff on the basis of her gender and age in violation of the collective bargaining agreement between Hartford and the Hartford Police Union.  Exhibit C, at Tab 2, Section 2.1; Conn. Gen. Stat. Secs. 31-91 and 31-93; Exhibit C, at Tab 4 (State Board of Mediation and Arbitration Award dated September 6, 2002).

**Admit.**

33.    In its Arbitration award dated September 6, 2002, the Board ruled in favor of the City of Hartford ("Hartford") on the merits of the Plaintiff's discrimination claim, concluding that Hartford did not discriminate against the Plaintiff in violation of the Collective Bargaining Agreement between Hartford and the Police Union.  Exhibit C, at Tab 4.

**Admit.**

34.    On or about September 15, 1992, Charles Natitus ("Natitus"), a Lieutenant in the HPD, allegedly pulled the Plaintiff's hair.  In response, the Plaintiff obtained a union steward to make out a complaint of sexual harassment.  The Plaintiff also verbally warned Natitus not to touch her.  Exhibit A, pp. 27, 29.

**Admit.**

35.    Approximately three months later, Natitus allegedly pulled the Plaintiff's hair again.  In response, the Plaintiff got a union steward and filled out the necessary paperwork.  The Plaintiff sent the information regarding her sexual harassment complaints to James Meehan, who was at that time the Assistant Chief of the HPD.  Exhibit A, p. 27.

**Admit.**

36.   According to the Plaintiff, no action was taken with respect to her sexual harassment

complaints.  Exhibit A, p. 27.

**Admit.**

37.   The Plaintiff has never spoken to any of the Defendants in this lawsuit regarding the

sexual harassment complaints she lodged in 1992.  The Plaintiff has no evidence or

personal knowledge that any of the Defendants in this lawsuit were aware of the sexual

harassment complaints when the decision to transfer the Plaintiff was made in 2000.

Exhibit A, pp. 32–39.

**Deny, in that the plaintiff filed a grievance on the matter and as supervisors, the**

**defendants are aware of grievances filed against other officers. Defendants Exhibit**

**A, pp. 35-37.**

38.   The only "evidence" the Plaintiff has that the Defendants in this lawsuit were aware of

her prior sexual harassment complaints when the decision to transfer her was made in

2000 is the Plaintiff's opinion that "word" somehow "travels" at the HPD.  Exhibit A,

pp. 32-39.

**Deny, in that the plaintiff filed a grievance on the matter and as supervisors, the**

**defendants are aware of grievances filed against other officers. Defendants Exhibit**

**A, pp. 35-37.**

39.   As Police Chief, Rudewicz did not possess authority to establish personnel policy.

Exhibit D, at Tab 1, Ch. X, Section 2, Ch. XVI; Sections 2, 5, 6, 7; Ch. V, Section 3.

**Admit.**

40.     Rudewicz was authorized by the Charter to enact and enforce operational rules and

regulations only to the extent said actions were consistent with Hartford personnel

policy as established by the Council or Manager pursuant to their authority under the

Charter.  Exhibit D, at Tab 1, Ch. X, Sections 2, Ch. XVI; Exhibit C, at Tab 2, Section

1.5, 3.3.

**Deny, the Chief could enact policies and practices. Deposition of Ilg, Exhibit 10,**

**pp. 22-24.**

41.     Any rules enacted by the Police Chief are contained in the Rules and Regulations of the

Hartford Police Department, and include the Code of Conduct.  Exhibit D, at Tab 1, Ch.

X, Section 2; Exhibit C, at Tab 2, Section 3.3; Exhibit C, at Tab 5 (Code of Conduct).

**Admit.**

42.     Under the Charter, final policy making authority is generally vested with the Court of

Common Council ("Council") which is empowered to "provide by ordinance for the

organization, conduct and operation of the departments (including the HPD), agencies

and offices established by this charter."  Exhibit D, at Tab 1, Ch. II, Sections 7-8; Ch.

III, Section 14.

**Admit.**

43.     The Council enacts personnel policy through the adoption of ordinances (contained in

the "Municipal Code") or the approval of the rules adopted by Hartford's Personnel

Board ("Personnel Rules").  Exhibit D, at Tab 1, Ch. XVI, Sections 5(b), 5(c), 5(e);

Exhibit D, at Tab 2 (Municipal Code of the City of Hartford), Sections 1-1, 1-8; Exhibit

C, at Tab 6 (Personnel Rules and Regulations of the City of Hartford).

**Admit.**

44.     The Council has, by ordinance, adopted a policy protecting employee free speech and

other workplace rights.  Exhibit D, at Tab 2, Section 2-290.

**Admit.**

45.     The Council has, by ordinance, adopted a policy prohibiting discriminating against

individuals in the terms and conditions of their employment, including transfers, on the

basis of age and gender.  Exhibit D, at Tab 2, Section 2-696.

**Admit.**

46.     The Personnel Rules, as approved by the Council, "govern the appointment,

promotions, demotion, transfer, layoff, removal of such [classified] employees and

other incidents of City employment on the basis of merit and fitness."  Exhibit C, at Tab

6, Rule 1, Section 1(b).

**Admit.**

47.     The Personnel Rules prohibits discriminating against employees on the basis of age or

sex.  Exhibit C, at Tab 6, Rule 1, Section 1(b); Rule XIV, Section 4.

**Admit.**

48. The provisions of the Charter, Municipal Code, Code of Conduct and Personnel Rules

governed Plaintiff's treatment by virtue of the Police Contract and his status as a

"classified employee."  Exhibit C, at Tab 2, Section 3.3; Exhibit D, at Tab 1, Ch. XVI,

Section 7; Exhibit C, at Tab 6, Rule 2, Section 1.

**Deny that the plaintiff is a male.**

49. Rules enacted by the Chief that conflict with Hartford personnel policy contained in the

Charter, Municipal Code or Personnel Rules are given no force or effect.  Exhibit D, at

Tab 1, Ch. X, Section 2, Ch. XVI; Exhibit C, at Tab 6, Rule I, Section 2, Rule XIV,

Sections 4-6.

**Admit, in part, in that the Chief enacts policy that the department is subject to**

**even if it is in conflict. Deposition of Ilg, Exhibit 10, pp. 29-32.**

50. The City Manager ("Manager") is the chief executive officer for Hartford.  Exhibit D, at

Tab 1, Ch. V, Section 3.

**Deny. The Mayor is the CEO for Hartford. Deposition of Ilg, Exhibit 10, pp. 10-12.**

51. The Manager, rather than the Police Chief, is responsible to the Council for the

administration of the HPD because the Police Chief is not appointed by the Council or

elected by the citizens.  Exhibit D, at Tab 1, generally, Ch. V, Sections 3, 4, 6.

**Deposition of Ilg, Exhibit 22, pp. 9-13.**

16

52.    The Manager directly supervises the Police Chief, and may appoint, remove and

discipline the Chief.  Exhibit D, at Tab 1, Ch. V, Sections 3, 4 and 6).

**Admit.**

53.    Plaintiff is a member of the Hartford Police Union (the "HPU"), which is the collective

bargaining unit representing Hartford Police Officers.  Exhibit C, at Tab 4; Exhibit C, at

Tab 2, Section 1.1.

**Admit.**

54.    The Manager is empowered to enact personnel policy pertaining to HPU members

through negotiation and execution of the collective bargaining agreement between

Hartford and the HPU (the "Police Contract").  Conn. Gen. Stat. § 7-474; Exhibit C, at

Tab 2, Sections 1.1 and 1.5; Exhibit D, at Tab 2, Ch. V, Sections 3, 6.

**Admit.**

55.    The Police Contract acknowledges that the right to establish personnel policy pertaining

to HPU members remains with the Council and Manager under Hartford's Charter.

Exhibit C, at Tab 2, Section 1.5; Exhibit D, at Tab 1, Sections 7, 8.

**Admit**

56.    The Police Contract as negotiated and executed by the Manager expressly requires

adherence to those provisions of the Municipal Code, the Personnel Rules, and the

Rules and Procedures of the Hartford Police Department, including the Code of

Conduct, which are not otherwise superceded by the terms of the Police Contract.

17

Exhibit C, at Tab 2, Section 3.3; Exhibit C, at Tab 5.

**Admit.**

57.    The Police Contract as negotiated and executed by the Manager incorporates the Police

Officer's Bill of Rights ("Bill of Rights").  Exhibit C, at Tab 2, Appendix A, Section 5,

p. 41.

**Admit.**

58.    The Police Contract mandates that the provisions thereof shall be applied equally to all

employees "without discrimination because of age [or] sex".  Exhibit C, at Tab 2,

Section 1.7.

**Admit.**

59.    The Police Contract mandates that "Police Officers shall enjoy all legal rights

guaranteed under the Constitution of the United States and the State of Connecticut and

any other federal or state statutes."  Exhibit C, at Tab 2, Appendix A, Section 5, p. 41.

**Admit.**

60.    The Chief may discipline or otherwise remove employees from regular duty only in

accordance with the provisions of the Police Contract and incorporated provisions of

the Charter, Personnel Rules, and the Rules and Regulations of the HPD (including the

Code of Conduct).  Exhibit C, at Tab 2, Sections 2.2 and 3.3.

**Admit.**

61.    The Police Contract mandates that subject employees shall not be suspended, discharged, demoted, disciplined or otherwise involuntarily removed from regular duty except for "just cause", which includes unfitness for duty.  Exhibit C, at Tab 2, Section 2.2, Memorandum of Understanding, at p. 62.

**Admit.**

62.    Rudewicz was not free under the Police Contract to treat the Plaintiff in a manner inconsistent with the provisions of the Charter, Personnel Rules, Rules of Regulations of the HPD (including the Code of Conduct), the Drug Policy or the Police Officer's Bill of Rights.  Exhibit C, at Tab 2, Sections 1.7, 3.3 and 6.7, Appendix A, Section 5, p. 41.

**Admit.**

63.    The Police Contract prohibits supervisors from utilizing arbitrary or abusive action in personal disputes and affairs or from issuing unlawful orders.  Exhibit C, at Tab 2, Section 3.3; Exhibit C, at Tab 5, Sections 2.10, 4.02, 10.02 and 10.07.

**Admit.**

64.    The Police Contract prohibits the intentional deprivation of an employee's constitutional rights.  Exhibit C, at Tab 2, Appendix A, Section 5, p. 41 .

**Admit.**

**65.**    The Police Contract also prohibits the taking of discriminatory acts towards fellow

employees.  Exhibit C, at Tab 2, Sections 1.7,3.3; Exhibit C, at Tab 5, Rule 12.03.

**Admit.**

66.   The Police Contract provides for a grievance process which is applicable to "any

grievance or dispute which may arise between the parties concerning the application,

meaning or interpretation of this Agreement".  Exhibit C, at Tab 2, Article II, Section

2.1.

**Admit.**

67.   Plaintiff was entitled under the Police Contract to grieve her transfer to the extent it was

discriminatory or otherwise in violation of the Police Contract.  Exhibit C, at Tab 2,

Sections 1.7, 2.1, 2.2, 3.1, 3.3, Appendix A, Section 5, p. 41.

**Admit.**

68.   Step 3 of the grievance procedure empowers the Personnel Director to hear and decide

any grievances not settled by Step 1 and Step 2, or those grievances which originate at

Step 3.  Exhibit C, at Tab 2, Section 2.1.

**Admit.**

69.   Either an employee or the Union may file and pursue grievances through Step 3.

Exhibit C, at Tab 2, Section 2.1.

**Admit.**

70.   Hartford is bound by the decision of the Personnel Director on grievances submitted to

him or her at Step 3.  Exhibit C, at Tab 2, Section 2.1.

**Admit.**

**UNITED STATES DISTRICT COURT**

**DISTRICT OF CONNECTICUT**


| | | |
|---|---|---|
| **ANN CODY,** | : | **CIVIL ACTION NO.** |
| **Plaintiff,** | | **3:02CV1789(SRU)** |
| | : | |
| **v.** | | |
| | : | |
| **CITY OF HARTFORD, et al.** | | |
| **Defendants.** | : | **JULY 22, 2004** |


<u>**PLAINTIFF'S MATERIAL FACTS IN DISPUTE**</u>


1.    In December, 1983, the plaintiff was hired by the Hartford Police Department as a

Police Officer. Plaintiff's Affidavit, Exhibit 14, ¶ 2.

2.    The plaintiff was assigned to the Community Response Division as a Community

Service Officer ("CSO") in 1993.  Plaintiff's Affidavit, Exhibit 14, ¶ 3.

3.    On December 18, 1992, the plaintiff filed a Hartford Police Union grievance for

sexual harassment.  Plaintiff's Affidavit, Exhibit 14, ¶ 4.

4.    Lt. Manzi was the plaintiff's supervisor when he became the commander of

Community Response Division (hereinafter "CRD") in January, 2000. Deposition of

Manzi, at 78.

5.    When Manzi became commander of CRD in January 2000, the plaintiff was the

only female Community Service Officer (hereinafter "CSO") under Manzi's

supervision until the day she was transferred and then there were no female CSOs.

Deposition of Manzi, at 78; Deposition of Chief Rudewicz, at 94.

6.    The CSO position's responsibilities include working with the community, attending

community meetings as needed and serving as a communications conduit between

the community and the police department.  The position allowed for a variation in

the schedule to accommodate the positions needs. Exhibit 6.

7.    Sergeant Mark Rudewicz was the plaintiff's Sergeant in the CRD in 2000.

Deposition of Manzi, at 78.

## I.   THE PLAINTIFF'S WORK HISTORY IN A MALE DOMINATED FIELD

8.    The plaintiff's work was not called into question until one year prior to the transfer

when Sergeant Rudewicz became her supervisor. Plaintiff's Affidavit, Exhibit 14, ¶

5.

23

9.      As the only female CSO, the plaintiff answered 2,537 calls for service in 1999 and

2000. Exhibit 8.  Out of 67 CSOs only five (5) CSOs responded to more calls than

the plaintiff.  Exhibit 8.

10.     In 1999 and 2000, there were 67 CSOs and only 8 were females in both the North

Police Service Area and South Police Service Area.  Exhibit 8.

11.     At the time of the transfer the plaintiff was over forty (40) years old.  Plaintiff's

Affidavit, Exhibit 14, ¶ 25.

**II.      LT. MANZI AND SRGT. RUDEWICZ'S INVESTIGATION INTO THE
         PLAINTIFF.**

12.     On June 27, 2000, Sergeant Rudewicz reported to Manzi that a community member

had complained that the plaintiff was spending too much time at the Zion St

community service building and was not attending community meetings. Deposition

of Manzi, at 86. Exhibit 1, (C-7).  The report from Sergeant Rudewicz to Lt. Manzi

was dated on June 27, 2000 but reported an event that occurred at a June 19, 2000

meeting. Exhibit 1, (C-7).

13.     In a memorandum dated June 28, 2000, Sergeant Rudewicz again reported to Lt.

Manzi that he had observed the plaintiff at Zion Street for an extended time.  In the

memo, Sergeant Rudewicz further stated that he had met with the plaintiff on June

29, 2000, although the memo was dated June 28, 2000. Exhibit 1, C-7)

14.     Lt. Manzi ordered Sergeant Rudewicz to investigate the complaint. Deposition of

Manzi, at 88.

15. As part of Sergeant Rudewicz's duties as Sergeant he was to prepare inspectional activity reports. Deposition of Manzi, at 88.

16. If Sergeant Rudewicz had properly conducted the inspectional activity reports then he could have prevented a community complaint against the plaintiff because he would have known that the plaintiff had not attended the community meeting. Deposition of Manzi, at 88-89.

17. Manzi and Sergeant Rudewicz claim that they investigated the citizen complaint against the plaintiff by observing the plaintiff's cruiser parked at one location for two hours. Deposition of Manzi, at 101. Neither Manzi nor Sergeant Rudewicz asked the plaintiff if she had parked the cruiser at the community center so that she could canvas the neighborhood on foot. Deposition of Manzi, at 106-107. Neither Manzi nor M Rudewicz checked the activity log to see if she had parked her cruiser and walked around the neighborhood. Deposition of Manzi, at 106-107.

18. At the same time that Lt. Manzi and Sergeant Rudewicz observed the plaintiff's cruiser at the community center there were two other officers' cruisers parked with the plaintiff's cruiser and those officers were not investigated or questioned for parking at the building. Deposition of Manzi, at 243-4.

19. Manzi and Sergeant Rudewicz did inspectional activity reports of the plaintiff

including checking on how long her cruiser had been parked outside the Community

Center, checking on whether the plaintiff had properly cleared herself at a school

traffic post and they attended community meetings to check on whether she had

attended but did not do this for other officers who had missed community meetings

and Manzi admitted that he would not do such an investigation on the other guy

CSOs. Deposition of Manzi, at 237, 238, lines 9-16.

### III.          COMMUNITY MEETINGS

20.     The plaintiff did not attend a community meeting in July at Behind the Rocks but no

one called her to tell her about the meeting. Deposition of Manzi, at 110.

21.     The plaintiff often had Sunday and Monday as days off which would frequently

coincide with the community meetings. Defendants Exhibit A, pp. 13.

22.     Manzi and Sergeant Rudewicz attended the July meeting to check up on the

plaintiff. Deposition of Manzi, at 115-116.

23.     Neither Manzi nor Sergeant Rudewicz  notified the plaintiff that she would be

transferred if she did not improve her performance Deposition of Manzi, at 134, l

19-23.

24.     The plaintiff missed the traffic court appearance on October 16, 2000 and stated that

she forgot about it but it was the first time in seventeen (17) years that she had

missed a court appearance. Exhibit 1 (C-6).

25.     The Plaintiff was excused from attending the May 17, 2000 the September 18, 2000

community meetings. Deposition of Manzi, at 231-2.The meetings that were

excused were still counted against her and used to justify her transfer. Deposition of

Manzi, at 231-2, and Manzi in his response to interrogatory questions as part of the

Internal Affairs investigation conducted by Assistant Chief Jones, Manzi states that

the plaintiff missed seven (7) meetings, which was not true. Exhibit 1, (C-3).

**IV.        DISCIPLINE LEADING UP TO TRANSFER**

26.     On October 17, 2000, Sergeant Rudewicz issued an oral reprimand against the

plaintiff for failing to attend a court appearance on October 16, 2000, which was

authorized by Chief Rudewicz on October 23, 2000. Exhibit 9.

27.     On October 18, 2000, Sergeant Rudewicz issued an oral reprimand against the

plaintiff for allegedly failing to attend a Problem Solving Meeting on October 16,

2000, which was authorized by Chief Rudewicz on October 23, 2000. Exhibit 9.

28.     The written discipline that the plaintiff received for missing the October 16, 2000

meeting was prepared after she was transferred. Deposition of Manzi, at 222. The

plaintiff received discipline for missing the court date and the community meeting

on October 16, 2000, however, she received the written discipline after she had been

27

transferred and it was the first written discipline she had received for missing any meeting.  The written discipline for missing the court appearance was the first time she had missed a court appearance in seventeen years. Deposition of Chief Rudewicz, at 108. Deposition of Manzi, at 224 The plaintiff had not received any discipline for the four other meetings she had missed. Deposition of Manzi, at 227.

**V.        THE TRANSFER**

29.    On October 20, 2000 the plaintiff was called to the Community Response Division by Sergeant Mark Rudewicz and was informed that they were going to meet with Lieutenant Manzi in his office.  Plaintiff's Affidavit, Exhibit 14, ¶ 6. Defendants Exhibit A, pp. 80.

30.    No one told the plaintiff what the meeting was about and did not afford the plaintiff to get a union steward because she did not know that the purpose of the meeting was to transfer her to patrol. Defendants Exhibit A, pp. 81.

31.    Lt. Manzi "advised me that I was being transferred because, A, the missed community meeting and the traffic subpoena. And I explained to him—justified my actions and what happened. And Manzi stated we know your home life is very important. We really need a younger guy more dynamic … for this position." Defendants Exhibit A, pp. 80.

32.    Present at this meeting were the plaintiff's supervisors, Sergeant Rudewicz,

28

Lieutenant Manzi, Captain Fallon and the plaintiff. Plaintiff's Affidavit, Exhibit 14,

¶7.

33.     During the meeting the plaintiff was informed that she was being transferred from

the Community Response Division to the Patrol Division, effective October 29,

2000. Plaintiff's Affidavit, Exhibit 14, ¶ 16.

34.     The Community Response Division was a coveted position in the Department.

Plaintiff's Affidavit, Exhibit 14, ¶ 17.

35.     During the meeting on October 20, 2002, Manzi told the plaintiff that she was being

transferred and that he wanted a "younger guy more dynamic" for the CSO position.

Plaintiff's affidavit, Exhibit 14, ¶ 18.

36.     The plaintiff was emotionally distraught upon learning of the transfer and felt

intimidated by the presence of her three male supervisors who were commenting on

her inability as an older female to properly perform the job as a CSO. Plaintiff's

affidavit, Exhibit 14, ¶ 19.

37.     Manzi admitted at his deposition that he told the plaintiff on October 20, 2000, that

"we need a newer officer for this position" and that the CSO position "will be

designed for the newer officer". Deposition of Manzi, at 146, 211-212, lines 7-10.

Exhibit 1(C-3).

38.     In response to interrogatory questions as part of the Internal Affairs investigation

29

conducted by Assistant Chief Jones, Sergeant Rudewicz stated that Lt. Manzi told

the plaintiff that the CSO position is designed for "newer officers". EXHIBIT 1 (C-

3).

39.    As set forth in interrogatory responses as part of the Internal Affairs investigation

conducted by Assistant Chief Jones, Officer Thomas Hardwick, the union

representative for the plaintiff, stated that he approached Lt. Manzi and asked him if

he had said "we need a younger guy more dynamic for the position", without telling

Lt. Manzi that the quote pertained to the plaintiff, and Lt.  Manzi asked if Hardwick

had spoken to Ann Cody. Exhibit 1, (C-5). Defendants Exhibit A, pp. 88-89.

40.    Manzi testified at his deposition that Captain Fallon told the plaintiff on October 20,

2000, that she was being transferred for the good of the organization. Deposition of

Manzi, at 143.

**VI.    INVESTIGATION INTO THE TRANSFER AND MANZI'S CONDUCT**

41.    The plaintiff filed a grievance for her involuntary transfer to patrol and for the

conduct of Lt. Manzi and Sergeant Rudewicz. Exhibit 2.

42.    On October 25, 2000, the plaintiff requested that Acting Chief Robert Rudewicz

investigate the discriminatory practices which occurred at the October 20, 2000

meeting, including the transfer to Patrol and the comments made by Lt. Manzi

indicating that age and gender were the reason for the transfer. See Exhibit 1 (C-1).

In the plaintiff's complaint and request for an investigation by Chief Rudewicz, she stated that Lt. Manzi had told her that "We need a younger guy more dynamic for this position." Id.

43. The next day, on October 26, 2000, the plaintiff was driving to work when she suffered severe stress induced chest pains that resulted in her treatment at St. Francis' Hospital and a medical leave from work for two weeks. Exhibit 13.; Plaintiff's Affidavit Exhibit 14, ¶ 24.

44. Chief Rudewicz directed Assistant Chief Jones to investigate the plaintiff's complaint even though Jones had authorized the plaintiff's transfer. Deposition of Chief Rudewicz, at 30-32, 34-36.

45. Chief Rudewicz did not direct Assistant Chief Jones to investigate whether the plaintiff's transfer was discriminatory and did not direct anyone else to investigate whether the transfer was legitimate because he assumed the transfer itself was proper. Deposition of Chief Rudewicz, at 33-36.

46. Chief Rudewicz directed Assistant Chief Jones to investigate the complaint even though Jones was a witness. Deposition of Chief Rudewicz, at 38, lines 15-21.

47. Assistant Chief Jones told Chief Rudewicz that the plaintiff was transferred because she missed too many meetings. Deposition of Chief Rudewicz, at 101.

48. Two days later, on October 27, 2000, Acting Chief Robert Rudewicz cited the

31

plaintiff in an interdepartmental memorandum for recognition of excellent

performance in the Community Response Division. Deposition of Chief Rudewicz,

at 112. Exhibit 12.

49.     Approximately one week before the plaintiff's transfer, Chief Rudewicz singled out

the plaintiff at a CRD meeting for doing a good job as a CSO. Defendants Exhibit

A, pp. 124.

50.     The plaintiff was recognized on October 24, 2000, by the Honorable Raymond

Norko for her hard work and commitment to enforcing "quality of life" crimes.

Exhibit 12.

**VII.    CREDIBILTY ISSUES OF LT. MANZI AND SERGEANT RUDEWICZ**

51.     Lieutenant Manzi admits to lying to a Hartford Police Lieutenant in 1995.

Deposition of Manzi, p. 9, 112-19.

52.     Lieutenant Manzi has committed perjury in a federal criminal case, USA v.

Reynaldo Arroyo, 3:03CR179(SRU). EXHIBIT 16.

53.     Lieutenant Manzi's perjury resulted in a reversal of a guilty jury verdict in a federal

criminal case, USA v. Reynaldo Arroyo, 3:03CR179(SRU). EXHIBIT 15.

54.     Manzi knows that it is illegal to single out and discriminate against an officer based

upon age or gender. Deposition of Manzi, at 238-9.

55.     Chief Rudewicz and Sergeant Rudewicz are cousins. Deposition of Chief Rudewicz,

32

at 9, 10, 23.

56.     On July 26, 2000, Lt. Manzi was in a motor vehicle accident which was found to be

chargeable by the Review Board and he was found to have violated the code of

conduct Exhibits 3, 7.

57.     Lt. Manzi was charged with the commission of a crime on January 19, 2001.

Exhibit 5. The criminal charges stemmed from a complaint by Cheryl Lynch a

resident of Columbia, CT, who was intimidated and harassed by both Lt. Manzi and

Sergeant Rudewicz on September 13, 2000.  Lt. Manzi and Sergeant Rudewicz stole

her horse and harassed her at her home.  Ms. Lynch's allegations against Manzi and

Sergeant Rudewicz include: " I have found witnesses that during the day of 9/13/00,

Manzi and Rudewicz visited 17 frmas (in uniform in my area, showing a picture of

myself and this horse telling people I had 'stolen a horse!' Lt. Manzi has also called

me at my home, harassing and threatening me. Prior to 9/13/00, Lt. Manzi had full

knowledge and acknowledged  that this horse had been given to me by Sgt.

Hammick and Capt. Jones.  Therefore he knowingly and blatantly lied on 9/13/00 in

an effort to exact a personal vendetta against me and to slander my reputation."

Exhibit 21.

58.     Sergeant Rudewicz would make offensive comments to the plaintiff such as : "when

are getting married." Defendants Exhibit A, pp. 64.

59. Sergeant Rudewicz was in control of approving overtime to the CSOs and would

   deny the plaintiff's request to accommodate her schedule so that she could earn

   overtime but he would accommodate the male CSOs' schedules. Defendants Exhibit

   A, pp. 66-67.

60. Prior to Sergeant Rudewicz becoming her supervisor in 1999, the plaintiff did not

   have difficulty earning overtime. Defendants Exhibit A, pp. 69.

61. The only other CSO female, Holly Donahue, who was assigned to the canine

   division was also denied overtime by Sergeant Rudewicz and Lt. Manzi. Defendants

   Exhibit A, pp.70-71.

62. Several months prior to the plaintiff's transfer, Sergeant Rudewicz told a male

   officer that he was going to transfer the plaintiff out of the South P.S.A. so that the

   male officer could take her place. Defendants Exhibit A, pp. 127.

63. The plaintiff was transferred so that Officer Castagna could replace her so that

   Castagna would not have to work the foot beat when the new Chief (Marquis)

   started. Defendants Exhibit A, pp.139-141.  The plaintiff was targeted so a male

   officer could replace her. Id.


64. The vacancy for the plaintiff's position was not posted and Officer Castagna was

verbally offered the position. Defendants Exhibit A, pp. 142.

## VIII.  CHIEF ROBERT RUDEWICZ'S INVOLVEMENT

65.   Chief Rudewicz made the decision to transfer the plaintiff. Deposition of Manzi, at 210.

66.   Chief Rudewicz did not direct Assistant Chief Jones to investigate whether the plaintiff's transfer was discriminatory and did not direct anyone else to investigate whether the transfer was legitimate because he assumed the transfer itself was proper. Deposition of Chief Rudewicz, at 33-36.

67.   Chief Rudewicz directed Assistant Chief Jones to investigate the complaint even though Jones was a witness. Deposition of Chief Rudewicz, at 38, lines 15-21.

68.   Chief Rudewicz knows that it is illegal to single out and discriminate against an officer based upon age or gender. Deposition of Chief Rudewicz, at 19, 20, 103.

69.   Officer Mark Castagna replaced the plaintiff in her CSO position.  Officer Castagna is younger and a male. Exhibit 4. Officer Castagna had a serious disciplinary history including a 120 day suspension in 1999 and violations of the Code of Conduct on October 4, 17,1996. Exhibit 4.

70.   The last time Lt. Manzi had received sexual harassment training was in 1993.

35

Exhibit 19.  The last time Sergeant Rudewicz had received sexual harassment

training was in 1994. Exhibit 20.


                              THE PLAINTIFF
                              ANN CODY


          BY: _____
                    Erin I. O'Neil
                    Brewer & O'Neil, LLC
                    818 Farmington Avenue
                    West Hartford, CT 06119
                    (860)523-4055
                    Federal Bar #ct 23073

37